**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ARKANSAS DAIRY COOPERATIVE ASSOCIATION, INC. P.O. Box 507 Damascus, AR 72039 ) ) ) ) ) | CIVIL CASE NO. |
| and ) ) | JUDGE |
| CENTRAL SANDS DAIRY, LLC (A Wisconsin Limited Liability Company) N15927 Hwy G Nekoosa, WI 54457 ) ) ) ) ) | [EXPEDITED ORAL HEARING REQUESTED] |
| and | |
| COLUMBIA RIVER DAIRY, LLC 75906 Threemile Rd. Boardman, OR 97818 | |
| and | |
| CONTINENTAL DAIRY PRODUCTS, INC. 320 W. Hermosa Street Artesia, NM 88210 | |
| and | |
| DAIRY PRODUCERS OF NEW MEXICO P.O. Box 6299 Roswell, NM 88202 | |
| and | |
| LONE STAR MILK PRODUCERS, INC. | |

1

217 Baird Lane                                      )
Windthorst, TX 76389                                )
                                                    )
and                                                 )
                                                    )
MARYLAND AND VIRGINIA MILK                          )
PRODUCERS COOPERATIVE ASSOCIATION                   )
1985 Isaac Newton Square West                       )
Reston, VA 20190-5094                               )
                                                    )
and                                                 )
                                                    )
SELECT MILK PRODUCERS, INC.                         )
320 W. Hermosa Street                               )
Artesia, NM 88210                                   )
                                                    )
and                                                 )
                                                    )
UNITED DAIRYMEN OF ARIZONA                          )
2008 S Hardy Dr                                     )
Tempe, AZ 85282                                     )
                                                    )
and                                                 )
                                                    )
ZIA MILK PRODUCERS, INC.                            )
400 East College                                    )
Roswell, NM 88202                                   )
                                                    )
        --PLAINTIFFS,                               )
                                                    )
        V.                                          )
                                                    )
UNITED STATES DEPARTMENT OF                         )
AGRICULTURE                                         )
1400 Independence Ave., SW                          )
Washington, DC 20250                                )
                                                    )
        --DEFENDANT.                                )

## COMPLAINT FOR DECLARATORY RELIEF AND
## TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiffs Arkansas Dairy Cooperative Association, Inc., Central Sands Dairy, LLC,

Columbia River Dairy, LLC, Continental Dairy Products, Inc., Dairy Producers of New Mexico,

Lone Star Milk Producers, Inc., Maryland and Virginia Milk Producers Cooperative Association, Select Milk Producers, Inc., United Dairymen of Arizona, and Zia Milk Producers, Inc.("Dairy Producers") for their Complaint state as follows:

## SUMMARY OF ACTION

1.      Dairy Producers seek declaratory and injunctive relief to prevent irreparable harm resulting from unlawful changes to the minimum price formulas used to determine prices paid to dairy farmers under the federal milk marketing orders.

2.      On July 31, 2008, the United States Department of Agriculture, ("USDA"), published a final decision that significantly reduces the prices dairy farmers receive under the milk marketing orders by an average of $0.32 per hundredweight of milk.   The USDA amendments are unlawful and must be set aside because the regulations do not, as a matter of law, conform to the Food, Conservation, and Energy Act of 2008, Pub. L. 110-246, Section 1504, the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. §§601 *et seq.* ("AMAA"); or to USDA's own rules. *See*; Proposed Rule; Tentative Partial Final Decision, 73 Fed. Reg. 35306 (June 20, 2008), ("Tentative Partial Final Decision"); Interim Order Amending the Orders, 73 Fed. Reg.44617 (July 31, 2008), ("Interim Order").   Attachments to this Complaint include (1) the Interim Order of July 31, 2008, (2) the relevant provisions of Pub. L. 110-246, and (3) the relevant provisions of 7 U.S.C. § 608c.

3.      USDA administers the federal milk marketing orders pursuant to limited authority under the AMAA.   Under the federal milk marketing orders, dairy farmers ("producers") receive minimum prices for their raw milk production sold to milk processors ("handlers").   The minimum prices are set by regulatory formulas issued pursuant to 7 U.S.C. § 608c which requires that USDA consider several factors in setting prices, including costs of feeds, energy and regional economic considerations.

3

4.  During the pendency of the challenged hearing, Congress enacted the Food, Conservation, and Energy Act of 2008 ("FCEA"). FCEA amended the AMAA to mandate the determination of monthly feed and fuel prices in each relevant marketing area and the consideration of whether or not to adjust make allowances in all hearings commencing before September 30, 2012. FCEA, § 1504, codified at 7 U.S.C. § 608c(17)(G). FCEA became effective on May 22, 2008.

5.  The Tentative Partial Final Decision constitutes the step in the rulemaking hearing process as contemplated by the FCEA wherein the requirements of making determinations and considerations of feed and fuel prices would be met.

6.  The Tentative Partial Final Decision and Interim Order must be enjoined because:

    a.  USDA has given only 22 days from the date of the final order (July 31, 2008) until it first becomes effective upon announcement of advance pricing factors (August 22, 2008) instead of the 30 days required by the APA and by agency rules;

    b.  USDA failed to consider factors mandated by the AMAA in order to establish producer prices, including direct consideration of the cost of feeds, feed availability and other regional economic factors;

    c.  USDA failed to consider the factors mandated by the Food, Conservation, and Energy Act of 2008, Section 1504(G), 7 U.S.C. § 608c(17)(G);

    d.  USDA has publicly acknowledged that there are insufficient facts underlying the pricing changes and has been forced to abandon or significantly alter its methods of computing make allowances in the face of such inadequacies;

    e.  USDA ignored the testimony of its own-commissioned researcher and expert that it was not necessary to include cost data for California plants in determining the appropriate make allowances;

4

f.    The decision is based upon speculation, unsworn evidence, improperly drawn inferences, unfounded conclusions and, as a result, is a decision that is arbitrary, capricious, and not in accordance with the law; and

g.    USDA has fully denied producers the right to participate in the hearing process because it has focused the formulas on make allowances (facts solely within the knowledge of the processors) and failed to arrive at sufficient knowledge to provide public information on the facts, has denied producers the right to have any say in the hearing on these issues, has allowed processors to say their costs have risen without showing that they have not also had higher margins of profits, and otherwise denied producers the right to participate in the hearing as provided by law.

7.    Accordingly, USDA has not complied with the terms of the AMAA and has issued a decision that is not in accordance with law and is otherwise arbitrary and capricious.

8.    Milk handlers are required to pay Dairy Producers at least the minimum milk prices established by USDA.  The challenged amendments will reduce these minimum prices by approximately thirty-two or more cents per hundred pounds of milk.  For all dairy farmers, USDA estimates this direct reduction in income to be $262 million in the first year after implementation and an average of $156 million per year for the next nine years.  For the Dairy Producers, the losses in the first month alone will exceed $6 million.

9.    Injunctive relief is needed now.  On Friday, August 22, 2008, at 10:00 A.M. Eastern Standard Time, USDA, through its agency Dairy Programs of the Agricultural Marketing Service, will announce the first of a series of scheduled minimum price announcements based upon the Interim Final Order.  Although those prices apply to milk to be marketed by Dairy Producers in September 2008, the *status quo* regarding dairy pricing will be altered to the detriment of Dairy Producers upon the announcement of prices. The entire dairy

industry will react to the announced price through contractual adjustments and delivery arrangements that will be binding.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337 as this action arises under the laws of the United States and because the complaint is based exclusively upon interpretation of federal law (to wit: Food, Conservation, and Energy Act of 2008 §1504; Agricultural Marketing Agreement Act, 7 U.S.C. §§ 601-674; Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*) and amendments to regulations issued by an agency of the United States (to wit: United States Department of Agriculture) claiming authority under those acts.

11.    This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* in order to settle an actual controversy between Dairy Producers and USDA involving an interpretation of federal law and regulations and the plaintiffs have a right to judicial review of agency action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

12.    Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 57, this Court can grant relief in addition to the declaration of rights.

13.    Venue in this Court is appropriate because USDA, an agency of the United States, is a Defendant, the Defendant can be found in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district. 28 U.S.C. §§ 115(a)(2), 1391(e).

## PARTIES

14.    Arkansas Dairy Cooperative Association, Inc. is a milk marketing cooperative organized under the laws of Arkansas.  Its members are located in the state of Arkansas, and its office is located at Damascus, Arkansas.  It markets the milk of its members in interstate commerce in the Appalachian, Southeast, Florida, Central and, occasionally, other Federal Milk

Marketing Orders and receives proceeds for the sale of its members' milk based upon the minimum prices established by USDA. The certain reduction in minimum prices that will result from the USDA amendments will reduce its members' income.

15.     Central Sands Dairy, LLC is a dairy producer that operates a dairy in Nekoosa, Wisconsin. The milk it produces on its farm is priced on formulas based upon the minimum prices established by the USDA for the Upper Midwest Milk Marketing Order and any changes to those formulas have a direct, penny for penny, impact on the prices received. The USDA amendments being challenged in this case will result in reduced income on the farm.

16.     Columbia River Dairy, LLC is a dairy producer that operates a dairy in Boardman, Oregon. The milk it produces on its farm is priced on formulas based upon the minimum prices established by the USDA for the Pacific Northwest Order and changes to those formulas have a direct, penny for penny, impact on the prices received. The USDA amendments being challenged in this case will result in reduced income on the farm.

17.     Continental Dairy Products, Inc. is a milk marketing cooperative organized under the laws of Ohio. Its members are located in the states of Ohio, Indiana, and Michigan. Its principal offices are located in Artesia, New Mexico. It markets the milk of its members in interstate commerce in the Appalachian, Mideast and Southeast Federal Milk Marketing Orders and receives proceeds for the sale of its members' milk based upon the minimum prices established by USDA. The certain reduction in minimum prices that will result from the USDA amendments will reduce its members' income.

18.     Lone Star Milk Producers, Inc. is a milk marketing cooperative organized under the laws of Ohio. Its members are located in the states of Texas, Oklahoma, Kansas, Missouri, Mississippi, Louisiana, Tennessee, Kentucky, New Mexico and Arkansas. Its offices are located in Windthorst, Texas. It markets the milk of its members in interstate commerce in

the Southwest, Appalachian, Southeast, Florida, Central and, occasionally, other Federal Milk Marketing Orders and receives proceeds for the sale of its members' milk based upon the minimum prices established by USDA. The certain reduction in minimum prices that will result from the USDA amendments will reduce its members' income.

19. Maryland and Virginia Milk Producers Cooperative, Inc. is a milk marketing cooperative. Its members are located in the states of Pennsylvania, Maryland, Virginia, West Virginia, North Carolina, South Carolina, Tennessee, Kentucky, and Ohio. Its principal offices are located in Reston, Virginia. It markets the milk of its members in interstate commerce in the Northeast, Appalachian, Mideast and Southeast Federal Milk Marketing Orders and receives proceeds for the sale of its members' milk based upon the minimum prices established by USDA. The certain reduction in minimum prices that will result from the USDA amendments will reduce its members' income.

20. Select Milk Producers, Inc. is a milk marketing cooperative organized under the laws of New Mexico. Its members are located in the states of New Mexico, Texas, Oklahoma, and Kansas. Its offices are located in Artesia, New Mexico. It markets the milk of its members in interstate commerce in the Southwest, Southeast and occasionally other Federal Milk Marketing Orders and receives proceeds for the sale of its members' milk based upon the minimum prices established by USDA. The certain reduction in minimum prices that will result from the USDA amendments will reduce its members' income.

21. United Dairymen of Arizona is a milk marketing cooperative organized under the laws of Arizona. Its members are located in the state of Arizona. Its offices are located in Tempe, Arizona. It markets the milk of its members in interstate commerce in the Arizona Milk Marketing Order, other Federal Milk Marketing Orders and California. The certain reduction in minimum prices that will result from the USDA amendments will reduce its

members' income.

22.    Zia Milk Producers, Inc. is a milk marketing cooperative organized under the laws of New Mexico. Its members are located in the states of New Mexico and Texas. Its offices are located in Roswell, New Mexico. It markets the milk of its members in interstate commerce in the Southwest Milk Marketing Order and occasionally other Federal Milk Marketing Orders. The certain reduction in minimum prices that will result from the USDA amendments will reduce its members' income.

23.    Each of the named marketing cooperatives is an "association of producers" certified to market milk on behalf of its members under the terms of Federal Milk Marketing Orders in accordance with 7 C.F.R. §§ 900.350-357. As a result, they are deemed "producers" under the various Federal Milk Marketing Orders and are entitled to receive all payments under, or in accordance with, said Federal Milk Marketing Orders, including the minimum uniform blend prices. Each of the named marketing cooperatives is a "cooperative association" as defined at 12 U.S.C. § 1141j(a) and referenced at 28 U.S.C. § 2412(d)(2)(B).

24.    Dairy Producers of New Mexico is a voluntary trade association of dairy producers located in New Mexico and West Texas. DPNM is the policy advocate for its member farmers. DPNM actively participated in the underlying rulemaking and offered alternatives that would have decreased, rather than increased make allowances and made other changes to the minimum price formulas. DPNM's members receive payments for their milk sales under the various federal milk marketing orders and will be directly and adversely impacted by the USDA amendments.

25.    Collectively the Plaintiff Dairy Producers market or represent producers who market in the aggregate over one billion pounds per month in all of the federal milk marketing orders. Their sales represent 40 to 80% of the milk marketed in the Appalachian, Florida, Southeast,

Southwest, and Arizona Milk Marketing Areas and various amounts in the other five marketing areas. Producers are located in 27 dairy producer states.

26.    Each and every Plaintiff named is subject to immediate, irreparable injury as a result of the USDA Interim Order, to wit: A permanent loss of income as a result of the illegal reduction in the minimum prices that plants will be required to pay as a result of the Interim Final Order.

### DESCRIPTION OF THE MINIMUM PRICE FORMULAS AND USDA AMENDMENTS

27.    The minimum prices which handlers must pay dairy producers are calculated based upon a codified regulatory formula which takes into account the market prices of dairy products and a factor called a "make allowance." The make allowance factor represents the cost manufacturers incur in making raw milk into one pound of finished product. The minimum prices for the various components of raw milk (fat, protein, solids-not-fat, and other solids) are calculated by multiplying these make allowance adjusted prices by the yield of finished product per unit of raw milk.

28.    The USDA amendments raise the make allowances in the formulas and consequently reduce the value of the component prices and the class prices which form the basis for what plants pay and producers receive. In other words, increases in make allowances decrease the prices paid to Dairy Producers for their milk.

29.    The AMAA mandates that any change in the formulas used to calculate minimum prices consider, ". . . the price of feeds, the available supplies of feeds, and other economic conditions which effect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order or amendment relates." 7 U.S.C. § 608c(18).

30. The FCEA amended the AMAA to include the following new section:

(G) MONTHLY FEED AND FUEL COSTS FOR MAKE ALLOWANCES. As part

of any hearing to adjust make allowances under marketing orders commencing prior

to September 30, 2012, the Secretary shall

(i) determine the average monthly prices of feed and fuel incurred by dairy

producers in the relevant marketing area;

(ii) consider the most recent monthly feed and fuel price data available; and

(iii) consider those prices in determining whether or not to adjust make allowances.

FCEA, § 1504, *codified at* 7 U.S.C. § 608c(17)(G), effective May 22, 2008.

## NEED FOR TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

31. The minimum prices for certain classes of milk (Class I and Class II skim milk) are announced on the last Friday before the 23rd of the month before the raw milk is received by the plants. 7 C.F.R. §1000.52.

32. Accordingly, USDA will compute and announce the minimum prices for Class I skim and butterfat and Class II nonfat solids on August 22, 2008 at 10:00 AM EST that will be applicable to milk marketed in September 2008.

33. Thus, implementation of the USDA amendments will take place on August 22, 2008 when USDA intends to announce the Class I and II prices effective for September 2008.

34. This implementation of the rule is less than thirty days as required by 5 U.S.C. §553 and agency rule, 7 C.F.R. 900.14. The shortened time has limited the time Dairy Producers have to seek judicial review of the USDA amendments in order to avoid implementation and the resulting irreparable harm.

35. The value of the milk sold under Class I and II in September using the prices announced

11

August 22 will be blended with the value of milk sold in September under Classes III and IV using prices separately announced on October 3. The result is a blended price that establishes what Dairy Producers will receive.

36.     Based upon the volume of milk marketed by Dairy Producers and USDA's own estimates of the financial impact of the USDA amendments, Dairy Producers will lose in excess of $6 million in September if the prices announced on August 22 and October 3 are allowed to go into effect as scheduled.

37.     USDA estimates the losses to producer income as a result of the USDA Amendments on all dairy producers nationwide to be $262 million dollars for the first year following implementation. USDA estimates that over a nine year period producer income will be reduced $1.4 billion.

38.     Due to the regulatory structure of the Federal Milk Marketing Orders, this loss of income cannot be recovered by judgment or otherwise and, if the higher make allowances are implemented, the income will be irretrievably lost. Once announced, the lower minimum prices cannot be re-announced at higher, corrected amounts. Neither this Court, nor any other Court could subsequently compel the third-party purchasers (handlers) of raw milk to pay additional money for milk purchased months before at prices then announced by the Secretary.

## FIRST CAUSE OF ACTION

### [Failure to Observe Proper Procedure Required By Law:

### Announcement of Decision Less Than 30 Days Before Taking Effect]

39.     In addition to all other averments in this Complaint, Dairy Producers state that the USDA has only provided 22 days from the date of the publication of the order until it takes effect when the Advanced Prices for Class I and Class II milk are announced.

40.    The APA requires that, "The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except . . . (3) as otherwise provided by the agency for good cause found and published with the rule." 5 U.S.C. §553(d)(3).

41.    USDA has provided that, "No marketing order shall become effective less than 30 days after its publication in the Federal Register, unless the Secretary, upon good cause found and published with the order, fixes an earlier effective date therefor." 7 C.F.R. 900.14(d).

42.    Here, USDA has articulated no reason to justify or excuse the shortened time from 30 days to 22 days.

43.    Dairy Producers are entitled to a Temporary and Preliminary Injunction delaying the implementation of the USDA Amendments until after September 1, 2008.

## SECOND CAUSE OF ACTION

### [Failure to Observe Proper Procedure Required By Law:

### Failing to Provide an Opportunity to Comment on the Tentative Final Decision]

44.    In addition to all other averments in this Complaint, Dairy Producers state that USDA issued a rule and ordered its implementation before receiving and considering comments as required by law.

45.    The APA requires that, "Before a recommended, initial, or tentative decision, or a decision on agency review of the decision of subordinate employees, the parties are entitled to a reasonable opportunity to submit for the consideration of the employees participating in the decisions (1) proposed findings and conclusions; or (2) exceptions to the decisions or recommended decisions of subordinate employees or to tentative agency decisions; and (3) supporting reasons for the exceptions or proposed findings or conclusions. 5 U.S.C. §557(c).

46.    The Tentative Final Decision uses, for the first time, a formula for setting make allowances for dry whey (using only data from the Cornell Program for Milk and Dairy Policy) and for

cheese (using only data from California Department of Food and Agriculture (CDFA)), neither of which were noticed or discussed at the hearing.

47.    The Tentative Final Decision incorporates values from a report by CDFA which was issued after the hearing record was closed and certified by the Administrative Law Judge.

48.    Both in the case of the new formulas and the data from CDFA, Dairy Producers never had notice of their use in time to comment as allowed by rule and law.

49.    Similarly, the FCEA provides timetables for rulemaking and provides for a recommended decision on a proposed amendment to an order to be issued not later than 90 days after the deadline for the submission of post-hearing briefs. It makes no provision for a tentative decision and interim final rule.

50.    According to the "USDA Agricultural Marketing Service (AMS) Economic Analysis, Class III and IV Pricing Formulas Tentative Partial Final Decision" which accompanied the Decision and was referenced therein, the pricing formulas were known prior to March 2008 when the report was published.

51.    The hearing record and exceptions closed on September 14, 2007.

52.    The USDA has failed to explain how there is an emergency requiring omission of a recommended decision and acceptance of comments before implementing a rule when it waited 280 days from completion of record until implementation, and three months from making the decision until it was published.

53.    The USDA has otherwise not articulated any legally sufficient reason to justify or excuse the implementation of the Interim Rule prior to receiving and ruling on comments.

54.    Dairy Producers are entitled to a Temporary and Preliminary Injunction delaying the implementation of the USDA Amendments until after an opportunity for comments has been allowed, comments have been filed, and the Secretary has issued a decision following

14

consideration of the comments.

### THIRD CAUSE OF ACTION

**[Failure to Make Required Determinations and Considerations**

**Relating to Prices of Dairy Feed and Fuel]**

55.  In addition to all other averments in this Complaint, Dairy Producers state that the USDA issued a rule without complying with the amendments to the AMAA ordered by FCEA.

56.  The AMAA requires that as part of any hearing that adjusts make allowances commencing before September 30, 2012 USDA determine the monthly prices of feed and fuel and consider those prices in adjusting make allowances.  7 U.S.C. § 608c(17)(G),  FCEA § 1504(G).

57.  The current hearing commenced prior to September 30, 2012 and the decision was issued after FCEA became law.

58.  USDA failed to determine the average monthly and recent monthly prices of feed and fuel incurred by dairy producers in the marketing areas or consider those prices in deciding whether or not to adjust make allowances.  USDA stated such factors were not relevant to its decision.

59.  Dairy Producers are entitled to a preliminary and final injunction enjoining implementation of the USDA Amendments until such time as USDA complies with FCEA.

### FOURTH CAUSE OF ACTION

**[Failure to comply with the mandates of 7 U.S.C. §608c(18)]**

60.  In addition to all other averments in this Complaint, Dairy Producers state that the USDA issued a rule without complying with the AMAA, specifically 7 U.S.C. §608c(18).

61.  Section (18) of the AMAA provides, in pertinent part:

> . . . The prices which it is declared to be the policy of Congress to

15

establish in section 602 of this title shall, for the purposes of such agreement, order, or amendment, be adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates.

7 U.S.C. § 608c(18).

62.    Not only has the USDA failed to consider price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, it has expressly stated such is irrelevant because arguments about feed costs "are not valid arguments for opposing how make allowances should be determined or what levels make allowances need to be in the Class III and Class IV product-pricing formulas."

63.    The USDA has failed to consider the impacts on the individual marketing areas.

64.    Dairy Producers are entitled to a preliminary and final injunction enjoining implementation of the USDA Amendments until such time as USDA complies with the AMAA's requirement to consider the impacts of its decision on each marketing area.

## FIFTH CAUSE OF ACTION

**[Failure to Issue a Decision Supported by Substantial Evidence on the Record]**

65.    In addition to all other averments in this Complaint, Dairy Producers state that the USDA issued a rule that is not supported by the record and is otherwise arbitrary and capricious.

66.    As a non-exclusive list of USDA errors and omissions, Dairy Producers state as follows:

   a.    In establishing three of the four make allowance factors, USDA used data from the California Department of Food and Agriculture, which does not represent any plant within any of the federally regulated marketing areas. (California is not in the FMMO system).

16

b.    USDA has never used the same scheme in establishing make allowances in the four separate proceedings in which make allowances are an issue.

c.    USDA increased the make allowance for cheese after its expert witness stated that his prior testimony overstated the make allowance for cheese.

d.    The make allowances used are for products which USDA does not obtain a price and yields which USDA does not use.

e.    USDA irrationally and without any sense of order picks and chooses random words and numbers to arrive at a predetermined number.

f.    USDA uses a yield for NFDM which assumes by adding water 3 to 5% by weight the yield goes from one to less than one.

g.    USDA cannot state, based on any data entered into the record or publicly available, what yields plants actually obtain or what the make allowances actually are.

h.    USDA cannot state based on any data entered into the record or publicly available that the prior formulas resulted in losses to an average of the plants.

i.    The decision is based upon speculation, inferences on inferences, unsubstantiated claims, and faulty logic.

67.    The decision is otherwise arbitrary and capricious.

68.    Dairy Producers are entitled to injunctive relief to stop the implementation of the USDA Amendments until such time as USDA issues a decision that is neither arbitrary nor capricious.

## SIXTH CAUSE OF ACTION

### [Denial of Substantive Due Process]

69.    In addition to all other averments in this Complaint, Dairy Producers state that the USDA in this and other price formula hearings has denied producers substantive due process.

17

70. The Supreme Court in *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984) explained that the scheme of the AMAA allows producers to fully participate in the rulemaking process. The AMAA and USDA's rules of procedure recognize that producers have standing to actively participate in the hearing process. The purpose of the AMAA is to provide means that increase producer income.

71. The USDA has decided to establish minimum prices for milk which rely entirely on data possessed by buyers of milk and not by producers or USDA.

72. The three elements to setting minimum prices are: sales prices of finished dairy products, costs to manufacture the products, and the product yield from producer milk.

73. All of these facts are in the possession of plants.

74. Plants are not required to reveal this information during the course of the rulemaking hearing and do not fully provide it.

75. USDA has failed to obtain the information to provide meaningful analysis of proposals.

76. As of this date USDA has no data by which it can state what the average yield for plants anywhere, within the FMMO or not, is for cheddar cheese from one hundred pounds of milk, but the formulas for minimum prices require that information.

77. As of this date USDA has no data, has done no study, and is doing no study to report what the yield of NFDM from a hundred pounds of milk is, but the formulas it uses require that information.

78. As of this date USDA has no data, has done no study, and is doing no study to report what the yield of dry whey from a hundred pounds of milk is, but the formulas it uses require that information.

79. As of this date USDA has no data, has done no study, and is doing no study to report what the yield of butter from a hundred pounds of milk is, but the formulas it uses require that

information.

80. As of this date USDA has no data, has done no study, and is doing no study to report what the cost is to make cheese, NFDM, dry whey, or butter.

81. The USDA picks and chooses subcategories of products and excuses profitable and higher priced products from any reporting.

82. As of this date USDA has no data, has done no study, and is doing no study to report what the margins of plants are and whether or not they are profitable and at what rate.

83. Because USDA has provided no such information and producers are not permitted to know, the hearing process is entirely dependent upon what plants say and do not say.

84. Producers are unable to fully present testimony in their favor.

85. Producers are denied the right to fully cross-examine witnesses for the plants.

86. Because USDA fails to acknowledge efficiencies and increases in yields or higher added value plants, its focus on make allowances guarantees each hearing process will result in lower producer prices.

87. USDA has allowed plants to replace and supplement information provided by the few studies done.

88. Although USDA has no information in the hearing record to support the formulas it has manufactured, it requires producers, who have no information on plant processes, to bear the burden of proof to prove USDA wrong.

89. USDA relies upon information from plants outside of the marketing areas, further isolating producers.

90. The few rights producers have, such as voting on amendments or even having hearings is severely reduced. For example, although no producers in the Arizona, Southwest, Southeast, Appalachia, or Florida Orders called for the hearing, one was set for those orders.

91.   USDA dilutes the evidence there is from unwilling orders by bringing in the testimony about other marketing areas.

92.   USDA forces producers to choose between no orders and the unlawful amendments.

93.   USDA simultaneously holds multiple hearings on pricing. At this moment there are three open national hearings, each one of which could change the outcome of the other two.

94.   USDA issues orders before producers can comment even when evidence outside the record and formulas never discussed are used.

95.   USDA never finishes an order based on comments after it issues the order.

96.   USDA relies on evidence outside the record. Based upon current practices, USDA could perpetually rely upon CDFA reports and annually adjust make allowances by issuing Temporary Orders and never again hold a hearing or consider comments from producers.

97.   USDA views any plant going out of business as a justification to reduce producer prices but has no concern whatsoever for producers going out of business.

98.   Producers are entitled to an order enjoining the USDA from implementing this order and any order or amendment that continues to deny producers their rights.

## FIRST CLAIM FOR RELIEF

### [Declaratory Relief]

99.   For each of the Causes of Action, Dairy Producers are entitled to judgment declaring the actions of USDA in amending the minimum price formulas unlawful because USDA exceeded its statutory authority, established price formulas in an illegal matter, otherwise acted in an arbitrary and capricious manner in violation of the AMAA, 7 U.S.C. §608c, and denied producers substantive due process.

## SECOND CLAIM FOR RELIEF

### [Temporary, Preliminary and Permanent Injunctive Relief]

100. Dairy Producers are entitled to a temporary restraining order and to a preliminary and a permanent injunction prohibiting USDA from implementing the increased make allowances in the Tentative Partial Final Decision, including the announcement of any component or class prices calculated using the increased make allowances.

101. Dairy Producers have a very high likelihood of success on the merits, because USDA admittedly failed to determine the average costs of feed and energy used by dairy farmers and to consider such costs in the setting of make allowances. In addition, USDA failed to consider the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order or amendment relates and otherwise acted arbitrarily, capriciously, and contrary to law.

102. Dairy Producers will suffer irreparable harm if the USDA amendments are not enjoined since contracts for the delivery of milk will have been executed, and Dairy Producers will be left without recourse to recover the losses resulting from the improperly announced minimum prices calculated under the USDA amendments.

103. The balance of equities favors issuing an injunction because the USDA amendments will permanently harm Dairy Producers and their members. Delay of the USDA amendments will not affect the *status quo* and will further the policy of the AMAA to establish appropriate producer prices.

104. An injunction will be in the public interest since continuation of the *status quo* will provide an adequate supply of good and wholesome milk to the consuming public at a reasonable cost.

105. A stay is needed now to preserve the *status quo* pending the resolution of the claims raised in this complaint.

## THIRD CLAIM FOR RELIEF

### [Remand Under the APA]

106.    The Interim Order constitutes a final agency action, and USDA has not complied with its authorizing statute and the APA in holding the hearing and making an agency determination in issuing the Interim Order.

107.    This Court should properly remand this proceeding to USDA for further action–including compliance with all of the requirements of 7 U.S.C. §608c, a full consideration of all elements of the pricing formula which may need to be updated or revised, consideration of all relevant data in arriving at a decision, and the taking of testimony from all interested persons wishing to provide relevant evidence and in particular dairy farmers and their representatives who are the intended beneficiaries of the program.

## FOURTH CLAIM FOR RELIEF

### [Equal Access to Justice Claim]

108.    The USDA's position in issuing the Interim Order and its process leading up to that decision are not substantially in compliance with the law.

109.    The USDA's action in issuing the Interim Order was arbitrary, capricious and not in accordance with the law and the USDA's position was not substantially justified.

110.    The  Dairy Producers are entitled to attorneys fees, costs, and reimbursement in accordance with the Equal Access to Justice Act, 28 U.S.C. §2412.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs hereby pray for  relief as follows:

A) An Order declaring that the Secretary, in issuing the Proposed Rule; Tentative Partial Final Decision, 73 Fed. Reg. 35306 (June 20, 2008), ("Tentative Partial Final Decision") and Interim Order Amending the Orders, 73 Fed. Reg.44617 (July 31, 2008) ("Interim Order") acted

22

arbitrarily, capriciously, and contrary to law and that such regulations are null and void, and remanded to USDA for corrective actions.

B) An Order temporarily, preliminarily, and permanently enjoining the Secretary, his agents and attorneys and those persons in active concert or participation with them who receive actual notice of the order  from implementing the provisions of the Proposed Rule; Tentative Partial Final Decision, 73 Fed. Reg. 35306 (June 20, 2008) ("Tentative Partial Final Decision") and Interim Order Amending the Orders, 73 Fed. Reg.44617 (July 31, 2008) ("Interim Order") in so far as they define and establish new make allowances.

C) An Order declaring that the USDA's present methodologies in setting minimum prices deny due process to the producers.

D) An Order declaring that Dairy Producers are entitled to reimbursement of attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C. §2412; and

E) A judgment for any interest, attorneys fees, costs permissible under law, and such other and further relief as the Court deems just and proper.

Respectfully submitted,
YALE LAW OFFICE, LP

*Benjamin F. Yale*

BENJAMIN F. YALE, OHIO 0924730
D.C. District Court No. OH 00068
527 North Westminster Street
P.O. Box 100
Waynesfield, Ohio 45896
419-568-6401
Fax 419-568-6413
ben@yalelawoffice.com
Counsel for Cooperative Plaintiffs

THE MILTNER LAW FIRM, LLC

*Ryan K. Miltner*

RYAN K. MILTNER, OHIO 0075405
D.C. District Court No. OH 0006
527 North Westminster Street
P.O. Box 477
Waynesfield, Ohio 45896
419-568-2920
Fax 419-568-6413
ryan@miltnerlawfirm.com
Counsel for Dairy Producers of New Mexico

## Executive Order 12372

This program/activity is listed in the Catalog of Federal Domestic Assistance under No. 10.025 and is subject to Executive Order 12372, which requires intergovernmental consultation with State and local officials. (See 7 CFR part 3015, subpart V.)

## Executive Order 12988

This rule has been reviewed under Executive Order 12988, Civil Justice Reform. This rule: (1) Preempts all State and local laws and regulations that are inconsistent with this rule; (2) has no retroactive effect; and (3) does not require administrative proceedings before parties may file suit in court challenging this rule.

## Paperwork Reduction Act

This rule contains no new information collection or recordkeeping requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*).

## List of Subjects

*7 CFR Part 301*

Agricultural commodities, Plant diseases and pests, Quarantine, Reporting and recordkeeping requirements, Transportation.

■ Accordingly, we are amending 7 CFR part 301 as follows:

## PART 301—DOMESTIC QUARANTINE NOTICES

■ 1. The authority citation for part 301 continues to read as follows:

**Authority:** 7 U.S.C. 7701–7772 and 7781–7786; 7 CFR 2.22, 2.80, and 371.3.

Section 301.75–15 issued under Sec. 204, Title II, Public Law 106–113, 113 Stat. 1501A–293; sections 301.75–15 and 301.75–16 issued under Sec. 203, Title II, Public Law 106–224, 114 Stat. 400 (7 U.S.C. 1421 note).

## § 301.75–7    [Amended]

■ 2. In § 301.75–7, paragraph (a)(5)(ii) is amended by removing the word "2008" and adding the word "2010" in its place.

Done in Washington, DC, this 28th day of July 2008.

**Cindy J. Smith,**

*Administrator, Animal and Plant Health Inspection Service.*

[FR Doc. E8–17592 Filed 7–30–08; 8:45 am]

**BILLING CODE 3410-34-P**

## DEPARTMENT OF AGRICULTURE

### Agricultural Marketing Service

### 7 CFR Part 1000

**[Docket No. AMS–DA–07–0026; AO–14–A77, et al.; DA–07–02–A]**

### Milk in the Northeast and Other Marketing Areas; Interim Order Amending the Orders

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Interim final rule.

**SUMMARY:** This order amends the manufacturing cost allowances and the butterfat yield factor used in the Class III and Class IV product-price formulas applicable to all Federal milk marketing orders. More than the required producers approved the issuance of the interim order as amended.

**DATES:** *Effective Date:* September 1, 2008.

**FOR FURTHER INFORMATION CONTACT:** Jack Rower, Marketing Specialist, USDA/AMS/Dairy Programs, Order Formulation and Enforcement Branches, STOP 0231–Room 2971, 1400 Independence Avenue, SW., Washington, DC 20250–0231, (202) 720–2357, e-mail address: *jack.rower@usda.gov.*

**SUPPLEMENTARY INFORMATION:** This decision adopts provisions to amend the manufacturing (make) allowances for cheese, butter, nonfat dry milk (NFDM) and dry whey powder contained in the Class III and Class IV product-price formulas. Specifically, this decision adopts the following make allowances: cheese—$0.2003 per pound; butter—$0.1715 per pound; NFDM—$0.1678 per pound; and dry whey—$0.1991 per pound. This decision also increases the butterfat yield factor in the butterfat price formula from 1.20 to 1.211.

This administrative rule is governed by the provisions of Sections 556 and 557 of Title 5 of the United States Code and, therefore, is excluded from the requirements of Executive Order 12866.

This interim rule has been reviewed under Executive Order 12988, Civil Justice Reform. This rule is not intended to have a retroactive effect. This rule will not preempt any state or local laws, regulations, or policies, unless they present an irreconcilable conflict with this rule.

The Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674) (AMAA), provides that administrative proceedings must be exhausted before parties may file suit in court. Under Section 608c(15)(A) of the

AMAA, any handler subject to an order may request modification or exemption from such order by filing with the Department of Agriculture (USDA) a petition stating that the order, any provision of the order, or any obligation imposed in connection with the order is not in accordance with the law. A handler is afforded the opportunity for a hearing on the petition. After a hearing, the Department would rule on the petition. The AMAA provides that the district court of the United States in any district in which the handler is an inhabitant, or has its principal place of business, has jurisdiction in equity to review the Department's ruling on the petition, provided a bill in equity is filed not later than 20 days after the date of the entry of the ruling.

### Regulatory Flexibility Act and Paperwork Reduction Act

In accordance with the Regulatory Flexibility Act (5 U.S.C. 601–612), the Agricultural Marketing Service has considered the economic impact of this action on small entities and has certified that this interim rule will not have a significant economic impact on a substantial number of small entities. For the purpose of the Regulatory Flexibility Act, a dairy farm is considered a small business if it has an annual gross revenue of less than $750,000, and a dairy products manufacturer is a small business if it has fewer than 500 employees.

For the purposes of determining which dairy farms are small businesses, the $750,000 per year criterion was used to establish a marketing guideline of 500,000 pounds per month. Although this guideline does not factor in additional monies that may be received by dairy producers, it should be an inclusive standard for most "small" dairy farmers. For purposes of determining a handler's size, if the plant is part of a larger company operating multiple plants that collectively exceed the 500-employee limit, the plant will be considered a large business even if the local plant has fewer than 500 employees.

During February 2007, the month the initial public hearing was held, the milk of 49,712 dairy farmers was pooled on the Federal order system. Of the total, 46,729 dairy farmers, or 94 percent, were considered small businesses. During the same month, 352 plants were regulated by or reported their milk receipts to be pooled and priced on a Federal order. Of the total, 186 plants, or 53 percent, were considered small businesses.

This interim final rule amends all orders by changing the make allowances

contained in the formulas used to compute component prices and the minimum class prices in all Federal milk orders. Specifically, the make allowance for butter increases from $0.1202 to $0.1715 per pound; the make allowance for cheese increases from $0.1682 to $0.2003 per pound; the make allowance for NFDM increases from $0.1570 to $0.1678 per pound; and the make allowance for dry whey increases from $0.1956 to $0.1991 per pound. The butterfat yield factor in the butterfat price formulas is increased from 1.20 to 1.211.

The adoption of these new make allowances serves to approximate the average cost of producing cheese, butter, NFDM and dry whey for manufacturing plants located in Federal milk marketing areas.

The established criteria for the make allowance changes are applied in an identical fashion to both large and small businesses and will not have any different impact on those businesses producing manufactured milk products. An economic analysis has been performed that discusses impacts of the amendments on industry participants including producers and manufacturers. It can be found on the AMS Dairy Web site at *http://www.ams.usda.gov/dairy*. Based on the economic analysis, we have concluded that the amendments will not have a significant economic impact on a substantial number of small entities.

The Agricultural Marketing Service (AMS) is committed to complying with the E-Government Act, to promote the use of the Internet and other information technologies to provide increased opportunities for citizen access to Government information and services, and for other purposes.

This interim final rule does not require additional information collection that needs clearance by the Office of Management and Budget (OMB) beyond currently approved information collection. The primary sources of data used to complete the forms are routinely used in most business transactions. Forms require only a minimal amount of information that can be supplied without data processing equipment or a trained statistical staff. Thus, the information collection and reporting burden is relatively small. Requiring the same reports for all handlers does not significantly disadvantage any handler that is smaller than the industry average.

## Prior Documents in This Proceeding

*Notice of Hearing:* Issued February 5, 2007; published February 9, 2007 (72 FR 6179).

*Supplemental Notice of Hearing:* Issued February 14, 2007; published February 20, 2007 (72 FR 7753).

*Notice to Reconvene Hearing:* Issued March 15, 2007; published March 21, 2007 (72 FR 13219).

*Notice to Reconvene Hearing:* Issued May 2, 2007; published May 8, 2007 (72 FR 25984).

*Tentative Partial Final Decision:* Issued June 16, 2008; published June 20, 2008 (73 FR 35306).

## Findings and Determinations

The findings and determinations hereinafter set forth supplement those that were made when the Northeast and other orders were first issued and when they were amended. The previous findings and determinations are hereby ratified and confirmed, except where they may conflict with those set forth herein.

The following findings are hereby made with respect to the Northeast and other marketing orders:

(a) *Findings upon the basis of the hearing record.*

A public hearing was held upon certain proposed amendments to the tentative marketing agreements and to the orders regulating the handling of milk in the Northeast and other marketing areas. The hearing was held pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674), and the applicable rules of practice and procedure (7 CFR part 900).

Upon the basis of the evidence introduced at such hearing and the record thereof, it is found that:

(1) The said orders as hereby amended, and all of the terms and conditions thereof, will tend to effectuate the declared policy of the Act;

(2) The parity prices of milk, as determined pursuant to section 2 of the Act, are not reasonable in view of the price of feeds, available supplies of feeds, and other economic conditions which affect market supply and demand for milk in the aforesaid marketing areas. The minimum prices specified in the orders as hereby amended on an interim basis, are such prices as will reflect the aforesaid factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest; and

(3) The said orders, as hereby amended on an interim basis, regulate the handling of milk in the same manner as, and is applicable only to

persons in the respective classes of industrial or commercial activity specified in, a marketing agreement upon which a hearing has been held.

(b) *Additional Findings.* It is necessary and in the public interest to make these interim amendments to the Northeast and other orders effective [insert effective date]. Any delay beyond that date would tend to disrupt the orderly marketing of milk in the aforesaid marketing areas.

The interim amendments to this order are known to handlers. The tentative partial decision containing the proposed amendments to this order was issued on June 16, 2008.

The changes that result from these interim amendments will not require extensive preparation or substantial alteration in the method of operation for handlers. In view of the foregoing, it is hereby found and determined that good cause exists for making these interim amendments effective on [insert effective date].

*Determinations.* It is hereby determined that:

(1) The refusal or failure of handlers (excluding cooperative associations specified in Section 8c(9) of the Act) of more than 50 percent of the milk, which is marketed within the specified marketing areas, to sign a proposed marketing agreement, tends to prevent the effectuation of the declared policy of the Act;

(2) The issuance of this interim order amending the Northeast and other marketing orders is the only practical means pursuant to the declared policy of the Act of advancing the interests of producers as defined in the orders as hereby amended;

(3) The issuance of the interim orders amending the Northeast and other orders is favored by at least two-thirds of the producers who were engaged in the production of milk for sale in the respective marketing areas.

## Order Relative to Handling

*It is therefore ordered,* that on and after the effective date hereof, the handling of milk in the Northeast and other marketing areas shall be in conformity to and in compliance with the terms and conditions of the orders, as amended, and as hereby amended, as follows:

## List of Subjects in 7 CFR Part 1000

Milk marketing orders.

■ For the reasons set forth in the preamble, the Agricultural Marketing Service amends Chapter X of Title 7 of the Code of Federal Regulations as follows:

## PART 1000—GENERAL PROVISIONS OF FEDERAL MILK MARKETING ORDERS

■ 1. The authority citation for 7 CFR part 1000 continues to read as follows:

**Authority:** 7 U.S.C. 601–674, and 7253.

■ 2. Section 1000.50 is amended by:
■ A. Revising paragraph (l);
■ B. Revising paragraph (m);
■ C. Revising paragraph (n)(2);
■ D. Revising paragraph (n)(3)(i);
■ E. Revising paragraph (o); and
■ F. Revising paragraph (q)(3).

The revisions read as follows:

### § 1000.50   Class prices, component prices, and advanced pricing factors.

*       *       *       *       *

(l) *Butterfat price.* The butterfat price per pound, rounded to the nearest one-hundredth cent, shall be the U.S. average NASS AA Butter survey price reported by the Department for the month, less 17.15 cents, with the result multiplied by 1.211.

(m) *Nonfat solids price.* The nonfat solids price per pound, rounded to the nearest one-hundredth cent, shall be the U.S. average NASS nonfat dry milk survey price reported by the Department for the month, less 16.78 cents and multiplying the result by 0.99.

(n) * * *

(2) Subtract 20.03 cents from the price computed pursuant to paragraph (n)(1) of this section and multiply the result by 1.383;

(3) * * *

(i) Subtract 20.03 cents from the price computed pursuant to paragraph (n)(1) of this section and multiply the result by 1.572; and

*       *       *       *       *

(o) *Other solids price.* The other solids price per pound, rounded to the nearest one-hundredth cent, shall be the U.S. average NASS dry whey survey price reported by the Department for the month minus 19.91 cents, with the result multiplied by 1.03.

*       *       *       *       *

(q) * * *

(3) An advanced butterfat price per pound rounded to the nearest one-hundredth cent, shall be calculated by computing a weighted average of the 2 most recent U.S. average NASS AA Butter survey prices announced before the 24th day of the month, subtracting 17.15 cents from this average, and multiplying the result by 1.211.

Dated: July 25, 2008.

**Lloyd C. Day,**

*Administrator, Agricultural Marketing Service.*

[FR Doc. 08–1482 Filed 7–28–08; 8:45 am]

**BILLING CODE 3410-02-P**

## NUCLEAR REGULATORY COMMISSION

**10 CFR Parts 2 and 50**

**RIN 3150–AH78**

**[NRC–2005–0032]**

### Price-Anderson Act Financial Protection Regulations and Elimination of Antitrust Reviews; Correction

**AGENCY:** Nuclear Regulatory Commission.

**ACTION:** Final rule: correcting amendment.

**SUMMARY:** On October 27, 2005 (70 FR 61885), the Nuclear Regulatory Commission (NRC) published a final rule revising its regulations to conform with the provisions of the Energy Policy Act of 2005 that, among other things, terminated the NRC's authority and responsibility to conduct antitrust reviews of future applications to construct or operate a nuclear reactor. Inadvertently, the final rule failed to remove some references to the NRC's authority and responsibility to conduct antitrust reviews. This rule removes those provisions.

**DATES:** This rule is effective on July 31, 2008, and is applicable to November 28, 2005, the date the original rule became effective.

**FOR FURTHER INFORMATION CONTACT:** Maxwell C. Smith, Office of the General Counsel, U.S. Nuclear Regulatory Commission, Washington, DC 20555–0001, telephone (301) 415–1246, *e-mail: Maxwell.Smith@nrc.gov.*

**SUPPLEMENTARY INFORMATION:** This document removes references to the NRC's antitrust responsibilities that it possessed prior to the enactment of section 625 of the Energy Policy Act of 2005, Public Law 109–58. For the reasons set out in the preamble and under the authority of the Atomic Energy Act of 1954, as amended; the Energy Reorganization Act of 1974, as amended; and 5 U.S.C. 552 and 553, the NRC is adopting the following amendments to 10 CFR parts 2 and 50.

### List of Subjects

*10 CFR Part 2*

Administrative practice and procedure, Antitrust, Byproduct material, Classified information, Environmental protection, Nuclear materials, Nuclear power plants and reactors, Penalties, Sex discrimination, Source material, Special nuclear material, Waste treatment and disposal.

*10 CFR Part 50*

Antitrust, Classified information, Criminal penalties, Fire protection, Intergovernmental relations, Nuclear power plants and reactors, Radiation protection, Reactor siting criteria, Reporting and recordkeeping requirements.

■ For the reasons set out in the preamble and under the authority of the Atomic Energy Act of 1954, as amended; the Energy Reorganization Act of 1974, as amended; and 5 U.S.C. 552 and 5 U.S.C. 553, the NRC is adopting the following amendments to 10 CFR Parts 2 and 50.

## PART 2—RULES OF PRACTICE FOR DOMESTIC LICENSING PROCEEDINGS AND ISSUANCE OF ORDERS

■ 1. The authority citation for Part 2 continues to read as follows:

**Authority:** Secs.161, 181, 68 Stat. 948, 953, as amended (42 U.S.C. 2201, 2231); sec. 191, as amended, Pub. L. 87–615, 76 Stat. 409 (42 U.S.C. 2241); sec. 201, 88 Stat.1242, as amended (42 U.S.C. 5841); 5 U.S.C. 552; sec. 1704, 112 Stat. 2750 (44 U.S.C. 3504 note).

Section 2.101 also issued under secs. 53, 62, 63, 81, 103, 104, 68 Stat. 930, 932, 933, 935, 936, 937, 938, as amended (42 U.S.C. 2073, 2092, 2093, 2111, 2133, 2134, 2135); sec. 114(f), Pub. L. 97–425, 96 Stat. 2213, as amended (42 U.S.C. 10143(f)); sec. 102, Pub. L. 91–190, 83 Stat. 853, as amended (42 U.S.C. 4332); sec. 301, 88 Stat. 1248 (42 U.S.C. 5871).

Sections 2.102, 2.103, 2.104, 2.105, 2.721 also issued under secs. 102, 103, 104, 105, 183i, 189, 68 Stat. 936, 937, 938, 954, 955, as amended (42 U.S.C. 2132, 2133, 2134, 2135, 2233, 2239). Section 2.105 also issued under Pub. L. 97–415, 96 Stat. 2073 (42 U.S.C. 2239). Sections 2.200–2.206 also issued under secs. 161 b, i, o, 182, 186, 234, 68 Stat. 948–951, 955, 83 Stat. 444, as amended (42 U.S.C. 2201 (b), (i), (o), 2236, 2282); sec. 206, 88 Stat 1246 (42 U.S.C. 5846). Section 2.205(j) also issued under Pub. L. 101–410, 104 Stat. 90, as amended by section 3100(s), Pub. L. 104–134, 110 Stat. 1321–373 (28 U.S.C. 2461 note). Subpart C also issued under sec. 189, 68 Stat. 955 (42 U.S.C. 2239). Sections 2.600–2.606 also issued under sec. 102, Pub. L. 91–190, 83 Stat. 853, as amended (42 U.S.C. 4332). Section 2.301 also issued under 5 U.S.C. 554. Sections 2.343, 2.346, 2.712 also issued under 5 U.S.C. 557. Section 2.340 also issued under secs. 135, 141, Pub. L. 97–425, 96 Stat. 2232, 2241 (42 U.S.C. 10155, 10161). Section 2.390 also issued under sec. 103, 68 Stat. 936, as amended (42 U.S.C. 2133) and 5 U.S.C. 552. Sections 2.800 and 2.808 also issued under 5 U.S.C. 553. Section 2.809 also issued under 5 U.S.C. 553, and sec. 29, Pub. L. 85–256, 71 Stat. 579, as amended (42 U.S.C. 2039). Subpart K also issued under sec. 189, 68 Stat. 955 (42 U.S.C. 2239); sec. 134, Pub. L. 97–425, 96 Stat. 2230 (42 U.S.C. 10154).

Subpart L also issued under sec. 189, 68 Stat. 955 (42 U.S.C. 2239). Subpart M also



**UNITED STATES PUBLIC LAWS**
**110th Congress - Second Session**
**Convening January 04, 2008**

Copr. © 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt.Works

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed

PL 110-246 (HR 6124)
June 18, 2008
FOOD, CONSERVATION, AND ENERGY ACT OF 2008

An Act To provide for the continuation of agricultural and other programs of the Department of Agriculture through fiscal year 2012, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States
of America in Congress assembled,

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

<< 7 USCA § 8701 NOTE >>

(a) SHORT TITLE.--This Act may be cited as the "Food, Conservation, and Energy Act of 2008".

 (b) TABLE OF CONTENTS.--The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.

Sec. 2. Definition of Secretary.

Sec. 3. Explanatory Statement.

Sec. 4. Repeal of duplicative enactment.

TITLE I--COMMODITY PROGRAMS

Sec. 1001. Definitions.

Subtitle A--Direct Payments and Counter-Cyclical Payments

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment 2

PL 110-246, 2008 HR 6124                                                                   Page 3
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

Sec. 1304. Availability of counter-cyclical payments for peanuts.

Sec. 1305. Producer agreement required as condition on provision of payments.

Sec. 1306. Planting flexibility.

Sec. 1307. Marketing assistance loans and loan deficiency payments for peanuts.

**\*1652**

Sec. 1308. Adjustments of loans.

Subtitle D--Sugar

Sec. 1401. Sugar program.

Sec. 1402. United States membership in the International Sugar Organization.

Sec. 1403. Flexible marketing allotments for sugar.

Sec. 1404. Storage facility loans.

Sec. 1405. Commodity Credit Corporation storage payments.

Subtitle E--Dairy

Sec. 1501. Dairy product price support program.

Sec. 1502. Dairy forward pricing program.

Sec. 1503. Dairy export incentive program.

Sec. 1504. Revision of Federal marketing order amendment procedures.

Sec. 1505. Dairy indemnity program.

Sec. 1506. Milk income loss contract program.

Sec. 1507. Dairy promotion and research program.

Sec. 1508. Report on Department of Agriculture reporting procedures for nonfat dry milk.

Sec. 1509. Federal Milk Marketing Order Review Commission.

Sec. 1510. Mandatory reporting of dairy commodities.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment 2

PL 110-246, 2008 HR 6124                                                                 Page 36
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

<< 31 USCA § 3716 NOTE >>

<< 31 USCA §§ 1324, 3716, 3803 >>

<< 37 USCA § 402a >>

<< 39 USCA §§ 3001, 3202 >>

<< 40 USCA § 15101 NOTE >>

<< 40 USCA prec. § 101 >>

<< 40 USCA prec. § 15101 >>

<< 40 USCA prec. § 15301 >>

<< 40 USCA prec. § 15501 >>

<< 40 USCA prec. § 15701 >>

<< 40 USCA prec. § 15731 >>

<< 40 USCA prec. § 15751 >>

<< 40 USCA prec. § 17101 >>

<< 40 USCA §§ 15101, 15301-15308, 15501-15506, 15701-15705, 15731-15733,
15751 >>

<< 42 USCA §§ 401 NOTE, 1382e NOTE, 1490e NOTE, 1769a NOTE, 3121 NOTE >>

<< 42 USCA §§ 290cc-22, 405, 411, 412, 503, 603, 604, 608, 611, 613, 629c,
629g, 653, 654, 1314a, 1320b-7, 1383, 1396r-5, 1437f, 1484, 1758, 1766, 1769,
1769a, 1786, 3012, 3056g, 3058e, 4728, 5179, 6949, 8011, 8622, 8624, 9858i,
16657 >>

<< 42 USCA §§ 1755a, 1758a >>

<< 43 USCA §§ 1592, 1595, 1626 >>

<< 43 USCA § 2211 NOTE >>

<< 48 USCA § 1841 >>

(a) IN GENERAL.--The Act entitled "An Act to provide for the continuation of agricultural programs through fiscal
year 2012, and for other purposes" (H.R. 2419 of the 110th Congress), and the amendments made by that Act, are
repealed, effective on the date of enactment of that Act.

 (b) EFFECTIVE DATE.--Except as otherwise provided in this Act, this Act and the amendments made by this Act
shall take effect on the earlier of--

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment 2

PL 110-246, 2008 HR 6124                                                Page 37
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

(1) the date of enactment of this Act; or

(2) the date of the enactment of the Act entitled "An Act to provide for the continuation of agricultural programs through fiscal year 2012, and for other purposes" (H.R. 2419 of the 110th Congress).

TITLE I--COMMODITY PROGRAMS
<< 7 USCA § 8702 >>

SEC. 1001. DEFINITIONS.

In this title (other than subtitle C):

**\*1665**
(1) AVERAGE CROP REVENUE ELECTION PAYMENT.--The term "average crop revenue election payment" means a payment made to producers on a farm under section 1105.

(2) BASE ACRES.--

   (A) IN GENERAL.--The term "base acres", with respect to a covered commodity on a farm, means the number of acres established under section 1101 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7911) as in effect on September 30, 2007, subject to any adjustment under section 1101 of this Act.

   (B) PEANUTS.--The term "base acres for peanuts" has the meaning given the term in section 1301.

(3) COUNTER-CYCLICAL PAYMENT.--The term "counter-cyclical payment" means a payment made to producers on a farm under section 1104.

(4) COVERED COMMODITY.--The term "covered commodity" means wheat, corn, grain sorghum, barley, oats, upland cotton, long grain rice, medium grain rice, pulse crops, soybeans, and other oilseeds.

(5) DIRECT PAYMENT.--The term "direct payment" means a payment made to producers on a farm under section 1103.

(6) EFFECTIVE PRICE.--The term "effective price", with respect to a covered commodity for a crop year, means the price calculated by the Secretary under section 1104 to determine whether counter-cyclical payments are required to be made for that crop year.

(7) EXTRA LONG STAPLE COTTON.--The term "extra long staple cotton" means cotton that--

   (A) is produced from pure strain varieties of the Barbadense species or any hybrid of the species, or other similar types of extra long staple cotton, designated by the Secretary, having characteristics needed for various end uses for which United States upland cotton is not suitable and grown in irrigated cotton-growing regions of the United States designated by the Secretary or other areas designated by the Secretary as suitable for the production of the varieties or types; and

   (B) is ginned on a roller-type gin or, if authorized by the Secretary, ginned on another type gin for experimental purposes.

(8) LOAN COMMODITY.--The term "loan commodity" means wheat, corn, grain sorghum, barley, oats, upland

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment 2

PL 110-246, 2008 HR 6124                                                          Page 103
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

coercion by handlers to enter into forward contracts.

(B) ACTION.--If the Secretary finds evidence of coercion, the Secretary shall take appropriate action.

(e) DURATION.--

(1) NEW CONTRACTS.--No forward price contract may be entered into under the program established under this section after September 30, 2012.

(2) APPLICATION.--No forward contract entered into under the program may extend beyond September 30, 2015.

**\*1721**

SEC. 1503. DAIRY EXPORT INCENTIVE PROGRAM.

<< 15 USCA § 713a-14 >>

(a) EXTENSION.--Section 153(a) of the Food Security Act of 1985 (15 U.S.C. 713a-14(a)) is amended by striking "2007" and inserting "2012".

(b) COMPLIANCE WITH TRADE AGREEMENTS.--Section 153 of the Food Security Act of 1985 (15 U.S.C. 713a-14) is amended--

<< 15 USCA § 713a-14 >>

(1) in subsection (c), by striking paragraph (3) and inserting the following:

"(3) the maximum volume of dairy product exports allowable consistent with the obligations of the United States under the Uruguay Round Agreements approved under section 101 of the Uruguay Round Agreements Act (19 U.S.C. 3511) is exported under the program each year (minus the volume sold under section 1163 of this Act during that year), except to the extent that the export of such a volume under the program would, in the judgment of the Secretary, exceed the limitations on the value permitted under subsection (f); and"; and.

<< 15 USCA § 713a-14 >>

(2) in subsection (f), by striking paragraph (1) and inserting the following:

"(1) FUNDS AND COMMODITIES.--Except as provided in paragraph (2), the Commodity Credit Corporation shall in each year use money and commodities for the program under this section in the maximum amount consistent with the obligations of the United States under the Uruguay Round Agreements approved under section 101 of the Uruguay Round Agreements Act (19 U.S.C. 3511), minus the amount expended under section 1163 of this Act during that year.".

<< 7 USCA § 608c >>

SEC. 1504. REVISION OF FEDERAL MARKETING ORDER AMENDMENT PROCEDURES.

Section 8c of the Agricultural Adjustment Act (7 U.S.C. 608c), reenacted with amendments by the Agricultural Marketing Agreement Act of 1937, is amended by striking subsection (17) and inserting the following:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment 2

PL 110-246, 2008 HR 6124                                                                                  Page 104
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

"(17) PROVISIONS APPLICABLE TO AMENDMENTS.--

"(A) APPLICABILITY TO AMENDMENTS.--The provisions of this section and section 8d applicable to orders shall be applicable to amendments to orders.

"(B) SUPPLEMENTAL RULES OF PRACTICE.--

"(i) IN GENERAL.--Not later than 60 days after the date of enactment of this subparagraph, the Secretary shall issue, using informal rulemaking, supplemental rules of practice to define guidelines and timeframes for the rulemaking process relating to amendments to orders.

"(ii) ISSUES.--At a minimum, the supplemental rules of practice shall establish--

"(I) proposal submission requirements;

"(II) pre-hearing information session specifications;

"(III) written testimony and data request requirements;

"(IV) public participation timeframes; and

"(V) electronic document submission standards.

"(iii) EFFECTIVE DATE.--The supplemental rules of practice shall take effect not later than 120 days after **\*1722** the date of enactment of this subparagraph, as determined by the Secretary.

"(C) HEARING TIMEFRAMES.--

"(i) IN GENERAL.--Not more than 30 days after the receipt of a proposal for an amendment hearing regarding a milk marketing order, the Secretary shall--

"(I) issue a notice providing an action plan and expected timeframes for completion of the hearing not more than 120 days after the date of the issuance of the notice;

"(II)(aa) issue a request for additional information to be used by the Secretary in making a determination regarding the proposal; and

"(bb) if the additional information is not provided to the Secretary within the timeframe requested by the Secretary, issue a denial of the request; or

"(III) issue a denial of the request.

"(ii) REQUIREMENT.--A post-hearing brief may be filed under this paragraph not later than 60 days after the date of an amendment hearing regarding a milk marketing order.

"(iii) RECOMMENDED DECISIONS.--A recommended decision on a proposed amendment to an order shall be issued not later than 90 days after the deadline for the submission of post-hearing briefs.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment 2

PL 110-246, 2008 HR 6124                                                                      Page 105
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

"(iv) FINAL DECISIONS.--A final decision on a proposed amendment to an order shall be issued not later than 60 days after the deadline for submission of comments and exceptions to the recommended decision issued under clause (iii).

"(D) INDUSTRY ASSESSMENTS.--If the Secretary determines it is necessary to improve or expedite rulemaking under this subsection, the Secretary may impose an assessment on the affected industry to supplement appropriated funds for the procurement of service providers, such as court reporters.

"(E) USE OF INFORMAL RULEMAKING.--The Secretary may use rulemaking under section 553 of title 5, United States Code, to amend orders, other than provisions of orders that directly affect milk prices.

"(F) AVOIDING DUPLICATION.--The Secretary shall not be required to hold a hearing on any amendment proposed to be made to a milk marketing order in response to an application for a hearing on the proposed amendment if--

"(i) the application requesting the hearing is received by the Secretary not later than 90 days after the date on which the Secretary has announced the decision on a previously proposed amendment to that order;  and

"(ii) the 2 proposed amendments are essentially the same, as determined by the Secretary.

"(G) MONTHLY FEED AND FUEL COSTS FOR MAKE ALLOWANCES.--As part of any hearing to adjust make allowances under marketing orders commencing prior to September 30, 2012, the Secretary shall--

**\*1723**
"(i) determine the average monthly prices of feed and fuel incurred by dairy producers in the relevant marketing area;

"(ii) consider the most recent monthly feed and fuel price data available;  and

"(iii) consider those prices in determining whether or not to adjust make allowances.".

<< 7 USCA § 450l >>

SEC. 1505. DAIRY INDEMNITY PROGRAM.

Section 3 of Public Law 90-484 (7 U.S.C. 450l) is amended by striking "2007" and inserting "2012".

<< 7 USCA § 8773 >>

SEC. 1506. MILK INCOME LOSS CONTRACT PROGRAM.

(a) DEFINITIONS.--In this section:

(1) CLASS I MILK.--The term "Class I milk" means milk (including milk components) classified as Class I milk under a Federal milk marketing order.

(2) ELIGIBLE PRODUCTION.--The term "eligible production" means milk produced by a producer in a participating State.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment 2



7 U.S.C.A. § 608c                                                                                      Page 1



**Effective:[See Notes]**

United States Code Annotated <u>Currentness</u>
   Title 7. Agriculture



          <u>Chapter 26</u>. Agricultural Adjustment <u>(Refs & Annos)</u>



          <u>Subchapter III</u>. Commodity Benefits



      **<u>§ 608c. Orders regulating handling of commodity</u>**

(1) Issuance by Secretary

The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section. Such persons are referred to in this chapter as "handlers."  Such orders shall regulate, in the manner hereinafter in this section provided, only such handling of such agricultural commodity, or product thereof, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof. In carrying out this section, the Secretary shall complete all informal rulemaking actions necessary to respond to recommendations submitted by administrative committees for such orders as expeditiously as possible, but not more than 45 days (to the extent practicable) after submission of the committee recommendations. The Secretary is authorized to implement a producer allotment program and a handler withholding program under the cranberry marketing order in the same crop year through informal rulemaking based on a recommendation and supporting economic analysis submitted by the Cranberry Marketing Committee. Such recommendation and analysis shall be submitted by the Committee no later than March 1 of each year. The Secretary shall establish time frames for each office and agency within the Department of Agriculture to consider the committee recommendations.

(2) Commodities to which applicable; single commodities and separate agricultural commodities

Orders issued pursuant to this section shall be applicable only to (A) the following agricultural commodities and the products thereof (except canned or frozen pears, grapefruit, cherries, apples, or cranberries, the products of naval stores, and the products of honeybees), or to any regional, or market classification of any such commodity or product: Milk, fruits (including filberts, almonds, pecans, and walnuts but not including apples, other than apples

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment 3

sold in the marketing area specified in such marketing agreement or order, but such termination shall be effective only if announced on or before such date (prior to the end of the then current marketing period) as may be specified in such marketing agreement or order.

(C) Except as otherwise provided in this subsection with respect to the termination of an order issued under this section, the termination or suspension of any order or amendment thereto or provision thereof, shall not be considered an order within the meaning of this section.

(17) Provisions applicable to amendments

The provisions of this section, and section 608d of this title   [FN10] applicable to orders shall be applicable to amendments to orders: *Provided*, That notice of a hearing upon a proposed amendment to any order issued pursuant to this section, given not less than three days prior to the date fixed for such hearing, shall be deemed due notice thereof.

(18) Milk prices

The Secretary of Agriculture, prior to prescribing any term in any marketing agreement or order, or amendment thereto, relating to milk or its products, if such term is to fix minimum prices to be paid to producers or associations of producers, or prior to modifying the price fixed in any such term, shall ascertain the parity prices of such commodities. The prices which it is declared to be the policy of Congress to establish in section 602 of this title shall, for the purposes of such agreement, order, or amendment, be adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates. Whenever the Secretary finds, upon the basis of the evidence adduced at the hearing required by section 608b of this title or this section, as the case may be, that the parity prices of such commodities are not reasonable in view of the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, he shall fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest. Thereafter, as the Secretary finds necessary on account of changed circumstances, he shall, after due notice and opportunity for hearing, make adjustments in such prices.

(19) Producer referendum

For the purpose of ascertaining whether the issuance of an order is approved or favored by producers or processors, as required under the applicable provisions of this chapter, the Secretary may conduct a referendum among producers or processors and in the case of an order other than an amendatory order shall do so. The requirements of approval or favor under any such provision shall be held to be complied with if, of the total number of producers or processors, or the total volume of production, as the case may be, represented in such referendum, the percentage approving or favoring is equal to or in excess of the percentage required under such provision. The terms and conditions of the proposed order shall be described by the Secretary in the ballot used in the conduct of the referendum. The nature, content, or extent of such description shall not be a basis for attacking the legality of the order or any action relating thereto. Nothing in this subsection shall be construed as limiting representation by cooperative associations as provided in subsection (12) of this section. For the purpose of ascertaining whether the issuance of an order applicable to pears for canning or freezing is approved or favored by producers as required under the applicable provisions of this chapter, the Secretary shall conduct a referendum among producers in each State in which pears for canning or freezing are proposed to be included within the provisions of such marketing order and the requirements of approval or favor under any such provisions applicable to pears for canning or freezing shall be held to be complied with if, of the total number of producers, or the total volume of production, as the case may be, represented in such referendum, the percentage approving or favoring is equal to or in excess of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment 3

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

**I (a) PLAINTIFFS**

Ark. Dairy Coop. Assn., Inc., C. Sands Dairy, LLC, Col. River Dairy, LLC, Continental Dairy Prod., Inc., Dairy Prod. of N.M., Lone Star Milk Prod., Inc., Md. & Va. Milk Prod. Coop. Assn., Select Milk Prod., Inc., United Dairymen of Az, Zia Milk Prod., Inc.

**DEFENDANTS**

United States Department of Agriculture

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Yale Law Office, LP, 527 N. Westminster St., PO Box 100, Waynesfield, OH 45896 (419) 568-6401
The Miltner Law Firm, LLC, 527 N. Westminster St., PO Box 477, Waynesfield, OH 45896 (419) 568-2920

Case: 1:08-cv-01426
Assigned To : Sullivan, Emmet G.
Assign. Date : 8/15/2008
Description: TRO/PI

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
◉ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**
☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☒ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**◉ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)   OR   ○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

3

| | | | |
|---|---|---|---|
| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| | | | |
|---|---|---|---|
| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**ORIGIN**

○ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
7 USC Sec. 608c(17), (18); challenges the amendment of minimum milk prices for failure to consider mandatory factors in changing regulations

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** _____   Check YES only if demanded in complaint
**JURY DEMAND:**   YES ☐   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  Aug. 14, 2008   SIGNATURE OF ATTORNEY OF RECORD  *Benjamin F. Yale* jm

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.