UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARKANSAS DAIRY COOPERATIVE ASSOCIATION, INC., et al., )
)
)   Civil Case No.:
--PLAINTIFFS, )
)   JUDGE
v. )
)
UNITED STATES DEPARTMENT OF AGRICULTURE, )   [Oral Hearing Requested]
)
)
--DEFENDANT. )

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR  PRELIMINARY INJUNCTION AND FOR EXPEDITED HEARING

Plaintiffs Arkansas Dairy Cooperative Association, Inc., Central Sands Dairy, LLC, Columbia River Dairy, LLC, Continental Dairy Products, Inc., Dairy Producers of New Mexico, Lone Star Milk Producers, Inc., Maryland and Virginia Milk Producers Cooperative Association, Select Milk Producers, Inc., United Dairymen of Arizona, and Zia Milk Producers, Inc.("Dairy Producers") by and through their undersigned counsel, respectfully move this Court for a Temporary Restraining Order and/or Preliminary Injunction and for Expedited Hearing (the "Motion").  As more fully set forth in the accompanying Memorandum, Dairy Producers request that this Court: (i) enter an Order granting a Temporary Restraining Order pursuant to Rule 65 of

the Federal Rules of Civil Procedure and Rule 65.1(a) of the Local Rules of this Court; (ii) enter an Order for Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rule 65.1(c) of the Local Rules of this Court; and (iii) enter an order granting an expedited hearing on the request for Preliminary Injunction pursuant to Rule 7(f) of the Local Rules of this Court.

Dairy Producers seek to enjoin the United States Department of Agriculture from implementing an Interim Final Rule affecting the minimum prices guaranteed to Dairy Producers under all Federal Milk Marketing Orders. The Interim Final Rule increases the "make allowance" factors in the formulas that establish the federal minimum milk prices. The amendments at issue are contained at 73 Fed. Reg. 44617 (July 31, 2008).

Dairy Producers seek to maintain the *status quo* regarding the minimum price formulas until this Court has time to fully review their challenges to USDA's conduct. The need is immediate as USDA intends to announce minimum prices under the Interim Final Rule at 10:00 AM Eastern Time on Friday August 22, 2008.

Unless enjoined by this Court, USDA will proceed to announce lower minimum prices under the Interim Final Rule than would otherwise be announced under current regulations. Contracts for the sale and delivery of milk will be immediately priced using the announced prices. Dairy Producers, and all other dairy farmers whose milk is eligible to receive the minimum price protection under the Federal Milk Marketing Orders, will suffer irreparable losses of income, as they will be unable to recover the difference between the proper minimum prices and the minimum prices announced under the Interim Final Rule from either their customers or USDA. An injunction would protect not only the *status quo* of the regulations but the *status quo* market as well.

2

As more fully explained in the accompanying Memorandum of Points and Authorities and supported by accompanying Declarations, Dairy Producers are entitled to the relief requested herein because:

1.    USDA failed to determine the average monthly prices of feed and fuel incurred by dairy producers in the relevant marketing areas; consider the most recent monthly feed and fuel price data available; and consider those prices in determining whether or not to adjust make allowances as mandated by the Agricultural Marketing Agreement Act of 1937 (AMAA), as amended by the Food, Conservation, and Energy Act of 2008 (FCEA).  7 U.S.C. § 608c(17)(G), Pub. L. 110-246, § 1504.

2.    USDA failed to take into account "the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates" as mandated by the AMAA.  7 U.S.C. § 608c(18).

As described in the accompanying Memorandum, a temporary restraining order and/or a preliminary injunction is necessary because: (1) Dairy Producers will suffer irreparable harm unless USDA is enjoined and/or restrained from increasing make allowances and announcing minimum prices under the Interim Final Rule; (2) Dairy Producers are likely to succeed on the merits of their claims; (3) USDA will not suffer irreparable harm if it is restrained and/or enjoined; and (4) the public interest will be served if the Court maintains the *status quo* until it has resolved the underlying claims presented in Dairy Producers' Complaint.

3.    USDA failed to comply with statutory (5 U.S.C. § 553) and agency (7 C.F.R. 900.14) requirements for publication or service of a substantive rule not less than 30 days before its effective date.  The Interim Final Rule was published July 31, 2008.  On August 22, 2008, a date only 22 days after publication of the rule, USDA will set the prices for milk and those prices

cannot thereafter be altered.  Counsel has requested that the USDA delay the first price announcement under the new rule until September 19, 2008, which would achieve compliance with the statutory and agency requirements, avoid the need for this Motion for a Temporary Restraining Order, and give USDA time to consider its options so that the new rule conforms with other statutory mandates.  But USDA has refused this request.

Because USDA intends to announce prices on August 22, 2008 using the increased make allowances established in the Interim Final Rule, good cause exists to set a hearing on the Motion at the earliest possible time.

Dairy Producers' counsel has contacted opposing counsel at the Federal Programs Branch, U.S. Department of Justice, pursuant to Local Rule 7.1(m) and Defendant did not consent to any of the relief requested in this Motion.

WHEREFORE, Dairy Producers, pray for relief as follows:   (i) for entry of an Order that temporarily enjoins the Secretary of USDA, his officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order, from implementing, enforcing or otherwise modifying the minimum price formulas as detailed; and (ii) for entry of an Order that enjoins, temporarily until the final determination of this action, the Secretary of USDA, his officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order, from announcing minimum prices using the formulas as detailed at 73 Fed. Reg. 44617 (July 31, 2008); and (iii) for entry of an Order granting an expedited  hearing on this Motion; and (iv) for such other relief the court may deem appropriate.

Respectfully submitted,
YALE LAW OFFICE, LP

/s/ Benjamin F. Yale

_____
BENJAMIN F. YALE, OHIO 0024730
D.C. District Court No. OH 00068
527 North Westminster Street
P.O. Box 100
Waynesfield, Ohio 45896
419-568-6401
Fax 419-568-6413
ben@yalelawoffice.com
Counsel for Cooperative Plaintiffs


THE MILTNER LAW FIRM, LLC

/s/ Ryan K. Miltner

_____
RYAN K. MILTNER, OHIO 0075405
D.C. District Court No. OH 0006
527 North Westminster Street
P.O. Box 477
Waynesfield, Ohio 45896
419-568-2920
Fax 419-568-6413
ryan@miltnerlawfirm.com
Counsel for Dairy Producers of New Mexico

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ARKANSAS DAIRY COOPERATIVE** | ) | |
| **ASSOCIATION, INC., et al.,** | ) | |
| | ) | **Civil Case No.:** |
| **--PLAINTIFFS,** | ) | |
| | ) | **JUDGE** |
| **v.** | ) | |
| | ) | **[Oral Hearing Requested]** |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **AGRICULTURE,** | ) | |
| | ) | |
| **--DEFENDANT.** | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR  PRELIMINARY INJUNCTION AND FOR EXPEDITED HEARING**

**ISSUE PRESENTED**

The Agricultural Marketing Agreement Act of 1937(AMAA), as amended by the Food,

Conservation, and Energy Act of 2008 (FCEA) requires USDA to determine and consider the

monthly feed and fuel costs incurred by dairy producers in the relevant marketing orders

whenever it adjusts make allowances.[1]  On July 31, 2008, USDA adjusted make allowances in

all federal orders without determining producers' monthly feed and fuel costs or considering

---

[1]The USDA Interim Final Rule, relevant provisions of the FCEA and the AMAA
are appended to this Memorandum as Attachment A and also appended to Plaintiffs'
Complaint.

those costs in setting make allowances. The adjustments will irreparably reduce producer income.  Are dairy producers entitled to injunctive relief prohibiting USDA from implementing the make allowance adjustments until USDA complies with the statutory requirements?

**I.      Summary of Argument**

Injunctive relief is necessary to maintain the *status quo* and protect plaintiffs from the imminent implementation of a USDA rule that will cause them irreparable harm.  On July 31, 2008, USDA announced that it will implement a final rule that adjusts make allowances in all milk marketing orders. The critical date before which injunctive relief must be granted is August 22, 2008.  On that date, USDA will use the adjusted make allowances in its announcement of the September advanced prices used in the federal milk marketing orders.[2]  USDA's decision to announce prices this month violates statutory and agency requirements for publication or service of a substantive rule not less than 30 days before its effective date.

The adjusted make allowances lower the minimum milk prices guaranteed to dairy producers, and USDA estimates that first year producer losses will be approximately $262 million.[3]  Plaintiff Dairy Producers estimate losses the first month alone in excess of $6 million. Once USDA announces these reduced prices, the *status quo* will be irrevocably changed and the prices cannot be reversed nor can the lost producer income be recovered from any source, making the losses irreparable.

Plaintiffs satisfy the burdens required for injunctive relief.  Plaintiffs are likely to succeed on the merits because the FCEA expressly requires USDA to determine feed and fuel costs and

---

[2]7 C.F.R. Parts 1000-1131.
[3]USDA Agricultural Marketing Service (AMS), Economic Analysis Class III and IV Pricing Formulas, Tentative Partial Final Decision March 2008, p. 5, www.ams.usda.gov/dairy (March 2008 Economic Analysis). Attached hereto as Attachment B.

then consider those costs in setting make allowances.[4]  The requirements apply in any hearing "commenced prior to September 30, 2012",[5] which the hearing at issue obviously did. USDA's failure to follow the mandate of the statute is most clearly demonstrated by its own statement that "These [higher producer feed and energy costs] are not valid arguments for opposing how make allowances should be determined or what levels make allowances need to be in the Class III and Class IV product-pricing formulas."[6] But the statute clearly compels a different analysis.

Plaintiffs are also able to demonstrate irreparable harm because USDA's actions will reduce producer income and that income cannot be returned to the producers from any source. Because the elements of likelihood of success on the merits, irreparable harm, public interest, and balancing of harm can be met, Plaintiffs are entitled to an order enjoining the implementation of make allowance adjustments and preserving the *status quo* until USDA reconsiders the make allowance adjustments in compliance with the law.  Plaintiffs further request an expedited hearing on their request for injunctive relief on or before Thursday, August 21, 2008.

## II.     Background Information

### A.     The federal milk marketing order program.

USDA administers and modifies milk marketing orders through the authority of the Agricultural Marketing Agreement Act (AMAA)[7] but currently only two-thirds of the milk production in the United States is subject to those orders.  The rest of our domestic milk production is subject to state orders or no orders.  The AMAA authorizes but does not require USDA to issue milk marketing orders.

---

[4]Agricultural Marketing Agreement Act, 7 U.S.C. §608c(17) as amended by Food, Conservation and Energy Act §1504(G) (FCEA), Pub. L. 110-246, 122 Stat 1651, 1721 (June 18, 2008).

[5]*Id.*

[6]73 Fed. Reg. 35306, 35324 (June 20, 2008).

[7]7 U.S.C. §608c.

The Congressional intent of the federal milk marketing orders is "to raise producer prices."[8]  A dairy plant pays and a dairy producer receives minimum prices in the form of federally established "component prices" for butterfat, protein, solids not fat, and other solids, or skim-fat prices that are derived from those component prices.[9]  The pricing formulas use three factors — prices of certain dairy products surveyed by NASS, a make allowance, and a yield.[10]  The levels of each of these factors affect the price that plants pay for raw milk and, ultimately, how much producers receive for their milk.  Because the amounts multiply and compound, seemingly small adjustments in any one of the factors can have profound impacts on pricing.  For example, USDA's upward adjustment of the make allowance for non-fat dry milk by $0.0108 per pound reduced the Class IV price by 10 cents per hundredweight.[11]  The current formulas for the components and prices are detailed in an appendix to the Economic Analysis.[12]

Two of the three are fixed by rule.  The third, product prices, are determined weekly.  National Agricultural Statistics Service ("NASS"), an agency of the USDA, weekly conducts the price survey of certain cheeses, butter, nonfat dry milk, and dry whey.  These prices, commonly called the "NASS prices," are reported each Friday morning.  According to regulations, USDA announces the Advanced Prices based upon the weighted average of two weeks of the NASS prices.  On August 22, USDA's Advance Price announcement will be based on adjusted make allowances that were implemented in violation of the FCEA.

Make allowances, fixed by rule, represent the allowance for manufacturing raw milk into a finished product.  Changes to make allowances are inverse to the resulting changes in the minimum prices.  Producers want lower make allowances and manufacturers want higher make

---

[8]*Block v. Community Nutrition Inst.,* 467 U.S. 340, 342 (1984).
[9]7 C.F.R. §100.50.
[10]*Id.*
[11]March 2008 Economic Analysis, p. 4, Table 2.
[12]*Id.* at 22.

allowances. The first relevant AMAA provision (Subsection 17) plainly requires USDA to determine average monthly producer costs for feed and fuel and consider those costs in considering whether or not to adjust make allowances.

> (G) MONTHLY FEED AND FUEL COSTS FOR MAKE ALLOWANCES.--As part of any hearing to adjust make allowances under marketing orders commencing prior to September 30, 2012, the Secretary shall--
>> (I) determine the average monthly prices of feed and fuel incurred by dairy producers in the relevant marketing area;
>> (ii) consider the most recent monthly feed and fuel price data available; and
>> (iii) consider those prices in determining whether or not to adjust make allowances.[13]

Similarly, Subsection 18 of the AMAA provides:

> (18) Milk prices.  * * *Whenever the Secretary finds, upon the basis of the evidence adduced at the hearing required by section 608b of this title or this section, as the case may be, that the parity prices of [milk or its products] are not reasonable in view of the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, he shall fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest. Thereafter, as the Secretary finds necessary on account of changed circumstances, he shall, after due notice and opportunity for hearing, make adjustments in such prices.[14]

For purposes of this case, Subsection 18 requires USDA to consider "the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates."

**B.    The administrative proceedings leading to this case**.

The pricing formulas (including adjustments to make allowances and yields) are changed through formal rulemaking hearings.[15]   After the close of the evidentiary part of the hearing,

---

[13] 7 U.S.C. §608c(17) as amended by FCEA §1504(G).
[14] 7 U.S.C. §608c(18).
[15] 7 C.F.R. §§900.1-900.18.

exceptions and comments are filed by interested parties[16] and the administrative law judge certifies the transcript to USDA.[17] Dairy Programs, a division of USDA, then prepares and submits a recommended decision. In this decision it delineates its findings of facts, rationale, and the legal authority for its decision.[18]  Additional comments follow and a referendum on the order as amended is held.  In the federal milk marketing orders, producers facing a referendum have only two choices: (1) vote out the entire marketing order; or (2) approve the amended order. There is no vote on the amendment itself. If the referendum passes, the order is adopted and becomes a final rule.[19]

Originally, USDA announced a hearing in January 2006[20] (Make Allowance Hearing) that addressed only proposed adjustments to the make allowances in the pricing formulas.  An on the record hearing was held later that month and post-hearing briefs were filed.  But on September 6, 2006, USDA announced that it had insufficient evidence to issue a decision changing the make allowances.  Instead, it would reconvene the hearing on September 14, 2006.[21]  On November 2, 2006, USDA announced a tentative final decision[22] and required comments to be filed by January 22, 2007.[23]  An Interim Order was issued on December 29, 2006.[24]  A legal challenge threatened to halt the implementation of those make allowances[25] but ultimately that hearing remains open as USDA has not yet ruled on the comments or made a Final Decision.

---

[16]7 C.F.R. § 900.9.
[17]7 C.F.R. § 900.10.
[18]7 C.F.R. § 900.12.
[19]7 C.F.R. §§900.300-311.
[20]71 Fed. Reg. 545 (January 5, 2006).
[21]71 Fed. Reg. 52502 (September 6, 2006).
[22]71 Fed. Reg. 67467 (November 22, 2006).
[23]*Id.*
[24]71 Fed. Reg. 78333 (December 29, 2006).
[25]*Bridgewater Dairy, LLC v. U.S. Dept. of Agriculture,* Slip Copy, 2007 WL 634059, (N.D.Ohio, February 22, 2007).

While that Make Allowance Hearing was pending, USDA noticed the instant Formula Hearing. That hearing notice included a number of modifications to the component prices of the formulas but also included proposed adjustments to make allowances, the subject of the other still pending hearing.[26] The Formula Hearing was held over twelve days in three cities and concluded on July 11, 2007. Comments were filed and the administrative law judge certified the transcript on October 11, 2007.

Sometime prior to March 2008, USDA decided to amend the orders by increasing the make allowances and correcting a mathematical error in the butterfat formula. The Economic Analysis Staff of USDA used the proposed modifications to run an economic model and prepare a report dated March 2008.[27] It was not until three months later that USDA made the decision public when it issued the Formula Decision. The decision was made without giving interested parties an opportunity to comment on the rule before it became final.[28] The amended orders were approved by producers (again, the producers only choice was to approve the amendment or vote out the order completely) and USDA issued the Formula Rule being challenged herein.

Plaintiffs sent correspondence to USDA's Dairy Programs division on August 8, 2008, explaining that the Formula Rule did not comport with statutory requirements (Subsections 17 and 18 of 608c) and warning that implementation of the Formula Rule on August 22, 2008 would also violate USDA's rules requiring at least thirty days notice before implementation. Request was made that USDA withdraw the Formula Rule.[29] That request was denied in a telephone call from Dana Coale to Ben Yale on August 14, 2008, making this lawsuit necessary.

---

[26] 72 Fed. Reg. 6179 (February 9, 2007).
[27] March 2008 Economic Analysis.
[28] 73 Fed. Reg. 35306 (June 20, 2008).
[29] Benjamin F. Yale to Dana Coale, August 8, 2008. Attached hereto as Attachment C.

III.    **Dairy Producers are entitled to Injunctive Relief.**

The APA provides that the Court may enjoin implementation of agency action pending judicial review:

> ...On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.[30]

To obtain injunctive relief, Plaintiffs must demonstrate (1) a substantial likelihood of success on the merits; (2) that they will suffer irreparable injury if the requested relief is denied; (3) that an order would not substantially injure other interested parties; and (4) that the public interest would be furthered by granting the order.[31] The standard for granting a temporary restraining order in this Circuit is similar to that of the preliminary injunction.[32]

The Court of Appeals for this Circuit held in *CityFed Financial* that these four factors must be viewed as a continuum where greater strength in one factor compensates for less in the other: "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."[33] Finally, the purpose of a TRO under Rule 65 is to preserve the *status quo* so that a reasoned resolution of a dispute may be had. As demonstrated below, the governing standard is met in this case and injunctive relief should issue.

---

[30]7 U.S.C. §705.

[31]*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir.1977).

[32]*Barrow v. Graham*, 124 F. Supp.2d 714, 716 (D.D.C. 2000).

[33]*CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

### A.    Absent injunctive relief, Plaintiffs will suffer irreparable harm.

Absent injunctive relief on or before August 21, 2008, the *status quo* will be permanently altered because USDA will use the adjusted make allowances to announce advance prices on August 22, 2008. The resulting losses in producer income are devastating and irreparable.

The underlying purpose of the AMAA and the federal milk marketing orders is to "raise producer prices,"[34] but the Formula Rule has just the opposite effect. According to USDA's own economic analysis all dairy farmers in the United States participating in the producer settlement funds of the federal milk marketing orders will suffer an aggregate loss of revenue of $262 million in the first year.[35]  Plaintiffs estimate for first month losses to exceed $6 million dollars for them or their producers.

This reduction in producer income hits at a particularly difficult time.  As one witness testified after reviewing and summarizing accounting reports from hundreds of dairy farmers, through September 2006, producers were already receiving an average net loss of 86 cents per hundredweight.[36]  Conditions are even worse today.  USDA has, through the first half of 2008 reported the lowest milk price-to-feed price ratios ever.  The milk to feed ratio averages 2.06 thus far in  2008.[37]  A ratio of 3.0 is considered ideal.  Despite higher milk prices, producer profits are tight in large part due to much higher feed and energy prices.  NASS reports significantly higher costs of feed.  Similarly, research out of The University of Wisconsin shows that the index for feed has risen to almost 200 percent of the base period of 1990-1992 compared to less than 125 percent during 2006.[38]  NASS also reports that fuel prices continue to climb.

---

[34]*Block v. Community Nutrition Institute,* 467 US 340, 342 (1984).
[35]March 2008 Economic Analysis, p. 5.
[36]Genske Testimony, March 1, 2008, Tr. 778-80.
[37]Understanding Dairy Markets, Brian Gould, Agricultural and Applied Economics, UW Madison, http://future.aae.wisc.edu/data/annual_values/by_area/2058?tab=prices (August 8, 2008).
[38]*Id*. at Graph, http://future.aae.wisc.edu/data/monthly_values/by_area/871?yoy=true&tab=costs&area=

The Index of Fuel Prices Paid for 2008 shows that fuel costs have risen to 420% of the 1990-1992 baseline compared to a high of 270% for 2006.[39] But USDA failed to consider these facts or explain how adjusting the make allowances resulting in a reduction in minimum prices can be justified.

These minimum prices are the foundation upon which milk transactions are computed.[40] As producer prices go down, producer income goes down almost penny for penny. Thus, even if Plaintiffs were to ultimately prevail on the merits of their claims, the damage will begin on August 22, 2008 and will be irreversible because plants that purchase producer milk will have contracted for, processed and sold the milk to their consumers at prices that reflect USDA's announced minimum prices derived from the adjusted make allowances.[41]

The resulting producer economic losses are not subject to a legal remedy. If denied injunctive relief but ultimately successful in their claims, Plaintiffs cannot obtain money damages from USDA because no public money is used to fund the producer settlement fund and because sovereign immunity shields the government from liability.

Other courts faced with the issue have agreed that the losses resulting from reduced payments into the producer settlement fund are irreparable. "Since there is no alternative remedy at law for recovery of these losses which will occur during the pendency of this matter before the Court, the Plaintiffs will suffer irreparable, immediate injury in the absence of a temporary restraining order."[42] In *St. Albans*, producers sought an injunction against the government in the

---

US August 8, 2008.
    [39]*Id.* at
http://future.aae.wisc.edu/data/monthly_values/by_area/877?yoy=true&tab=costs&area=
US.
    [40]Declarations of Rance Miles, Frank Schekarski, Mark Hocking, See
Attachments, D, E, and F.
    [41]*Id.*
    [42]*St. Albans Coop. Creamery, Inc. v. Glickman,* 68 F. Supp.2d 380, 386 (D.
Vt.1999).

implementation of amended milk marketing orders.  Though the changes were more sweeping than those in this case, the result was the same– minimum prices were being reduced to the detriment of producers.  Producers brought suit and in their motion for preliminary injunction, the *St. Albans* court found that producers would be irreparably harmed.

> **B.     Plaintiffs are likely to succeed on the merits of their claims.**
>
> **1.     USDA has failed to follow statutory mandates to determine and consider the monthly average costs of feed and fuel in the marketing areas and to consider those numbers in determining whether or not to adjust make allowances.**

The hearing at issue is one to adjust make allowances.  It commenced prior to September 30, 2012.  Once those preliminary requirements are met, the AMAA mandates that USDA (1)"determine the average monthly prices of feed and fuel incurred by dairy producers in the relevant marketing area"; (2) "consider the most recent monthly feed and fuel price data available;" and (3) consider those prices in determining whether or not to adjust make allowances.[43]  By its own admission, USDA failed to complete any of these three mandatory tasks, in violation of its statutory obligations.

In its decision USDA said,  "These [arguments that feed costs are too high] are not valid arguments for opposing how make allowances should be determined or what levels make allowances need to be in the Class III  and Class IV product-pricing formulas."[44]  But USDA's stated belief that these factors are not relevant is supplanted by Congress's mandatory directive that these factors be determined and considered.

USDA's obvious error in interpreting the statute is demonstrated not only by its express statement to the contrary but also by a review of the decision.  A review of the accompanying

---

[43]7 U.S.C. 608c(17) as amended by FCEA §1504(G).

[44]73 Fed. Reg. 35306, 35324.

economic analysis relied upon by USDA in its decision does not once include either the word "feed" or the word "fuel".

The argument that Plaintiffs are likely to succeed on the merits is very simple: The FCEA requires an analysis of fuel and feed costs in plain, unambiguous terms and USDA implicitly and explicitly demonstrated that in this decision, it chose not to conduct that analysis and has therefore failed to comply with the FCEA.

> **2.     USDA failed to consider separate factors enumerated in the AMAA and their impact on the various milk marketing areas.  Instead, USDA engaged in a single national analysis of its proposed changes.**

USDA also failed to comply with the more general mandates of the AMAA.  As detailed above, Plaintiffs have shown that the Formula Rule does not "reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products" as required by the AMAA.  Courts considering the question have held that the Secretary must make such a determination. "Section 608c(18) clearly requires that the Secretary take into account the economic factors described in that section before undertaking a rulemaking which fixes minimum prices."[45]

Though it does recite this mandate of the AMAA, USDA never explains anywhere in the entire Decision how feed costs were considered.  The  econometric model that was used to do an economic impact analysis does compute "the quantity of milk supplied [as] a function of the all-milk price, feed prices, cow slaughter prices and trend [sic]."  At best, the model indirectly considers feed costs by merely calculating the production levels and prices of milk based on predetermined assumptions about feed costs and other economic criteria.  USDA did not take actual record evidence into account to directly consider the impact that feed costs and

---

[45]*Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1348 (6th Cir. 1994).

availability of feeds have on dairy farmer incomes.  Accordingly, USDA could not assess the reasonableness of reducing minimum prices and ensure that the minimum prices "reflect" the financial burdens on dairy producers.

 This kind of indirect consideration of feed costs was flatly rejected in *St. Albans*.  In that decision, the Court reviewed the purpose of the AMAA, and rejected USDA's assertion that indirect consideration of the Subsection (18) factors could suffice.  "Given that the consolidation of the orders creates a concrete and direct effect on milk prices, and that indirect consideration of regional economic factors is imprecise, direct consideration of these factors is required by the AMAA."[46] In a separate case, the district court for the Northern District Court of Ohio concluded that this kind of indirect consideration was sufficient.[47]  But that case (1) was decided before the FCEA amendments were enacted and (2) is not binding precedent on this court. In addition, that Court concluded that it was the intent of Congress that the enumerated factors in 7 U.S.C. § 608c(18) needed to be considered each time USDA amended the prices under a milk marketing order, including the requirement that the supplies and demands of feeds and other economic conditions in each marketing area be considered.[48]

 Aside from establishing what factors must be considered, the AMAA also mandates consideration be given to "the marketing area to which the contemplated marketing agreement, order, or amendment relates." The econometric model in the Economic Analysis does not take into account the regional economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates.  During the evidentiary part of the hearing process during the Make Allowance Hearing which is still pending a final decision,  USDA's economist was questioned

---

[46]*St. Albans*, 68 F.Supp.2d at 390.
[47]*Bridgewater Dairy,* 2007 WL 634059 at * 6.
[48]*Id.* at * 5-6 (analyzing the House and Senate reports accompanying the AMAA passage and the decision of the Sixth circuit in *Lansing Dairy*).

about whether the economic model can take into account the economic conditions and effect of the proposed changes "on a region-by region or order-by-order or geographic basis." In response, he stated unequivocally, "Not at this time." Dr. McDowell was also asked about whether the model forecasted the all-milk price impacts on a marketing order basis. Once again, he stated that the model did not compute region-specific data.[49]

In the hearing leading to this case, Dr. McDowell confirmed that USDA's economic analysis does not include any regional analysis of the proposed minimum price amendments. On cross-examination, he agreed that disparate regional impacts are not captured in USDA's econometric model.[50] In light of this total failure, even if the Court were to conclude that USDA met its obligation to consider feed costs and availability, the Formula Rule must still be enjoined for failure to consider regional economic factors.

The language in the AMAA clearly mandates individual market considerations. The Sixth Circuit has already construed the AMAA and held that, "Section 608c(18) clearly requires that the Secretary take into account the economic factors described in that section before undertaking a rulemaking which fixes minimum prices."[51] The Vermont District Court agreed.[52]

USDA ignores marketing area regions, and, instead treats pricing as if it occurred in a "national market." For example, it states, "Additionally, the Class III and Class IV product-price formulas establish derived classified prices for producer milk that are used nationally in all Federal milk orders."[53] That is not a true statement. The Federal milk marketing orders collectively do not constitute the "national market" but instead are ten regional markets that account for only two-thirds of the milk produced in the nation. Changes in the federal order

---

[49]McDowell, January 24, 2006, p. 260-1.
[50]McDowell, February 27, 2007, p. 190-92.
[51]*Lansing Dairy,* 39 F.3d at 1348.
[52]*St. Albans,* 68 F. Supp.2d at 390.
[53]73 Fed. Reg. 35306, 35324.

prices under the Formula Decision do not affect the national milk supply.  Furthermore, Dr. McDowell testified that the specific regional impacts vary from marketing area to marketing area.

In fact, USDA determined that while federal milk market order receipts would decline by $165 million dollars on average over nine years, producer revenue over the entire nation would only go down $156 million, suggesting that producer revenue outside of the federal system will benefit by $9 million per year.[54]  If this was truly a "national" market as represented by USDA in the Formula Decision, distribution of the economic impact of USDA's decision should be borne more approximate to two-thirds by the federal order system and one-third by those participants operating outside of the federal order system.

The USDA goes further afar with the make allowances when it says:

> It is important to Federal order classified pricing that Class III and Class IV prices be derived, as much as possible, from *national* estimates of manufacturing cost information and because NASS survey prices include California. Accordingly, it is reasonable to conclude that appropriately combining this cost data with cost survey data of manufacturing plants not located in California will tend to produce a measure of *national* manufacturing costs.[55]

The argument fails because the make allowances are not national at all.  Their distribution is weighted in favor of areas outside of the federal marketing areas, especially California.  Based on the Formula Decision, the entire make allowance for cheese comes from California.[56]  According to the economic analysis that accompanied the Make Allowance Decision, only 854 million pounds of American style cheese of the U.S. total of 3.812 billion came from California.[57]  The California cost survey of cheese shows a range of costs from

---

[54]*Id.*

[55]*Id* (emphasis added).

[56]*Id* at 35326.

[57]USDA Agricultural Marketing Service (AMS) Economic Analysis Class III and IV Make Allowances Tentative Final Decision, November 2006, Table 1, p. 2.

$0.1862 to $0.2186 based on efficiency of plants.[58]  USDA chose California's *weighted* average. Implicitly it found, without evidence, that the distribution of cheese production among more and less efficient plants in California is the same "nationally" and within the marketing areas.  This is not supported by evidence.

When passed in 1937, Congress expressed a clear intent that the cost of feeds, available supplies of feeds, and regional economic conditions were to be considered each and every time that USDA fixed, amended, or (due to changed circumstances) adjusted  the minimum prices:

> The proposed amendment . . . provides that if the Secretary finds that the national parity price for milk does not adequately reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk *in the marketing area to which the marketing agreement or order relates*, he shall fix such prices as will reflect such factors, insure a sufficient quantity of pure wholesome milk, and be in the public interest. The proposed amendment further provides that as the Secretary finds necessary on account of changed circumstances, he shall make adjustments in such prices. Such adjustments are to be made in accordance with the same standards as are provided for the initial fixing of prices under this subsection.[59]

The Senate report included nearly identical language:

> [I]f he finds these ascertained prices are not reasonable in view of local price of feeds, the available supply of feeds and other economic conditions which affect the supply of and demand for milk *in a particular marketing area*, the Secretary shall fix such prices as will reflect these conditions, insure a sufficient quantity of pure and wholesome milk, and be in the public interest. * * * The Secretary is to use the same standard in adjusting prices as is to be used in the fixing of prices initially in the regulation of any marketing area.[60]

In line with the requirements under subsections (17) and (18) that determinations be made on a market by market basis, the AMAA requires that the orders are to be created and amended based on regional, not national factors.

> All orders issued under this section which are applicable to the same commodity or product thereof shall, so far as practicable, prescribe such different terms,

---

[58]Manufacturing Costs Exhibit - 2006, CDFA
http://www.cdfa.ca.gov/dairy/pdf/ManufCostExhibit2006.pdf.
[59]H.R. Rep. 75-468 (1937) (emphasis added).
[60]Sen. Rpt. 75-565 (1937) (emphasis added).

applicable to different production areas and marketing areas, as the Secretary finds necessary to give due recognition to the differences in production and marketing of such commodity or product in such areas.[61]

In 1973, when Congress added language to Subsection (18) regarding the productive capacity, it reaffirmed that the purpose of Subsection (18) was to assure a farm income adequate to maintain production. "Although the need for establishing price levels that assure maintenance of adequate productive capacity to meet future needs is probably already embodied in the existing standard, the amendment is intended to make clear that adequate farm income is an important consideration in setting prices under milk marketing orders."[62]

Congress has demanded that USDA assess supply and demand considerations within each marketing area, not nationally, when defining marketing order regulations. A perusal of the Formula Decision as well as the hearing record establishes both that USDA has failed to comply with the AMAA in this regard, and this lack of evidence prohibited a change in the minimum prices. The Supreme Court in has held that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[63] In this case the relevant data includes at a minimum the average monthly costs of feed and fuel incurred by dairy farmers with the marketing area. There is no evidence of such examination.

3.      **USDA failed to follow the law and its own rules when it made a rule effective without allowing the required thirty days between publication of the rule and its effective date.**

Finally, USDA has also failed to follow the law and its own regulations because USDA has only provided 22 days from the date of the publication of the order until it takes effect when

---

[61]7 U.S.C. §608c(11)(C).
[62]H.R. Rpt. 93-337, at p. 1762 (June 27, 1973).
[63]*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

the advanced prices for Class I and Class II milk are announced on August 22, 2008. The APA requires that, "The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except . . . (3) as otherwise provided by the agency for good cause found and published with the rule."[64]  USDA itself has provided that, "No marketing order shall become effective less than 30 days after its publication in the Federal Register, unless the Secretary, upon good cause found and published with the order, fixes an earlier effective date therefor."[65]  Here, USDA has articulated no reason to justify or excuse the shortened time from 30 days to 22 days.  This error provides an additional basis for which Dairy Producers are entitled to a Temporary and Preliminary Injunction delaying the implementation of the USDA Amendments until after September 1, 2008.

C.    **The balance of harm and the public interest support maintenance of the** *status quo* **until USDA complies with the statutory mandates.**

The public has a substantial interest in USDA following the law.[66]  Compliance with the AMAA furthers policy established by the Congress which is in the interest of consumers and producers.[67]  In furtherance of this policy, Congress has expressly required that USDA consider producer costs of fuel and feed when setting make allowances[68] and minimum prices.[69]

There is a public interest in lower consumer prices.  According to USDA, consumer prices will rise if the rule is implemented. USDA's economic analysis shows implementation

---

[64]5 U.S.C. §553(d)(3).
[65]7 C.F.R. 900.14(d).
[66]*See, e.g.*, *In re Medicare Reimbursement Litigation*, 414 F.3d 7,12 (D.C. Cir. 2005) (Additional administrative burden "[would] not outweigh the public's substantial interest in the Secretary's following the law.").
[67]7 U.S.C. §602.
[68]7 U.S.C. 608c(17) as amended by FCEA §1504(G).
[69]7 U.S.C. §608c.

will reduce milk production and that the "contraction in milk production results in higher prices of major dairy products."[70]

The USDA has no pecuniary or vested interest in implementation of the regulations versus the continued use of the existing price formulas. Those who will receive the financial gain from the reduced minimum milk prices are plants. Though the buyers of milk will be required to maintain current levels of payment. Congress has, through its requirements under section 1504 of the Farm Bill, required that in making decisions about make allowances, the USDA must consider the cost of feeds and fuel incurred by producers. Although the Secretary has said that it is important to reduce the costs to plants, that determination was made without considering the factors required by Congress. Thus the basis of its interest in the lower costs of milk is based upon a failed determination by the Secretary, not one in fact. In point of fact, the Economic Analysis done by USDA in promulgating this rule did not find a failure of plants or its ability over a nine year period to receive, process, and market all of the milk production. That contrasts with its clear showing that implementation will result in reduced marketings. In the immediately prior, and still pending hearing process on make allowances, the participants in the USDA economic study testified that reduction in milk production meant farms would go out of business.[71]

The unexplained delay in publishing the decision belies the USDA's assertion that emergency conditions exist justifying immediate implementation of the rule. The hearing record was complete in October of 2007. USDA was aware of conditions before then. According to the Economic Analysis, it was published in March 2008.[72] It reflects the already made decisions to the minimum price formulas. At least three or more months passed from the Economic Analysis

---

[70]March 2008 Economic Analysis, p.5.
[71]McDowell, January 24, 2006, p. 256, ll. 6-11.
[72]March 2008 Economic Analysis, p. 1.

until publication.   If USDA thought remedy for the emergency conditions could wait for months it must not have been so imminent.   The stated emergency is based upon changes in prices in *2006* versus *2005*.   In the two years those dire circumstances existed prior to publication of the rule have not provided any evidence of such circumstances.   In point of fact, USDA statistics show that the total number of cheese plants in the US in 2006 was 427 compared to 434 in 2007, or an increase in seven plants during the "emergency conditions."   The production of cheese in 2006 rose 4.1% over 2005 and 2007 was 1.8% over 2006.[73]    Similarly, the number of butter plants increased by three and producers of non fat dry milk increased by 5.[74]   Contrast that with the reduction of farms 2006 to 2007 from 74,980 to 71,510 and USDA's own expectation that the rule will result in even more farms going out of operation.[75]

The balance of harm favors staying implementation and the public interest will be best served by maintaining the *status quo* until such time as the matter can be fully explored.

## IV.    Conclusion

WHEREFORE, the Plaintiffs respectfully request that this Court grant Plaintiffs injunctive relief and order USDA, its agents and attorneys and those persons in active concert or participation with them who receive actual notice of this order be restrained, until further order of this Court, from implementing the adjusted make allowances in amendments to the regulations found at 7 C.F.R. Parts 1000 - 1131, Proposed Rule; Tentative Partial Final Decision, 73 Fed. Reg. 35306 (June 20, 2008) and Interim Order Amending the Orders, 73 Fed. Reg.44617 (July 31, 2008).

---

[73]USDA National Agricultural Statistics Service, Dairy Products 2007 Summary, April 2008, pp. 2, 4, 5, and 7.
http://usda.mannlib.cornell.edu/usda/current/DairProdSu/DairProdSu-04-25-2008.pdf.
[74]*Id.*
[75]USDA Agricultural Statistics Board,  NASS, Farms, Land in Farms, and Livestock Operations 2007 Summary, February 2008, p. 23.

Respectfully submitted,
YALE LAW OFFICE, LP


/s/ Benjamin F. Yale
_____
BENJAMIN F. YALE, OHIO 0024730
D.C. District Court No. OH 00068
527 North Westminster Street
P.O. Box 100
Waynesfield, Ohio 45896
419-568-5751
Fax 419-568-6413
ben@yalelawoffice.com
Counsel for Cooperative Plaintiffs


THE MILTNER LAW FIRM, LLC


/s/ Ryan K. Miltner
_____
RYAN K. MILTNER, OHIO 0075405
D.C. District Court No. OH 0006
527 North Westminster Street
P.O. Box 477
Waynesfield, Ohio 45896
419-568-2920
Fax 419-568-6413
ryan@miltnerlawfirm.com
Counsel for Dairy Producers of New Mexico

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ARKANSAS DAIRY COOPERATIVE** | ) | |
| **ASSOCIATION, INC., et al.,** | ) | |
| | ) | **Civil Case No.:** |
| **--PLAINTIFFS,** | ) | |
| | ) | **JUDGE** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **AGRICULTURE,** | ) | |
| | ) | |
| **--DEFENDANT.** | ) | |

**NOTICE OF MOTION SEEKING A TEMPORARY RESTRAINING ORDER**

Please take notice that on or about 2:00 pm August 15, 2008 the Plaintiffs will be filing a

motion for a temporary restraining order in this case in the U.S. District Court for the District of

Columbia, 333 Constitution Avenue, NW, Washington, D.C.  The matter will be referred to a

judge of that court and a hearing will be held as soon thereafter as the court provides.

Respectfully submitted,
YALE LAW OFFICE, LP

/s/ Benjamin F. Yale

_____
BENJAMIN F. YALE, OHIO 0024730
D.C. District Court No. OH 00068
527 North Westminster Street
P.O. Box 100
Waynesfield, Ohio 45896
419-568-6401
Fax 419-568-6413
ben@yalelawoffice.com
Counsel for Cooperative Plaintiffs


THE MILTNER LAW FIRM, LLC

/s/ Ryan K. Miltner

_____
RYAN K. MILTNER, OHIO 0075405
D.C. District Court No. OH 0006
527 North Westminster Street
P.O. Box 477
Waynesfield, Ohio 45896
419-568-2920
Fax 419-568-6413
ryan@miltnerlawfirm.com
Counsel for Dairy Producers of New Mexico

## Executive Order 12372

This program/activity is listed in the Catalog of Federal Domestic Assistance under No. 10.025 and is subject to Executive Order 12372, which requires intergovernmental consultation with State and local officials. (See 7 CFR part 3015, subpart V.)

## Executive Order 12988

This rule has been reviewed under Executive Order 12988, Civil Justice Reform. This rule: (1) Preempts all State and local laws and regulations that are inconsistent with this rule; (2) has no retroactive effect; and (3) does not require administrative proceedings before parties may file suit in court challenging this rule.

## Paperwork Reduction Act

This rule contains no new information collection or recordkeeping requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*).

## List of Subjects

*7 CFR Part 301*

Agricultural commodities, Plant diseases and pests, Quarantine, Reporting and recordkeeping requirements, Transportation.

■ Accordingly, we are amending 7 CFR part 301 as follows:

## PART 301—DOMESTIC QUARANTINE NOTICES

■ 1. The authority citation for part 301 continues to read as follows:

**Authority:** 7 U.S.C. 7701–7772 and 7781–7786; 7 CFR 2.22, 2.80, and 371.3.

Section 301.75–15 issued under Sec. 204, Title II, Public Law 106–113, 113 Stat. 1501A–293; sections 301.75–15 and 301.75–16 issued under Sec. 203, Title II, Public Law 106–224, 114 Stat. 400 (7 U.S.C. 1421 note).

## § 301.75–7 [Amended]

■ 2. In § 301.75–7, paragraph (a)(5)(ii) is amended by removing the word "2008" and adding the word "2010" in its place.

Done in Washington, DC, this 28th day of July 2008.

**Cindy J. Smith,**

*Administrator, Animal and Plant Health Inspection Service.*

[FR Doc. E8–17592 Filed 7–30–08; 8:45 am]

**BILLING CODE 3410–34–P**

## DEPARTMENT OF AGRICULTURE

**Agricultural Marketing Service**

**7 CFR Part 1000**

**[Docket No. AMS–DA–07–0026; AO–14–A77, et al.; DA–07–02–A]**

**Milk in the Northeast and Other Marketing Areas; Interim Order Amending the Orders**

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Interim final rule.

**SUMMARY:** This order amends the manufacturing cost allowances and the butterfat yield factor used in the Class III and Class IV product-price formulas applicable to all Federal milk marketing orders. More than the required producers approved the issuance of the interim order as amended.

**DATES:** *Effective Date:* September 1, 2008.

**FOR FURTHER INFORMATION CONTACT:** Jack Rower, Marketing Specialist, USDA/AMS/Dairy Programs, Order Formulation and Enforcement Branches, STOP 0231–Room 2971, 1400 Independence Avenue, SW., Washington, DC 20250–0231, (202) 720–2357, e-mail address: *jack.rower@usda.gov.*

**SUPPLEMENTARY INFORMATION:** This decision adopts provisions to amend the manufacturing (make) allowances for cheese, butter, nonfat dry milk (NFDM) and dry whey powder contained in the Class III and Class IV product-price formulas. Specifically, this decision adopts the following make allowances: cheese—$0.2003 per pound; butter—$0.1715 per pound; NFDM—$0.1678 per pound; and dry whey—$0.1991 per pound. This decision also increases the butterfat yield factor in the butterfat price formula from 1.20 to 1.211.

This administrative rule is governed by the provisions of Sections 556 and 557 of Title 5 of the United States Code and, therefore, is excluded from the requirements of Executive Order 12866.

This interim rule has been reviewed under Executive Order 12988, Civil Justice Reform. This rule is not intended to have a retroactive effect. This rule will not preempt any state or local laws, regulations, or policies, unless they present an irreconcilable conflict with this rule.

The Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674) (AMAA), provides that administrative proceedings must be exhausted before parties may file suit in court. Under Section 608c(15)(A) of the

AMAA, any handler subject to an order may request modification or exemption from such order by filing with the Department of Agriculture (USDA) a petition stating that the order, any provision of the order, or any obligation imposed in connection with the order is not in accordance with the law. A handler is afforded the opportunity for a hearing on the petition. After a hearing, the Department would rule on the petition. The AMAA provides that the district court of the United States in any district in which the handler is an inhabitant, or has its principal place of business, has jurisdiction in equity to review the Department's ruling on the petition, provided a bill in equity is filed not later than 20 days after the date of the entry of the ruling.

## Regulatory Flexibility Act and Paperwork Reduction Act

In accordance with the Regulatory Flexibility Act (5 U.S.C. 601–612), the Agricultural Marketing Service has considered the economic impact of this action on small entities and has certified that this interim rule will not have a significant economic impact on a substantial number of small entities. For the purpose of the Regulatory Flexibility Act, a dairy farm is considered a small business if it has an annual gross revenue of less than $750,000, and a dairy products manufacturer is a small business if it has fewer than 500 employees.

For the purposes of determining which dairy farms are small businesses, the $750,000 per year criterion was used to establish a marketing guideline of 500,000 pounds per month. Although this guideline does not factor in additional monies that may be received by dairy producers, it should be an inclusive standard for most "small" dairy farmers. For purposes of determining a handler's size, if the plant is part of a larger company operating multiple plants that collectively exceed the 500-employee limit, the plant will be considered a large business even if the local plant has fewer than 500 employees.

During February 2007, the month the initial public hearing was held, the milk of 49,712 dairy farmers was pooled on the Federal order system. Of the total, 46,729 dairy farmers, or 94 percent, were considered small businesses. During the same month, 352 plants were regulated by or reported their milk receipts to be pooled and priced on a Federal order. Of the total, 186 plants, or 53 percent, were considered small businesses.

This interim final rule amends all orders by changing the make allowances

contained in the formulas used to compute component prices and the minimum class prices in all Federal milk orders. Specifically, the make allowance for butter increases from $0.1202 to $0.1715 per pound; the make allowance for cheese increases from $0.1682 to $0.2003 per pound; the make allowance for NFDM increases from $0.1570 to $0.1678 per pound; and the make allowance for dry whey increases from $0.1956 to $0.1991 per pound. The butterfat yield factor in the butterfat price formulas is increased from 1.20 to 1.211.

The adoption of these new make allowances serves to approximate the average cost of producing cheese, butter, NFDM and dry whey for manufacturing plants located in Federal milk marketing areas.

The established criteria for the make allowance changes are applied in an identical fashion to both large and small businesses and will not have any different impact on those businesses producing manufactured milk products. An economic analysis has been performed that discusses impacts of the amendments on industry participants including producers and manufacturers. It can be found on the AMS Dairy Web site at *http://www.ams.usda.gov/dairy*. Based on the economic analysis, we have concluded that the amendments will not have a significant economic impact on a substantial number of small entities.

The Agricultural Marketing Service (AMS) is committed to complying with the E-Government Act, to promote the use of the Internet and other information technologies to provide increased opportunities for citizen access to Government information and services, and for other purposes.

This interim final rule does not require additional information collection that needs clearance by the Office of Management and Budget (OMB) beyond currently approved information collection. The primary sources of data used to complete the forms are routinely used in most business transactions. Forms require only a minimal amount of information that can be supplied without data processing equipment or a trained statistical staff. Thus, the information collection and reporting burden is relatively small. Requiring the same reports for all handlers does not significantly disadvantage any handler that is smaller than the industry average.

**Prior Documents in This Proceeding**

*Notice of Hearing:* Issued February 5, 2007; published February 9, 2007 (72 FR 6179).

*Supplemental Notice of Hearing:* Issued February 14, 2007; published February 20, 2007 (72 FR 7753).

*Notice to Reconvene Hearing:* Issued March 15, 2007; published March 21, 2007 (72 FR 13219).

*Notice to Reconvene Hearing:* Issued May 2, 2007; published May 8, 2007 (72 FR 25986).

*Tentative Partial Final Decision:* Issued June 16, 2008; published June 20, 2008 (73 FR 35306).

**Findings and Determinations**

The findings and determinations hereinafter set forth supplement those that were made when the Northeast and other orders were first issued and when they were amended. The previous findings and determinations are hereby ratified and confirmed, except where they may conflict with those set forth herein.

The following findings are hereby made with respect to the Northeast and other marketing orders:

(a) *Findings upon the basis of the hearing record.*

A public hearing was held upon certain proposed amendments to the tentative marketing agreements and to the orders regulating the handling of milk in the Northeast and other marketing areas. The hearing was held pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674), and the applicable rules of practice and procedure (7 CFR part 900).

Upon the basis of the evidence introduced at such hearing and the record thereof, it is found that:

(1) The said orders as hereby amended, and all of the terms and conditions thereof, will tend to effectuate the declared policy of the Act;

(2) The parity prices of milk, as determined pursuant to section 2 of the Act, are not reasonable in view of the price of feeds, available supplies of feeds, and other economic conditions which affect market supply and demand for milk in the aforesaid marketing areas. The minimum prices specified in the orders as hereby amended on an interim basis, are such prices as will reflect the aforesaid factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest; and

(3) The said orders, as hereby amended on an interim basis, regulate the handling of milk in the same manner as, and is applicable only to

persons in the respective classes of industrial or commercial activity specified in, a marketing agreement upon which a hearing has been held.

(b) *Additional Findings.* It is necessary and in the public interest to make these interim amendments to the Northeast and other orders effective [insert effective date]. Any delay beyond that date would tend to disrupt the orderly marketing of milk in the aforesaid marketing areas.

The interim amendments to this order are known to handlers. The tentative partial decision containing the proposed amendments to this order was issued on June 16, 2008.

The changes that result from these interim amendments will not require extensive preparation or substantial alteration in the method of operation for handlers. In view of the foregoing, it is hereby found and determined that good cause exists for making these interim amendments effective on [insert effective date].

*Determinations.* It is hereby determined that:

(1) The refusal or failure of handlers (excluding cooperative associations specified in Section 8c(9) of the Act) of more than 50 percent of the milk, which is marketed within the specified marketing areas, to sign a proposed marketing agreement, tends to prevent the effectuation of the declared policy of the Act;

(2) The issuance of this interim order amending the Northeast and other marketing orders is the only practical means pursuant to the declared policy of the Act of advancing the interests of producers as defined in the orders as hereby amended;

(3) The issuance of the interim orders amending the Northeast and other orders is favored by at least two-thirds of the producers who were engaged in the production of milk for sale in the respective marketing areas.

**Order Relative to Handling**

*It is therefore ordered,* that on and after the effective date hereof, the handling of milk in the Northeast and other marketing areas shall be in conformity to and in compliance with the terms and conditions of the orders, as amended, and as hereby amended, as follows:

**List of Subjects in 7 CFR Part 1000**

Milk marketing orders.

■ For the reasons set forth in the preamble, the Agricultural Marketing Service amends Chapter X of Title 7 of the Code of Federal Regulations as follows:

**PART 1000—GENERAL PROVISIONS OF FEDERAL MILK MARKETING ORDERS**

■ 1. The authority citation for 7 CFR part 1000 continues to read as follows:

**Authority:** 7 U.S.C. 601–674, and 7253.

■ 2. Section 1000.50 is amended by:
■ A. Revising paragraph (l);
■ B. Revising paragraph (m);
■ C. Revising paragraph (n)(2);
■ D. Revising paragraph (n)(3)(i);
■ E. Revising paragraph (o); and
■ F. Revising paragraph (q)(3).

The revisions read as follows:

**§ 1000.50   Class prices, component prices, and advanced pricing factors.**

\*    \*    \*    \*    \*

(l) *Butterfat price.* The butterfat price per pound, rounded to the nearest one-hundredth cent, shall be the U.S. average NASS AA Butter survey price reported by the Department for the month, less 17.15 cents, with the result multiplied by 1.211.

(m) *Nonfat solids price.* The nonfat solids price per pound, rounded to the nearest one-hundredth cent, shall be the U.S. average NASS nonfat dry milk survey price reported by the Department for the month, less 16.78 cents and multiplying the result by 0.99.

(n) \*   \*   \*

(2) Subtract 20.03 cents from the price computed pursuant to paragraph (n)(1) of this section and multiply the result by 1.383;

(3) \*   \*   \*

(i) Subtract 20.03 cents from the price computed pursuant to paragraph (n)(1) of this section and multiply the result by 1.572; and

\*    \*    \*    \*    \*

(o) *Other solids price.* The other solids price per pound, rounded to the nearest one-hundredth cent, shall be the U.S. average NASS dry whey survey price reported by the Department for the month minus 19.91 cents, with the result multiplied by 1.03.

\*    \*    \*    \*    \*

(q) \*   \*   \*

(3) An advanced butterfat price per pound rounded to the nearest one-hundredth cent, shall be calculated by computing a weighted average of the 2 most recent U.S. average NASS AA Butter survey prices announced before the 24th day of the month, subtracting 17.15 cents from this average, and multiplying the result by 1.211.

Dated: July 25, 2008.

**Lloyd C. Day,**
*Administrator, Agricultural Marketing Service.*

[FR Doc. 08–1482 Filed 7–28–08; 8:45 am]

**BILLING CODE 3410-02-P**

**NUCLEAR REGULATORY COMMISSION**

**10 CFR Parts 2 and 50**

**RIN 3150–AH78**

**[NRC–2005–0032]**

**Price-Anderson Act Financial Protection Regulations and Elimination of Antitrust Reviews; Correction**

**AGENCY:** Nuclear Regulatory Commission.

**ACTION:** Final rule: correcting amendment.

**SUMMARY:** On October 27, 2005 (70 FR 61885), the Nuclear Regulatory Commission (NRC) published a final rule revising its regulations to conform with the provisions of the Energy Policy Act of 2005 that, among other things, terminated the NRC's authority and responsibility to conduct antitrust reviews of future applications to construct or operate a nuclear reactor. Inadvertently, the final rule failed to remove some references to the NRC's authority and responsibility to conduct antitrust reviews. This rule removes those provisions.

**DATES:** This rule is effective on July 31, 2008, and is applicable to November 28, 2005, the date the original rule became effective.

**FOR FURTHER INFORMATION CONTACT:** Maxwell C. Smith, Office of the General Counsel, U.S. Nuclear Regulatory Commission, Washington, DC 20555–0001, telephone (301) 415–1246, *e-mail: Maxwell.Smith@nrc.gov.*

**SUPPLEMENTARY INFORMATION:** This document removes references to the NRC's antitrust responsibilities that it possessed prior to the enactment of section 625 of the Energy Policy Act of 2005, Public Law 109–58. For the reasons set out in the preamble and under the authority of the Atomic Energy Act of 1954, as amended; the Energy Reorganization Act of 1974, as amended; and 5 U.S.C. 552 and 553, the NRC is adopting the following amendments to 10 CFR parts 2 and 50.

**List of Subjects**

*10 CFR Part 2*

Administrative practice and procedure, Antitrust, Byproduct material, Classified information, Environmental protection, Nuclear materials, Nuclear power plants and reactors, Penalties, Sex discrimination, Source material, Special nuclear material, Waste treatment and disposal.

*10 CFR Part 50*

Antitrust, Classified information, Criminal penalties, Fire protection, Intergovernmental relations, Nuclear power plants and reactors, Radiation protection, Reactor siting criteria, Reporting and recordkeeping requirements.

■ For the reasons set out in the preamble and under the authority of the Atomic Energy Act of 1954, as amended; the Energy Reorganization Act of 1974, as amended; and 5 U.S.C. 552 and 5 U.S.C. 553, the NRC is adopting the following amendments to 10 CFR Parts 2 and 50.

**PART 2—RULES OF PRACTICE FOR DOMESTIC LICENSING PROCEEDINGS AND ISSUANCE OF ORDERS**

■ 1. The authority citation for Part 2 continues to read as follows:

**Authority:** Secs.161, 181, 68 Stat. 948, 953, as amended (42 U.S.C. 2201, 2231); sec. 191, as amended, Pub. L. 87–615, 76 Stat. 409 (42 U.S.C. 2241); sec. 201, 88 Stat.1242, as amended (42 U.S.C. 5841); 5 U.S.C. 552; sec. 1704, 112 Stat. 2750 (44 U.S.C. 3504 note).

Section 2.101 also issued under secs. 53, 62, 63, 81, 103, 104, 68 Stat. 930, 932, 933, 935, 936, 937, 938, as amended (42 U.S.C. 2073, 2092, 2093, 2111, 2133, 2134, 2135); sec. 114(f), Pub. L. 97–425, 96 Stat. 2213, as amended (42 U.S.C. 10143(f)); sec. 102, Pub. L. 91–190, 83 Stat. 853, as amended (42 U.S.C. 4332); sec. 301, 88 Stat. 1248 (42 U.S.C. 5871).

Sections 2.102, 2.103, 2.104, 2.105, 2.721 also issued under secs. 102, 103, 104, 105, 183i, 189, 68 Stat. 936, 937, 938, 954, 955, as amended (42 U.S.C. 2132, 2133, 2134, 2135, 2233, 2239). Section 2.105 also issued under Pub. L. 97–415, 96 Stat. 2073 (42 U.S.C. 2239). Sections 2.200–2.206 also issued under secs. 161 b, i, o, 182, 186, 234, 68 Stat. 948–951, 955, 83 Stat. 444, as amended (42 U.S.C. 2201 (b), (i), (o), 2236, 2282); sec. 206, 88 Stat 1246 (42 U.S.C. 5846). Section 2.205(j) also issued under Pub. L. 101–410, 104 Stat. 90, as amended by section 3100(s), Pub. L. 104–134, 110 Stat. 1321–373 (28 U.S.C. 2461 note). Subpart C also issued under sec. 189, 68 Stat. 955 (42 U.S.C. 2239). Sections 2.600–2.606 also issued under sec. 102, Pub. L. 91–190, 83 Stat. 853, as amended (42 U.S.C. 4332). Section 2.301 also issued under 5 U.S.C. 554. Sections 2.343, 2.346, 2.712 also issued under 5 U.S.C. 557. Section 2.340 also issued under secs. 135, 141, Pub. L. 97–425, 96 Stat. 2232, 2241 (42 U.S.C. 10155, 10161). Section 2.390 also issued under sec. 103, 68 Stat. 936, as amended (42 U.S.C. 2133) and 5 U.S.C. 552. Sections 2.800 and 2.808 also issued under 5 U.S.C. 553. Section 2.809 also issued under 5 U.S.C. 553, and sec. 29, Pub. L. 85–256, 71 Stat. 579, as amended (42 U.S.C. 2039). Subpart K also issued under sec. 189, 68 Stat. 955 (42 U.S.C. 2239); sec. 134, Pub. L. 97–425, 96 Stat. 2230 (42 U.S.C. 10154).

Subpart L also issued under sec. 189, 68 Stat. 955 (42 U.S.C. 2239). Subpart M also

Attachment A



### UNITED STATES PUBLIC LAWS
### 110th Congress - Second Session
### Convening January 04, 2008

Copr. © 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt.Works

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed

PL 110-246 (HR 6124)
June 18, 2008
FOOD, CONSERVATION, AND ENERGY ACT OF 2008

An Act To provide for the continuation of agricultural and other programs of the Department of Agriculture through fiscal year 2012, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States
of America in Congress assembled,

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

<< 7 USCA § 8701 NOTE >>

(a) SHORT TITLE.--This Act may be cited as the "Food, Conservation, and Energy Act of 2008".

 (b) TABLE OF CONTENTS.--The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.

Sec. 2. Definition of Secretary.

Sec. 3. Explanatory Statement.

Sec. 4. Repeal of duplicative enactment.

TITLE I--COMMODITY PROGRAMS

Sec. 1001. Definitions.

Subtitle A--Direct Payments and Counter-Cyclical Payments

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment A

PL 110-246, 2008 HR 6124                                                                                      Page 3
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

Sec. 1304. Availability of counter-cyclical payments for peanuts.

Sec. 1305. Producer agreement required as condition on provision of payments.

Sec. 1306. Planting flexibility.

Sec. 1307. Marketing assistance loans and loan deficiency payments for peanuts.

**\*1652**

Sec. 1308. Adjustments of loans.

Subtitle D--Sugar

Sec. 1401. Sugar program.

Sec. 1402. United States membership in the International Sugar Organization.

Sec. 1403. Flexible marketing allotments for sugar.

Sec. 1404. Storage facility loans.

Sec. 1405. Commodity Credit Corporation storage payments.

Subtitle E--Dairy

Sec. 1501. Dairy product price support program.

Sec. 1502. Dairy forward pricing program.

Sec. 1503. Dairy export incentive program.

Sec. 1504. Revision of Federal marketing order amendment procedures.

Sec. 1505. Dairy indemnity program.

Sec. 1506. Milk income loss contract program.

Sec. 1507. Dairy promotion and research program.

Sec. 1508. Report on Department of Agriculture reporting procedures for nonfat dry milk.

Sec. 1509. Federal Milk Marketing Order Review Commission.

Sec. 1510. Mandatory reporting of dairy commodities.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment A

PL 110-246, 2008 HR 6124                                                          Page 36
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

<< 31 USCA § 3716 NOTE >>

<< 31 USCA §§ 1324, 3716, 3803 >>

<< 37 USCA § 402a >>

<< 39 USCA §§ 3001, 3202 >>

<< 40 USCA § 15101 NOTE >>

<< 40 USCA prec. § 101 >>

<< 40 USCA prec. § 15101 >>

<< 40 USCA prec. § 15301 >>

<< 40 USCA prec. § 15501 >>

<< 40 USCA prec. § 15701 >>

<< 40 USCA prec. § 15731 >>

<< 40 USCA prec. § 15751 >>

<< 40 USCA prec. § 17101 >>

<< 40 USCA §§ 15101, 15301-15308, 15501-15506, 15701-15705, 15731-15733, 15751 >>

<< 42 USCA §§ 401 NOTE, 1382e NOTE, 1490e NOTE, 1769a NOTE, 3121 NOTE >>

<< 42 USCA §§ 290cc-22, 405, 411, 412, 503, 603, 604, 608, 611, 613, 629c, 629g, 653, 654, 1314a, 1320b-7, 1383, 1396r-5, 1437f, 1484, 1758, 1766, 1769, 1769a, 1786, 3012, 3056g, 3058e, 4728, 5179, 6949, 8011, 8622, 8624, 9858i, 16657 >>

<< 42 USCA §§ 1755a, 1758a >>

<< 43 USCA §§ 1592, 1595, 1626 >>

<< 43 USCA § 2211 NOTE >>

<< 48 USCA § 1841 >>

(a) IN GENERAL.--The Act entitled "An Act to provide for the continuation of agricultural programs through fiscal year 2012, and for other purposes" (H.R. 2419 of the 110th Congress), and the amendments made by that Act, are repealed, effective on the date of enactment of that Act.

 (b) EFFECTIVE DATE.--Except as otherwise provided in this Act, this Act and the amendments made by this Act shall take effect on the earlier of--

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment A

PL 110-246, 2008 HR 6124                                                    Page 37
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

 (1) the date of enactment of this Act; or

 (2) the date of the enactment of the Act entitled "An Act to provide for the continuation of agricultural programs through fiscal year 2012, and for other purposes" (H.R. 2419 of the 110th Congress).

TITLE I--COMMODITY PROGRAMS
<< 7 USCA § 8702 >>

SEC. 1001. DEFINITIONS.

 In this title (other than subtitle C):

**\*1665**
(1) AVERAGE CROP REVENUE ELECTION PAYMENT.--The term "average crop revenue election payment" means a payment made to producers on a farm under section 1105.

 (2) BASE ACRES.--

   (A) IN GENERAL.--The term "base acres", with respect to a covered commodity on a farm, means the number of acres established under section 1101 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7911) as in effect on September 30, 2007, subject to any adjustment under section 1101 of this Act.

   (B) PEANUTS.--The term "base acres for peanuts" has the meaning given the term in section 1301.

 (3) COUNTER-CYCLICAL PAYMENT.--The term "counter-cyclical payment" means a payment made to producers on a farm under section 1104.

 (4) COVERED COMMODITY.--The term "covered commodity" means wheat, corn, grain sorghum, barley, oats, upland cotton, long grain rice, medium grain rice, pulse crops, soybeans, and other oilseeds.

 (5) DIRECT PAYMENT.--The term "direct payment" means a payment made to producers on a farm under section 1103.

 (6) EFFECTIVE PRICE.--The term "effective price", with respect to a covered commodity for a crop year, means the price calculated by the Secretary under section 1104 to determine whether counter-cyclical payments are required to be made for that crop year.

 (7) EXTRA LONG STAPLE COTTON.--The term "extra long staple cotton" means cotton that--

   (A) is produced from pure strain varieties of the Barbadense species or any hybrid of the species, or other similar types of extra long staple cotton, designated by the Secretary, having characteristics needed for various end uses for which United States upland cotton is not suitable and grown in irrigated cotton-growing regions of the United States designated by the Secretary or other areas designated by the Secretary as suitable for the production of the varieties or types; and

   (B) is ginned on a roller-type gin or, if authorized by the Secretary, ginned on another type gin for experimental purposes.

 (8) LOAN COMMODITY.--The term "loan commodity" means wheat, corn, grain sorghum, barley, oats, upland

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment A

PL 110-246, 2008 HR 6124                                                                                       Page 103
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

coercion by handlers to enter into forward contracts.

   (B) ACTION.--If the Secretary finds evidence of coercion, the Secretary shall take appropriate action.

 (e) DURATION.--

 (1) NEW CONTRACTS.--No forward price contract may be entered into under the program established under this section after September 30, 2012.

 (2) APPLICATION.--No forward contract entered into under the program may extend beyond September 30, 2015.

**\*1721**

SEC. 1503. DAIRY EXPORT INCENTIVE PROGRAM.

<< 15 USCA § 713a-14 >>

(a) EXTENSION.--Section 153(a) of the Food Security Act of 1985 (15 U.S.C. 713a-14(a)) is amended by striking "2007" and inserting "2012".

 (b) COMPLIANCE WITH TRADE AGREEMENTS.--Section 153 of the Food Security Act of 1985 (15 U.S.C. 713a-14) is amended--

<< 15 USCA § 713a-14 >>

(1) in subsection (c), by striking paragraph (3) and inserting the following:

 "(3) the maximum volume of dairy product exports allowable consistent with the obligations of the United States under the Uruguay Round Agreements approved under section 101 of the Uruguay Round Agreements Act (19 U.S.C. 3511) is exported under the program each year (minus the volume sold under section 1163 of this Act during that year), except to the extent that the export of such a volume under the program would, in the judgment of the Secretary, exceed the limitations on the value permitted under subsection (f); and"; and.

<< 15 USCA § 713a-14 >>

(2) in subsection (f), by striking paragraph (1) and inserting the following:

 "(1) FUNDS AND COMMODITIES.--Except as provided in paragraph (2), the Commodity Credit Corporation shall in each year use money and commodities for the program under this section in the maximum amount consistent with the obligations of the United States under the Uruguay Round Agreements approved under section 101 of the Uruguay Round Agreements Act (19 U.S.C. 3511), minus the amount expended under section 1163 of this Act during that year.".

<< 7 USCA § 608c >>

SEC. 1504. REVISION OF FEDERAL MARKETING ORDER AMENDMENT PROCEDURES.

 Section 8c of the Agricultural Adjustment Act (7 U.S.C. 608c), reenacted with amendments by the Agricultural Marketing Agreement Act of 1937, is amended by striking subsection (17) and inserting the following:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment A

PL 110-246, 2008 HR 6124                                                                                    Page 104
**PL 110-246**, June 18, 2008, 122 Stat 1651
**(Cite as: 122 Stat 1651)**

"(17) PROVISIONS APPLICABLE TO AMENDMENTS.--

"(A) APPLICABILITY TO AMENDMENTS.--The provisions of this section and section 8d applicable to orders shall be applicable to amendments to orders.

"(B) SUPPLEMENTAL RULES OF PRACTICE.--

"(i) IN GENERAL.--Not later than 60 days after the date of enactment of this subparagraph, the Secretary shall issue, using informal rulemaking, supplemental rules of practice to define guidelines and timeframes for the rulemaking process relating to amendments to orders.

"(ii) ISSUES.--At a minimum, the supplemental rules of practice shall establish--

"(I) proposal submission requirements;

"(II) pre-hearing information session specifications;

"(III) written testimony and data request requirements;

"(IV) public participation timeframes; and

"(V) electronic document submission standards.

"(iii) EFFECTIVE DATE.--The supplemental rules of practice shall take effect not later than 120 days after **\*1722** the date of enactment of this subparagraph, as determined by the Secretary.

"(C) HEARING TIMEFRAMES.--

"(i) IN GENERAL.--Not more than 30 days after the receipt of a proposal for an amendment hearing regarding a milk marketing order, the Secretary shall--

"(I) issue a notice providing an action plan and expected timeframes for completion of the hearing not more than 120 days after the date of the issuance of the notice;

"(II)(aa) issue a request for additional information to be used by the Secretary in making a determination regarding the proposal; and

"(bb) if the additional information is not provided to the Secretary within the timeframe requested by the Secretary, issue a denial of the request; or

"(III) issue a denial of the request.

"(ii) REQUIREMENT.--A post-hearing brief may be filed under this paragraph not later than 60 days after the date of an amendment hearing regarding a milk marketing order.

"(iii) RECOMMENDED DECISIONS.--A recommended decision on a proposed amendment to an order shall be issued not later than 90 days after the deadline for the submission of post-hearing briefs.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Attachment A

"(iv) FINAL DECISIONS.--A final decision on a proposed amendment to an order shall be issued not later than 60 days after the deadline for submission of comments and exceptions to the recommended decision issued under clause (iii).

"(D) INDUSTRY ASSESSMENTS.--If the Secretary determines it is necessary to improve or expedite rulemaking under this subsection, the Secretary may impose an assessment on the affected industry to supplement appropriated funds for the procurement of service providers, such as court reporters.

"(E) USE OF INFORMAL RULEMAKING.--The Secretary may use rulemaking under section 553 of title 5, United States Code, to amend orders, other than provisions of orders that directly affect milk prices.

"(F) AVOIDING DUPLICATION.--The Secretary shall not be required to hold a hearing on any amendment proposed to be made to a milk marketing order in response to an application for a hearing on the proposed amendment if--

"(i) the application requesting the hearing is received by the Secretary not later than 90 days after the date on which the Secretary has announced the decision on a previously proposed amendment to that order;  and

"(ii) the 2 proposed amendments are essentially the same, as determined by the Secretary.

"(G) MONTHLY FEED AND FUEL COSTS FOR MAKE ALLOWANCES.--As part of any hearing to adjust make allowances under marketing orders commencing prior to September 30, 2012, the Secretary shall--

**\*1723**
"(i) determine the average monthly prices of feed and fuel incurred by dairy producers in the relevant marketing area;

"(ii) consider the most recent monthly feed and fuel price data available;  and

"(iii) consider those prices in determining whether or not to adjust make allowances.".

<< 7 USCA § 450l >>

SEC. 1505. DAIRY INDEMNITY PROGRAM.

Section 3 of Public Law 90-484 (7 U.S.C. 450l) is amended by striking "2007" and inserting "2012".

<< 7 USCA § 8773 >>

SEC. 1506. MILK INCOME LOSS CONTRACT PROGRAM.

(a) DEFINITIONS.--In this section:

(1) CLASS I MILK.--The term "Class I milk" means milk (including milk components) classified as Class I milk under a Federal milk marketing order.

(2) ELIGIBLE PRODUCTION.--The term "eligible production" means milk produced by a producer in a participating State.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment A



7 U.S.C.A. § 608c                                                                                    Page 1



**Effective:[See Notes]**

United States Code Annotated Currentness
  Title 7. Agriculture



       Chapter 26. Agricultural Adjustment (Refs & Annos)



       Subchapter III. Commodity Benefits



       **§ 608c. Orders regulating handling of commodity**

(1) Issuance by Secretary

The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section. Such persons are referred to in this chapter as "handlers."  Such orders shall regulate, in the manner hereinafter in this section provided, only such handling of such agricultural commodity, or product thereof, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof. In carrying out this section, the Secretary shall complete all informal rulemaking actions necessary to respond to recommendations submitted by administrative committees for such orders as expeditiously as possible, but not more than 45 days (to the extent practicable) after submission of the committee recommendations. The Secretary is authorized to implement a producer allotment program and a handler withholding program under the cranberry marketing order in the same crop year through informal rulemaking based on a recommendation and supporting economic analysis submitted by the Cranberry Marketing Committee. Such recommendation and analysis shall be submitted by the Committee no later than March 1 of each year. The Secretary shall establish time frames for each office and agency within the Department of Agriculture to consider the committee recommendations.

(2) Commodities to which applicable; single commodities and separate agricultural commodities

Orders issued pursuant to this section shall be applicable only to (A) the following agricultural commodities and the products thereof (except canned or frozen pears, grapefruit, cherries, apples, or cranberries, the products of naval stores, and the products of honeybees), or to any regional, or market classification of any such commodity or product: Milk, fruits (including filberts, almonds, pecans, and walnuts but not including apples, other than apples

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment A

sold in the marketing area specified in such marketing agreement or order, but such termination shall be effective only if announced on or before such date (prior to the end of the then current marketing period) as may be specified in such marketing agreement or order.

(C) Except as otherwise provided in this subsection with respect to the termination of an order issued under this section, the termination or suspension of any order or amendment thereto or provision thereof, shall not be considered an order within the meaning of this section.

(17) Provisions applicable to amendments

The provisions of this section, and section 608d of this title   [FN10] applicable to orders shall be applicable to amendments to orders: *Provided*, That notice of a hearing upon a proposed amendment to any order issued pursuant to this section, given not less than three days prior to the date fixed for such hearing, shall be deemed due notice thereof.

(18) Milk prices

The Secretary of Agriculture, prior to prescribing any term in any marketing agreement or order, or amendment thereto, relating to milk or its products, if such term is to fix minimum prices to be paid to producers or associations of producers, or prior to modifying the price fixed in any such term, shall ascertain the parity prices of such commodities. The prices which it is declared to be the policy of Congress to establish in section 602 of this title shall, for the purposes of such agreement, order, or amendment, be adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates. Whenever the Secretary finds, upon the basis of the evidence adduced at the hearing required by section 608b of this title or this section, as the case may be, that the parity prices of such commodities are not reasonable in view of the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, he shall fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest. Thereafter, as the Secretary finds necessary on account of changed circumstances, he shall, after due notice and opportunity for hearing, make adjustments in such prices.

(19) Producer referendum

For the purpose of ascertaining whether the issuance of an order is approved or favored by producers or processors, as required under the applicable provisions of this chapter, the Secretary may conduct a referendum among producers or processors and in the case of an order other than an amendatory order shall do so. The requirements of approval or favor under any such provision shall be held to be complied with if, of the total number of producers or processors, or the total volume of production, as the case may be, represented in such referendum, the percentage approving or favoring is equal to or in excess of the percentage required under such provision. The terms and conditions of the proposed order shall be described by the Secretary in the ballot used in the conduct of the referendum. The nature, content, or extent of such description shall not be a basis for attacking the legality of the order or any action relating thereto. Nothing in this subsection shall be construed as limiting representation by cooperative associations as provided in subsection (12) of this section. For the purpose of ascertaining whether the issuance of an order applicable to pears for canning or freezing is approved or favored by producers as required under the applicable provisions of this chapter, the Secretary shall conduct a referendum among producers in each State in which pears for canning or freezing are proposed to be included within the provisions of such marketing order and the requirements of approval or favor under any such provisions applicable to pears for canning or freezing shall be held to be complied with if, of the total number of producers, or the total volume of production, as the case may be, represented in such referendum, the percentage approving or favoring is equal to or in excess of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Attachment A

**USDA Agricultural Marketing Service (AMS)**

**Economic Analysis**
**Class III and IV Pricing Formulas**
**Tentative Partial Final Decision**

**March 2008**

**Economic Analysis Staff**

**Dairy Programs**

**Office of the Chief Economist**

Attachment B

**Introduction**

The Department has performed this analysis in order to provide further information to all interested parties regarding the effects of proposed changes to the pricing formulas used to price Class III and Class IV milk pooled under Federal Milk marketing orders (FMMO). Under this proposal, manufacturing allowances commonly referred to as "make allowances," are increased as illustrated in Table 1. Additionally, the butterfat yield factor is increased from 1.20 to 1.211.

The current make allowances were established in an interim final rule of December 2006. These make allowances are derived from two sources (1) *Cost of Processing in Cheese, Whey, Butter and Nonfat Dry Milk Plants*, by Mark Stephenson, Ph.D., Cornell Program on Dairy Markets and Policy, September 1, 2006; and (2) *Weighted Average Manufacturing Costs for Butter, Nonfat Powder, Skim Whey Powder and Cheddar Cheese, California Department of Food and Agriculture*, Costs for Calendar Year 2004, amended January 2006.

The make allowances proposed in this tentative partial final decision come from the most recent surveys of those same sources: *Testimony on Cost of Processing in Cheese, Whey, Butter and Nonfat Dry Milk Plants*, by Mark Stephenson, Ph.D., Cornell Program on Dairy Markets and Policy, July 9, 2007 (Cornell study); and (2) *Weighted Average Manufacturing Costs for Butter, Nonfat Powder, Skim Whey Powder and Cheddar Cheese, California Department of Food and Agriculture*, Costs for Calendar Year 2006, published September 2007 (CDFA study). The Cornell study encompassed data from last quarter of 2005 through the second quarter of 2007, but it was submitted in testimony that a large proportion of the data apply to the calendar year of 2006.

In calculating make allowances for butter and nonfat dry milk (NFDM), weighted average costs from both studies are weighted by their respective product volumes for the calendar year 2006 to estimate an overall U.S. weighted average. The weighted average costs for cheese manufacturing are based solely on the data from the CDFA study and the costs for dry whey manufacturing use data only from the Cornell study. An additional $0.0015 per pound is added in the calculation of the final make allowance as an estimate of sales and administrative costs.

1

Attachment B

Table 1. Calculation of Make Allowances as Proposed in Tentative Final Decision

| Butter | | NFDM | |
|---|---|---|---|
| Weighted average cost, $/pound: | | Weighted average cost, $/pound: | |
| CDFA Study[1] | 0.1373 | CDFA Study | 0.1664 |
| Cornell Study[2] | 0.1846 | Cornell Study | 0.1662 |
| 2006 volume[3], 1000 pounds: | | 2006 volume, 1000 pounds: | |
| California | 448,592 | California | 613,240 |
| U.S. other than California | 999,890 | U.S. other than California | 610,832 |
| U.S. | 1,448,482 | U.S. | 1,224,072 |
| Weighted average cost per pound: | | Weighted average cost per pound: | |
| Before sales and administrative costs | 0.1700 | Before sales and administrative costs | 0.1663 |
| Sales and administrative costs | 0.0015 | Sales and administrative costs | 0.0015 |
| Proposed make allowance | 0.1715 | Proposed make allowance | 0.1678 |

| Cheese | | Whey | |
|---|---|---|---|
| Weighted average cost, Cheddar cheese, $/pound: | | Weighted average cost, $/pound: | |
| CDFA Study | 0.1988 | Cornell Study | 0.1976 |
| Sales and administrative costs | 0.0015 | Sales and administrative costs | 0.0015 |
| Proposed make allowance | 0.2003 | Proposed make allowance | 0.1991 |

[1] *Weighted Average Manufacturing Costs for Butter, Nonfat Powder, Skim Whey Powder and Cheddar Cheese,* California Department of Food and Agriculture, Costs for Calendar Year 2006, September 2007

[2] *Testimony on Cost of Processing in Cheese, Whey, Butter, and Nonfat Dry Milk Plants,* by Mark Stephenson, Cornell Program on Dairy Markets and Policy, July 2007

[3] Source for all volumes:  USDA, National Agricultural Statistics Service, 2006 values

2

Attachment B

**Economic Analysis Framework**

This document provides analysis of the proposed changes to Class III and Class IV pricing formulas using *USDA Agricultural Baseline Projections to 2016*, published in February 2007[1]. Baseline projections have been adjusted to reflect make allowances as stated in the December 2006 Interim Final Rule. These make allowances became effective February 1, 2007. (See Appendix for current formulas.) Hereafter, all impacts are stated as changes from the USDA baseline projections as adjusted for the new make allowances.

The most current version of the Dairy Programs National Econometric Model is used, as described in *National Econometric Baseline Documentation (Model Calibrated to USDA Baseline Projections to 2016)*, published in April 2007[2]. The USDA baseline and the model baseline assume: (1) Milk Price Support Program (MPSP) will continue unchanged; (2) the Dairy Export Incentive Program (DEIP) will not be used throughout the projection period; (3) the Milk Income Loss Contract Program (MILC) terminated in 2007 and is not renewed; and (4) the Federal Milk Marketing Order Program (FMMO) will continue unchanged. This analysis assumes that the first three assumptions remain unchanged and that the FMMO changes are limited to the changes in make allowances and butterfat yield factor proposed in this decision. As the model is an annual model, it is assumed that these changes are effective January 1, 2008.

The econometric model used for this analysis includes demands for fluid milk products and manufactured dairy products. Demands for fluid milk and manufactured dairy products are functions of per capita consumption and population. Per capita consumption for the major milk and dairy products are estimated as functions of own prices, substitute prices, and income. The demands for fluid milk and soft manufactured products are satisfied first by the eligible supply of milk. The milk supply for manufactured hard products is the volume of milk marketings remaining after satisfying the volumes demanded for fluid and soft manufactured products. Milk is manufactured into dairy products according to returns to manufacturing in each class. Wholesale prices for cheese, butter, nonfat dry milk (NFDM) and dry whey reflect supply and demand conditions for these products. These manufactured dairy product prices underlie the FMMO pricing system.

---

[1] OCE-2007-1 http://www.usda.gov/oce/commodity/ag_baseline.htm
[2] http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5056334

Attachment B

**Static Results**

The proposed changes to the Class III and Class IV formulas have direct impact on the values of milk pricing components and consequently Federal order minimum prices. Table 2 illustrates the static impact of these changes, that is, without accounting for the changes in supply and allocation that would occur as prices change. Component prices fall as make allowances increase. The protein price is the most affected by the proposed changes given that this formula incorporates not only adjustments for the make allowance for cheese, but also includes the butterfat price which itself is altered by the change in the make allowance for butter as well as the change in butterfat yield.

Table 2. Static Results of Proposed Changes to Class III and Class IV Pricing Formulas [1]

| Product Prices ($/pound) | Baseline | | | |
|---|---|---|---|---|
| Cheese | 1.5538 | | | |
| Butter | 1.8296 | | | |
| NFDM | 1.0120 | | | |
| Dry Whey | 0.3624 | | | |

| Make allowances ($/pound) | | | | |
|---|---|---|---|---|
| | Current | Proposed | Change | Percent Change |
| Cheese | 0.1682 | 0.2003 | 0.0321 | 19.1 |
| Butter | 0.1202 | 0.1715 | 0.0513 | 42.7 |
| NFDM | 0.1570 | 0.1678 | 0.0108 | 6.9 |
| Dry Whey | 0.1956 | 0.1991 | 0.0035 | 1.8 |

| Change in component values assuming no supply response ($/pound) | | | | |
|---|---|---|---|---|
| Protein | 2.3047 | 2.2469 | -0.0578 | -2.5 |
| Butterfat [2] | 2.0513 | 2.0080 | -0.0433 | -2.1 |
| Nonfat solids | 0.8465 | 0.8358 | -0.0107 | -1.3 |
| Other solids | 0.1718 | 0.1682 | -0.0036 | -2.1 |

| Change in milk prices assuming no supply response ($/cwt.) | | | | |
|---|---|---|---|---|
| Class III skim milk | 8.16 | 7.96 | -0.20 | -2.5 |
| Class IV skim milk | 7.62 | 7.52 | -0.10 | -1.3 |
| Class III price at 3.5% butterfat | 15.05 | 14.71 | -0.34 | -2.3 |
| Class IV price at 3.5% butterfat | 14.53 | 14.29 | -0.24 | -1.7 |

[1] Nine-year average baseline prices are used in the formulas for calculations.

[2] Proposed butterfat yield factor is 1.211

4

**Model Results**

An increase in make allowances has the immediate effect of lowering FMMO component values which, through price formulas, translate into decreased minimum prices for milk and a reduction in producer revenue (Table 3).  As producer revenue falls, supply tightens and production of hard manufactured dairy products decreases, which in turn results in higher prices for those products. These higher product prices, however, are not sufficient to offset the greater impact of the increased make allowances in the pricing formulas.  Declines in Class I and Class II prices follow, as they are based on the Class III and Class IV skim milk and butterfat prices.

All-Milk Price and Milk Production

Increases in the make allowances result in a lower all-milk price paid by plants (Table 4). The effect diminishes over the nine-year projection period, falling $0.14 per hundredweight (cwt) or 0.93 percent below the baseline level of $14.74 per cwt in the first year. The price impact declines and settles to $0.04 below baseline in the final four years to reach an average decrease of $0.06 (0.39 percent) below the baseline average price of $16.22 per cwt over the nine-year projection.  Producer revenue follows suit, falling throughout the projection period with the greatest losses early in the period for an average decrease of $156 million (0.51 percent).  The greatest producer revenue impact is in the first year, $262 million (0.97 percent) below baseline.

In response, milk production falls increasingly below baseline levels, averaging a decrease of 240 million pounds (0.13 percent) as shown in Table 5.  The cumulative changes range from a decrease of 72 million pounds (0.04 percent) below baseline level in the first year to a decrease of 328 million pounds (0.17 percent) in the final year of the projection.  The marginal changes decline throughout the period to reach 13 million pounds by 2015.  The change in production is the result of a reduction in yield as well as in cow numbers.  Cows are reduced by an average 7000 head (0.08 percent) over the projection period while yield falls an average nine pounds per cow (0.04 percent) over that same period.  The variation from baseline levels is greatest at the end of the period, with a decrease of 9000 cows (0.10 percent) and yield 15 pounds (0.07 percent) below baseline.

Product Prices

The contraction in milk production results in higher prices of major dairy products: cheese, butter, nonfat dry milk, and dry whey, illustrated in Table 6.  Increased product prices counteract the reduction in milk prices due to the higher make allowances.  The greatest impact to product prices, nominally and by percentage, is on the butter price. The increase is greatest in the first year of the projection period at $0.0393 per pound (2.46 percent) over baseline. The effect diminishes over the projection period, resulting in an average increase of $0.0346 (1.89 percent).   The cheese price exhibits the next largest

5

Attachment B

impact, rising an average $0.0176 per pound (1.14 percent) above baseline levels. The change is smallest in the first year at $0.0090 per pound (0.63 percent) and increases over time until stabilizing at $0.0201 per pound below baseline in the final three years of the period. Nonfat dry milk and dry whey demand functions are more elastic and thus bring about smaller price increases over baseline levels.

Table 3. Model Results for Proposed Class III and Class IV Pricing Changes
Nine-year averages, 2008 through 2016

| Scenario | Units | Baseline [1] | Decision |
|---|---|---|---|
| | | | Change from Baseline |
| F.O. Minimum Prices, 3.5% BF | | | |
| Class I | $/cwt | 17.76 | -0.14 |
| Class II | $/cwt | 15.23 | -0.02 |
| Class III | $/cwt | 15.05 | -0.14 |
| Class IV | $/cwt | 14.53 | -0.02 |
| Blend | $/cwt | 16.00 | -0.11 |
| | | | |
| F.O. Minimum Prices at Test | | | |
| Class I | $/cwt | 14.90 | -0.14 |
| Class II | $/cwt | 23.79 | -0.03 |
| Class III | $/cwt | 14.76 | -0.14 |
| Class IV | $/cwt | 19.09 | 0.05 |
| Blend | $/cwt | 16.43 | -0.11 |
| | | | |
| NASS Wtd. Avg. Product Prices | | | |
| Cheddar | $/pound | 1.5538 | 0.0176 |
| Butter | $/pound | 1.8296 | 0.0346 |
| NFDM | $/pound | 1.0120 | 0.0090 |
| Whey | $/pound | 0.3624 | 0.0034 |
| | | | |
| Retail fluid milk price | $/gal. | 3.4135 | -0.0094 |
| | | | |
| Component Prices | | | |
| Protein | $/pound | 2.3048 | -0.0451 |
| Butterfat | $/pound | 2.0513 | -0.0014 |
| Other solids | $/pound | 0.1718 | -0.0001 |
| Nonfat solids | $/pound | 0.8465 | -0.0018 |

Table continued on next page

Attachment B

Table 3 Continued. Model Results for Proposed Class III and Class IV Pricing Changes
Nine-year averages, 2008 through 2016

| Scenario | Units | Baseline | Decision |
|---|---|---|---|
| | | | Change from Baseline |
| | | | |
| Skim Milk Prices | | | |
|    Class I skim price | $/cwt | 10.87 | -0.14 |
|    Class II skim price | $/cwt | 8.32 | -0.02 |
|    Class III skim price | $/cwt | 8.16 | -0.14 |
|    Class IV skim price | $/cwt | 7.62 | -0.02 |
| | | | |
| F.O. Class Uses | | | |
|    Class I | mil. pounds | 44,987 | 32 |
|    Class II | mil. pounds | 17,350 | 5 |
|    Class III | mil. pounds | 53,030 | -55 |
|    Class IV | mil. pounds | 11,181 | -127 |
|    Total Marketings | mil. pounds | 126,548 | -145 |
| | | | |
| Federal Order | | | |
| Cash Receipts | mil. $ | 20,808 | -165 |
| | | | |
| All Milk Price | $/cwt | 16.22 | -0.06 |
| | | | |
| Milk Cows | 1,000s | 8,667 | -7 |
| Yield per Cow | pounds | 21,722 | -9 |
| U.S. Marketings [2] | mil. pounds | 187,533 | -240 |
| | | | |
| Government removals | | | |
| of NFDM | mil. pounds | 2 | 0 |
| | | | |
| U.S. Producer Revenue | mil. $ | 30,447 | -156 |

[1] In this analysis, the baseline reflects adjustments from the published USDA baseline to reflect changes in manufacturing (make) allowances per the Interim Final Rule issued by USDA on December 26, 2006.

[2] U.S. Marketings differs from U.S. milk production due to farm use of milk.

Attachment B

Table 4. All-Milk Price and Producer Revenue

| | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All Milk | $/cwt | Baseline | 14.74 | 15.40 | 15.93 | 16.33 | 16.55 | 16.63 | 16.77 | 16.80 | 16.86 | 16.22 |
| | $/cwt | Decision | -0.14 | -0.10 | -0.07 | -0.06 | -0.05 | -0.04 | -0.04 | -0.04 | -0.04 | -0.06 |
| | percent | Decision | -0.93 | -0.63 | -0.46 | -0.35 | -0.28 | -0.26 | -0.23 | -0.21 | -0.21 | -0.39 |
| Producer Revenue | mil. $ | Baseline | 26,952 | 28,158 | 29,254 | 30,195 | 30,963 | 31,350 | 31,934 | 32,334 | 32,886 | 30,447 |
| | mil. $ | Decision | -262 | -200 | -168 | -145 | -132 | -129 | -124 | -122 | -124 | -156 |
| | percent | Decision | -0.97 | -0.71 | -0.57 | -0.48 | -0.43 | -0.41 | -0.39 | -0.38 | -0.38 | -0.51 |

Table 5. Milk Production Variables

| | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Milk Cows | 1,000s | Baseline | 8,945 | 8,853 | 8,768 | 8,701 | 8,642 | 8,590 | 8,544 | 8,501 | 8,458 | 8,667 |
| | 1,000s | Decision | -4 | -6 | -7 | -8 | -8 | -8 | -8 | -9 | -9 | -7 |
| | Percent | Decision | -0.04 | -0.06 | -0.08 | -0.09 | -0.09 | -0.10 | -0.10 | -0.10 | -0.10 | -0.08 |
| Yield per Cow | Pounds | Baseline | 20,540 | 20,745 | 21,021 | 21,332 | 21,719 | 21,998 | 22,343 | 22,694 | 23,110 | 21,722 |
| | Pounds | Decision | 0 | -4 | -7 | -9 | -11 | -12 | -13 | -14 | -15 | -9 |
| | Percent | Decision | 0.00 | -0.02 | -0.03 | -0.04 | -0.05 | -0.05 | -0.06 | -0.06 | -0.07 | -0.04 |
| Milk Production | mil. Pounds | Baseline | 183,741 | 183,666 | 184,323 | 185,619 | 187,697 | 188,961 | 190,906 | 192,923 | 195,460 | 188,144 |
| | mil. Pounds | Decision | -72 | -152 | -204 | -240 | -266 | -285 | -302 | -315 | -328 | -240 |
| | Percent | Decision | -0.04 | -0.08 | -0.11 | -0.13 | -0.14 | -0.15 | -0.16 | -0.16 | -0.17 | -0.13 |
| Farm Use | mil. Pounds | Baseline | 900 | 800 | 700 | 700 | 600 | 500 | 500 | 400 | 400 | 611 |
| Marketings | mil. Pounds | Baseline | 182,841 | 182,866 | 183,623 | 184,919 | 187,097 | 188,461 | 190,406 | 192,523 | 195,060 | 187,533 |
| | mil. Pounds | Decision | -72 | -152 | -204 | -240 | -266 | -285 | -302 | -315 | -328 | -240 |
| | Percent | Decision | -0.04 | -0.08 | -0.11 | -0.13 | -0.14 | -0.15 | -0.16 | -0.16 | -0.17 | -0.13 |

Attachment B

Table 6. Product Prices

| | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cheddar cheese | $/pound | Baseline | 1.4259 | 1.4931 | 1.5358 | 1.5698 | 1.5885 | 1.5863 | 1.5959 | 1.5933 | 1.5959 | 1.5538 |
| | $/pound | Decision | 0.0090 | 0.0141 | 0.0169 | 0.0187 | 0.0197 | 0.0199 | 0.0201 | 0.0202 | 0.0201 | 0.0176 |
| | Percent | Decision | 0.63 | 0.95 | 1.10 | 1.19 | 1.24 | 1.26 | 1.26 | 1.27 | 1.26 | 1.14 |
| | | | | | | | | | | | | |
| Butter | $/pound | Baseline | 1.5953 | 1.7118 | 1.8014 | 1.8431 | 1.8591 | 1.8898 | 1.9074 | 1.9168 | 1.9420 | 1.8296 |
| | $/pound | Decision | 0.0393 | 0.0369 | 0.0334 | 0.0329 | 0.0332 | 0.0329 | 0.0336 | 0.0348 | 0.0346 | 0.0346 |
| | Percent | Decision | 2.46 | 2.15 | 1.85 | 1.79 | 1.79 | 1.74 | 1.76 | 1.82 | 1.78 | 1.89 |
| | | | | | | | | | | | | |
| Nonfat dry milk | $/pound | Baseline | 0.9635 | 0.9819 | 1.0115 | 1.0243 | 1.0274 | 1.0326 | 1.0272 | 1.0205 | 1.0193 | 1.0120 |
| | $/pound | Decision | 0.0038 | 0.0069 | 0.0096 | 0.0106 | 0.0105 | 0.0105 | 0.0100 | 0.0094 | 0.0092 | 0.0090 |
| | Percent | Decision | 0.39 | 0.71 | 0.95 | 1.03 | 1.02 | 1.02 | 0.98 | 0.93 | 0.91 | 0.88 |
| | | | | | | | | | | | | |
| Dry whey | $/pound | Baseline | 0.3197 | 0.3249 | 0.3376 | 0.3529 | 0.3627 | 0.3749 | 0.3894 | 0.3981 | 0.4014 | 0.3624 |
| | $/pound | Decision | 0.0013 | 0.0021 | 0.0027 | 0.0033 | 0.0037 | 0.0040 | 0.0044 | 0.0046 | 0.0047 | 0.0034 |
| | Percent | Decision | 0.40 | 0.65 | 0.81 | 0.93 | 1.01 | 1.08 | 1.12 | 1.16 | 1.18 | 0.94 |
| | | | | | | | | | | | | |
| Retail fluid milk | $/gallon | Baseline | 3.1407 | 3.2299 | 3.3051 | 3.3758 | 3.4354 | 3.4814 | 3.5378 | 3.5833 | 3.6325 | 3.4135 |
| | $/gallon | Decision | -0.0161 | -0.0121 | -0.0100 | -0.0086 | -0.0078 | -0.0076 | -0.0074 | -0.0073 | -0.0074 | -0.0094 |
| | Percent | Decision | -0.51 | -0.38 | -0.30 | -0.25 | -0.23 | -0.22 | -0.21 | -0.20 | -0.20 | -0.27 |

9

Attachment B

The nonfat dry milk price increases an average $0.0090 per pound (0.88 percent) while the dry whey price increases an average $0.0034 per pound (0.94 percent).

The demand for fluid milk is more inelastic and retail price falls below baseline levels by an average of $0.0094 per gallon (0.27 percent) over the projection period. The retail price follows the direction of change in the all-milk price, also falling the furthest below baseline in the beginning years of the projection period.

Component Prices and Pricing Factors

All Federal order component prices (butterfat, protein, nonfat solids, and other solids) are below average baseline levels over the projection period as presented in Table 7.

In the case of most component prices, the effects over a nine-year period are smaller than those examined in the static analysis. After the initial impact, markets respond and move back toward the baseline and a new equilibrium. Only the protein price shows a larger divergence from the baseline than in the static calculations, falling $0.0763 per pound (3.49 percent) below baseline in the first year and diminishing to an average $0.0451 per pound (1.96 percent) below baseline over the nine-year projection. This is due in large part to the relationship of butter and cheese prices over the course of the projection period. The increase in the butter price is greater than that of the cheese price, nominally as well as proportionally. As a result, the butterfat portion of the protein price (which is subtracted) exceeds the smaller increase attributed to the cheese price.

Lower component prices result in lower Class III and Class IV skim prices. The Class III skim price falls further below its baseline levels (an average $0.14 per pound or 1.72 percent), than the Class IV skim price (an average $0.02 per pound or 0.22 percent), but remains high enough that the Class III skim price remains the price mover for the Class I skim price throughout the projection period.

Federal order minimum prices at 3.5 percent butterfat also fall below baseline levels (Table 8). Across all minimum prices, the greatest effect is in the first year, the uniform price falling $0.19 (1.34 percent) below baseline. The greatest impact is in the Class III minimum price, which falls an average $0.14 (0.93 percent) over the projection period. As the Class III price remains the mover for Class I prices in all years, the Class I price falls an average $0.14 per cwt below baseline levels as well.

Federal Order Prices at Class Butterfat Tests

The average butterfat test remains unchanged from the baseline for Class I and Class II milk (Table 9). However, the higher butter price creates a movement of butterfat from Class III to Class IV. Marketings decrease in all classes, but Class IV marketings carry the greatest loss, proportionally. There is less milk available over all, and even less milk being allocated to manufacturing classes. Class butterfat tests and minimum prices at test illustrate the response within the manufacturing classes to the tighter supply of milk.

10

Attachment B

Table 7. Federal Order Component Prices and Pricing Factors

| | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Butterfat | $/pound | Baseline | 1.7701 | 1.9100 | 2.0174 | 2.0674 | 2.0867 | 2.1236 | 2.1447 | 2.1559 | 2.1862 | 2.0513 |
| | $/pound | Decision | 0.0017 | 0.0000 | -0.0032 | -0.0033 | -0.0028 | -0.0029 | -0.0018 | -0.0002 | -0.0002 | -0.0014 |
| | percent | Decision | 0.09 | 0.00 | -0.16 | -0.16 | -0.13 | -0.13 | -0.08 | -0.01 | -0.01 | -0.07 |
| | | | | | | | | | | | | |
| Protein | $/pound | Baseline | 2.1886 | 2.2581 | 2.2825 | 2.3393 | 2.3793 | 2.3335 | 2.3421 | 2.3217 | 2.2984 | 2.3048 |
| | $/pound | Decision | -0.0763 | -0.0580 | -0.0455 | -0.0396 | -0.0370 | -0.0362 | -0.0367 | -0.0381 | -0.0384 | -0.0451 |
| | percent | Decision | -3.49 | -2.57 | -1.99 | -1.69 | -1.56 | -1.55 | -1.57 | -1.64 | -1.67 | -1.96 |
| | | | | | | | | | | | | |
| Nonfat Solids | $/pound | Baseline | 0.7984 | 0.8166 | 0.8459 | 0.8586 | 0.8617 | 0.8669 | 0.8615 | 0.8548 | 0.8536 | 0.8465 |
| | $/pound | Decision | -0.0070 | -0.0038 | -0.0012 | -0.0002 | -0.0003 | -0.0003 | -0.0008 | -0.0013 | -0.0016 | -0.0018 |
| | percent | Decision | -0.87 | -0.47 | -0.14 | -0.03 | -0.03 | -0.03 | -0.09 | -0.16 | -0.18 | -0.22 |
| | | | | | | | | | | | | |
| Other Solids | $/pound | Baseline | 0.1278 | 0.1332 | 0.1463 | 0.1620 | 0.1721 | 0.1847 | 0.1996 | 0.2086 | 0.2119 | 0.1718 |
| | $/pound | Decision | -0.0023 | -0.0014 | -0.0008 | -0.0002 | 0.0002 | 0.0005 | 0.0009 | 0.0011 | 0.0013 | -0.0001 |
| | percent | Decision | -1.79 | -1.08 | -0.54 | -0.14 | 0.11 | 0.30 | 0.45 | 0.55 | 0.59 | -0.05 |
| | | | | | | | | | | | | |
| Class I Skim | $/cwt | Baseline | 10.25 | 10.50 | 10.65 | 10.92 | 11.10 | 11.03 | 11.15 | 11.14 | 11.09 | 10.87 |
| | $/cwt | Decision | -0.25 | -0.19 | -0.15 | -0.12 | -0.11 | -0.11 | -0.11 | -0.11 | -0.11 | -0.14 |
| | percent | Decision | -2.44 | -1.79 | -1.37 | -1.14 | -1.02 | -0.99 | -0.97 | -1.00 | -1.01 | -1.29 |
| | | | | | | | | | | | | |
| Class II Skim | $/cwt | Baseline | 7.89 | 8.05 | 8.31 | 8.43 | 8.46 | 8.50 | 8.45 | 8.39 | 8.38 | 8.32 |
| | $/cwt | Decision | -0.06 | -0.03 | -0.01 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 | -0.01 | -0.02 |
| | percent | Decision | -0.80 | -0.43 | -0.13 | -0.03 | -0.03 | -0.03 | -0.08 | -0.14 | -0.17 | -0.20 |
| | | | | | | | | | | | | |
| Class III Skim | $/cwt | Baseline | 7.54 | 7.79 | 7.94 | 8.21 | 8.39 | 8.32 | 8.44 | 8.43 | 8.38 | 8.16 |
| | $/cwt | Decision | -0.25 | -0.19 | -0.15 | -0.12 | -0.11 | -0.11 | -0.11 | -0.11 | -0.11 | -0.14 |
| | percent | Decision | -3.32 | -2.42 | -1.84 | -1.51 | -1.35 | -1.31 | -1.29 | -1.32 | -1.33 | -1.72 |
| | | | | | | | | | | | | |
| Class IV Skim | $/cwt | Baseline | 7.19 | 7.35 | 7.61 | 7.73 | 7.76 | 7.80 | 7.75 | 7.69 | 7.68 | 7.62 |
| | $/cwt | Decision | -0.06 | -0.03 | -0.01 | 0.00 | 0.00 | 0.00 | -0.01 | -0.01 | -0.01 | -0.02 |
| | percent | Decision | -0.87 | -0.47 | -0.14 | -0.03 | -0.03 | -0.03 | -0.09 | -0.16 | -0.18 | -0.22 |

11

Attachment B

Table 8. Federal Order Milk Prices at 3.5 Percent Butterfat

|  | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class I | $/cwt. | Baseline | 16.18 | 16.91 | 17.43 | 17.87 | 18.11 | 18.17 | 18.36 | 18.39 | 18.44 | 17.76 |
|  | $/cwt. | Decision | -0.24 | -0.18 | -0.15 | -0.13 | -0.12 | -0.12 | -0.11 | -0.11 | -0.11 | -0.14 |
|  | percent | Decision | -1.46 | -1.07 | -0.87 | -0.74 | -0.66 | -0.63 | -0.60 | -0.59 | -0.59 | -0.79 |
| Class II | $/cwt. | Baseline | 13.83 | 14.48 | 15.11 | 15.39 | 15.49 | 15.66 | 15.69 | 15.67 | 15.77 | 15.23 |
|  | $/cwt. | Decision | -0.05 | -0.03 | -0.02 | -0.01 | -0.01 | -0.01 | -0.01 | -0.01 | -0.01 | -0.02 |
|  | percent | Decision | -0.40 | -0.23 | -0.15 | -0.09 | -0.08 | -0.08 | -0.08 | -0.08 | -0.09 | -0.14 |
| Class III | $/cwt. | Baseline | 13.47 | 14.20 | 14.72 | 15.16 | 15.40 | 15.46 | 15.65 | 15.68 | 15.73 | 15.05 |
|  | $/cwt. | Decision | -0.24 | -0.18 | -0.15 | -0.13 | -0.12 | -0.12 | -0.11 | -0.11 | -0.11 | -0.14 |
|  | percent | Decision | -1.75 | -1.28 | -1.03 | -0.87 | -0.78 | -0.75 | -0.71 | -0.69 | -0.69 | -0.93 |
| Class IV | $/cwt. | Baseline | 13.13 | 13.78 | 14.41 | 14.69 | 14.79 | 14.96 | 14.99 | 14.97 | 15.07 | 14.53 |
|  | $/cwt. | Decision | -0.05 | -0.03 | -0.02 | -0.01 | -0.01 | -0.01 | -0.01 | -0.01 | -0.01 | -0.02 |
|  | percent | Decision | -0.42 | -0.24 | -0.15 | -0.09 | -0.08 | -0.08 | -0.09 | -0.08 | -0.10 | -0.14 |
| Uniform at 3.5% BF | $/cwt. | Baseline | 14.48 | 15.19 | 15.73 | 16.13 | 16.33 | 16.41 | 16.55 | 16.56 | 16.61 | 16.00 |
|  | $/cwt. | Decision | -0.19 | -0.15 | -0.12 | -0.10 | -0.09 | -0.09 | -0.09 | -0.08 | -0.08 | -0.11 |
|  | percent | Decision | -1.34 | -0.97 | -0.78 | -0.65 | -0.58 | -0.55 | -0.52 | -0.51 | -0.51 | -0.70 |

Table 9. Average Class Butterfat Test

|  | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class I | percent | Baseline | 2.047 | 2.047 | 2.047 | 2.047 | 2.047 | 2.047 | 2.047 | 2.047 | 2.047 | 2.047 |
|  | percent | Decision | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Class II | percent | Baseline | 7.828 | 7.835 | 7.840 | 7.840 | 7.837 | 7.835 | 7.832 | 7.827 | 7.822 | 7.833 |
|  | percent | Decision | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Class III | percent | Baseline | 3.375 | 3.368 | 3.361 | 3.355 | 3.351 | 3.346 | 3.343 | 3.339 | 3.336 | 3.353 |
|  | percent | Decision | -0.001 | -0.002 | -0.002 | -0.002 | -0.002 | -0.002 | -0.002 | -0.002 | -0.002 | -0.002 |
| Class IV | percent | Baseline | 5.711 | 5.906 | 6.000 | 5.987 | 5.911 | 5.855 | 5.746 | 5.639 | 5.558 | 5.813 |
|  | percent | Decision | 0.026 | 0.037 | 0.041 | 0.041 | 0.039 | 0.037 | 0.035 | 0.033 | 0.031 | 0.036 |

12

Attachment B

Across all classes, the greatest diversion from baseline prices at test is in the first year (Table 10). Even the Class IV price at test, which increases on average during the projection period, falls by $0.01 per cwt (0.03 percent) in the projection for 2008. This initial drop due to the make allowance changes, is mitigated by reallocation of butterfat from Class III to Class IV. The Class III butterfat test falls slightly, 0.002 percent below baseline levels in each year. The Class IV butterfat test increases in every year of the projection period by an average 0.03 percent.

The butterfat tests for Class I and Class II remain unchanged signaling that product mix for each of those classes remains stable. Regarding Class III and Class IV, however, there is less milk being allocated to manufacturing and within these classes, the product mix is changing. In Class III specifically, disappearance of other than American cheese drops further, an average 9 million pounds (0.14 percent) below baseline than the higher-fat American cheese at an average 6 million pounds (0.15 percent) below baseline levels. The movement of butterfat from Class III to Class IV mitigates the reduction in Class IV butterfat due to the loss of marketings. The reduction in commercial disappearance of butter remains constant at 1 million pounds below baseline throughout the projection period.

A greater butterfat test in Class IV places upward pressure on the price. The Class IV price at test moves above baseline levels over the course of the projection period and averages $0.05 per cwt (0.24 percent) above baseline over the nine years. This increase is not translated into a Class II increase because Class II butterfat content does not change from baseline levels. Federal order prices move below baseline levels for all other classes, resulting in an average decrease in the uniform price of $0.11 per cwt (0.68 percent) over the projection period. The greatest average impact on prices at test is seen in the Class I and Class III prices, which fall $0.24 per cwt below baseline in the first year before settling at $0.11 below baseline in the final projection years.

Federal Order Marketings and Cash Receipts

Total Federal order marketings (Table 11) are 34 million pounds (0.03 percent) below baseline in the first projection year and the gap widens at a decreasing marginal rate over time, reaching 200 million pounds (0.15 percent) below baseline in 2016 for an average shortfall of 145 million pounds (0.11 percent). A clear divide emerges in the response of the varying classes. Class I and Class II marketings increase in response to lower prices, and coupled with reduced total milk marketings, reduce Class III and Class IV marketings. Class I and Class II marketings increase at a decreasing rate until settling for the last three years of the projection period while Class III and Class IV marketings fall increasingly below baseline levels. U.S. Marketings (Table 12) vary in similar fashion.

The decreases in Class III and Class IV marketings are indicative of a decreased demand for manufacturing milk. The higher dairy products prices result in a contraction in the quantities demanded of cheese, butter, and nonfat dry milk. Domestic commercial disappearance, illustrated in Table 13, falls below baseline averages for all these products. The most affected, in terms of

Attachment B

volume, is other than American cheese, which averages 9 million pounds below baseline (0.15 percent) over the projection period. The next greatest change, and greatest proportionally, is in disappearance of nonfat dry milk, which begins with a decrease of 3 million pounds in the first year and settles at 8 million pounds below baseline beginning in 2011 to average a decrease of 7 million pounds (0.66 percent) over the nine-year period.  Some of the milk that would have gone to manufacturing these products is reallocated to Class I and Class II products

Lower milk marketings and lower farm milk prices translate into a decrease in revenue (Table 14). Total Federal order receipts decrease by an average $165 million (0.79 percent) over the nine-year projection.  Class III receipts fall the furthest over the projection period with an average decrease in revenue of $84 million (1.07 percent).   The increased marketings for Class I and Class II milk are not enough to overcome the lower prices and decline in total receipts for both those classes as well.  The most modest impacts are in Class II receipts, averaging $3 million (0.08 percent) below baseline, never falling more than $6 million (0.17 percent) below baseline levels.

14

Attachment B

Table 10. Federal Order Milk Prices at Test

| | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class I | $/cwt | Baseline | 13.72 | 14.25 | 14.62 | 14.98 | 15.20 | 15.21 | 15.37 | 15.38 | 15.39 | 14.90 |
| | $/cwt | Decision | -0.24 | -0.18 | -0.15 | -0.13 | -0.12 | -0.11 | -0.11 | -0.11 | -0.11 | -0.14 |
| | percent | Decision | -1.76 | -1.29 | -1.02 | -0.86 | -0.77 | -0.74 | -0.71 | -0.71 | -0.71 | -0.94 |
| Class II | $/cwt | Baseline | 21.18 | 22.44 | 23.53 | 24.03 | 24.20 | 24.53 | 24.64 | 24.67 | 24.88 | 23.79 |
| | $/cwt | Decision | -0.05 | -0.03 | -0.04 | -0.03 | -0.02 | -0.02 | -0.02 | -0.01 | -0.01 | -0.03 |
| | percent | Decision | -0.21 | -0.14 | -0.15 | -0.12 | -0.10 | -0.10 | -0.08 | -0.05 | -0.06 | -0.11 |
| Class III | $/cwt | Baseline | 13.26 | 13.96 | 14.45 | 14.87 | 15.10 | 15.15 | 15.32 | 15.35 | 15.39 | 14.76 |
| | $/cwt | Decision | -0.24 | -0.19 | -0.16 | -0.14 | -0.12 | -0.12 | -0.11 | -0.11 | -0.11 | -0.14 |
| | percent | Decision | -1.80 | -1.33 | -1.08 | -0.91 | -0.81 | -0.78 | -0.74 | -0.73 | -0.73 | -0.97 |
| Class IV | $/cwt | Baseline | 16.88 | 18.20 | 19.26 | 19.64 | 19.63 | 19.78 | 19.63 | 19.42 | 19.41 | 19.09 |
| | $/cwt | Decision | -0.01 | 0.04 | 0.05 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.05 | 0.05 |
| | percent | Decision | -0.03 | 0.20 | 0.26 | 0.31 | 0.30 | 0.29 | 0.28 | 0.29 | 0.27 | 0.24 |
| Uniform | $/cwt | Baseline | 14.84 | 15.58 | 16.15 | 16.56 | 16.77 | 16.86 | 17.01 | 17.02 | 17.09 | 16.43 |
| | $/cwt | Decision | -0.19 | -0.15 | -0.12 | -0.10 | -0.09 | -0.09 | -0.09 | -0.08 | -0.08 | -0.11 |
| | percent | Decision | -1.30 | -0.94 | -0.76 | -0.63 | -0.56 | -0.54 | -0.51 | -0.49 | -0.49 | -0.68 |

Attachment B

Table 11. Federal Order Marketings

| | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class I | mil. pounds | Baseline | 45,163 | 44,973 | 44,942 | 44,912 | 45,021 | 44,913 | 44,920 | 44,947 | 45,091 | 44,987 |
| | mil. pounds | Decision | 56 | 42 | 34 | 29 | 26 | 25 | 24 | 24 | 24 | 32 |
| | percent | Decision | 0.12 | 0.09 | 0.08 | 0.06 | 0.06 | 0.06 | 0.05 | 0.05 | 0.05 | 0.07 |
| | | | | | | | | | | | | |
| Class II | mil. pounds | Baseline | 16,717 | 16,726 | 16,823 | 17,001 | 17,280 | 17,462 | 17,740 | 18,038 | 18,360 | 17,350 |
| | mil. pounds | Decision | 7 | 5 | 6 | 5 | 5 | 5 | 5 | 4 | 4 | 5 |
| | percent | Decision | 0.04 | 0.03 | 0.04 | 0.03 | 0.03 | 0.03 | 0.03 | 0.02 | 0.02 | 0.03 |
| | | | | | | | | | | | | |
| Class III | mil. pounds | Baseline | 50,363 | 51,173 | 51,803 | 52,387 | 53,115 | 53,665 | 54,245 | 54,867 | 55,654 | 53,030 |
| | mil. pounds | Decision | -16 | -28 | -40 | -51 | -60 | -67 | -72 | -76 | -79 | -55 |
| | percent | Decision | -0.03 | -0.06 | -0.08 | -0.10 | -0.11 | -0.13 | -0.13 | -0.14 | -0.14 | -0.10 |
| | | | | | | | | | | | | |
| Class IV | mil. pounds | Baseline | 11,665 | 10,811 | 10,488 | 10,530 | 10,802 | 10,994 | 11,377 | 11,792 | 12,173 | 11,181 |
| | mil. pounds | Decision | -81 | -108 | -123 | -129 | -133 | -137 | -140 | -143 | -149 | -127 |
| | percent | Decision | -0.70 | -1.00 | -1.17 | -1.22 | -1.23 | -1.24 | -1.23 | -1.22 | -1.22 | -1.14 |
| | | | | | | | | | | | | |
| Total | mil. pounds | Baseline | 123,909 | 123,683 | 124,057 | 124,830 | 126,217 | 127,035 | 128,282 | 129,644 | 131,278 | 126,548 |
| | mil. pounds | Decision | -34 | -89 | -123 | -146 | -162 | -173 | -184 | -192 | -200 | -145 |
| | percent | Decision | -0.03 | -0.07 | -0.10 | -0.12 | -0.13 | -0.14 | -0.14 | -0.15 | -0.15 | -0.11 |

Attachment B

Table 12.  U.S. Marketings

| | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class I | mil. pounds | Baseline | 54,810 | 54,579 | 54,542 | 54,505 | 54,637 | 54,506 | 54,514 | 54,548 | 54,722 | 54,596 |
| | mil. pounds | Decision | 68 | 51 | 42 | 35 | 32 | 31 | 30 | 29 | 29 | 38 |
| | percent | Decision | 0.12 | 0.09 | 0.08 | 0.06 | 0.06 | 0.06 | 0.05 | 0.05 | 0.05 | 0.07 |
| | | | | | | | | | | | | |
| Class II | mil. pounds | Baseline | 19,553 | 19,563 | 19,676 | 19,884 | 20,210 | 20,424 | 20,749 | 21,097 | 21,473 | 20,292 |
| | mil. pounds | Decision | 8 | 6 | 7 | 6 | 6 | 6 | 5 | 4 | 4 | 6 |
| | percent | Decision | 0.04 | 0.03 | 0.04 | 0.03 | 0.03 | 0.03 | 0.03 | 0.02 | 0.02 | 0.03 |
| | | | | | | | | | | | | |
| Class III | mil. pounds | Baseline | 91,736 | 93,211 | 94,359 | 95,423 | 96,749 | 97,751 | 98,808 | 99,939 | 101,373 | 96,594 |
| | mil. pounds | Decision | -29 | -52 | -73 | -93 | -110 | -122 | -132 | -139 | -145 | -99 |
| | percent | Decision | -0.03 | -0.06 | -0.08 | -0.10 | -0.11 | -0.13 | -0.13 | -0.14 | -0.14 | -0.10 |
| | | | | | | | | | | | | |
| Class IV | mil. pounds | Baseline | 17,029 | 15,782 | 15,311 | 15,373 | 15,769 | 16,050 | 16,608 | 17,215 | 17,771 | 16,323 |
| | mil. pounds | Decision | -119 | -157 | -180 | -188 | -194 | -200 | -205 | -209 | -217 | -185 |
| | percent | Decision | -0.70 | -1.00 | -1.17 | -1.22 | -1.23 | -1.24 | -1.23 | -1.22 | -1.22 | -1.14 |
| | | | | | | | | | | | | |
| Total Class Use [1] | mil. pounds | Baseline | 183,128 | 183,135 | 183,888 | 185,184 | 187,364 | 188,731 | 190,679 | 192,799 | 195,340 | 187,805 |
| | mil. pounds | Decision | -72 | -152 | -204 | -240 | -266 | -285 | -302 | -315 | -328 | -240 |
| | percent | Decision | -0.04 | -0.08 | -0.11 | -0.13 | -0.14 | -0.15 | -0.16 | -0.16 | -0.17 | -0.13 |

[1] Total Class Use differs from U.S. Marketings due to the presence of imported dairy ingredients.

17

Attachment B

Table 13.  Domestic Commercial Disappearance

| | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Cheese | mil. pounds | Baseline | 4,011 | 4,043 | 4,064 | 4,089 | 4,131 | 4,159 | 4,195 | 4,236 | 4,292 | 4,136 |
| | mil. pounds | Decision | -3 | -5 | -6 | -6 | -6 | -6 | -7 | -7 | -7 | -6 |
| | percent | Decision | -0.08 | -0.12 | -0.14 | -0.15 | -0.15 | -0.15 | -0.16 | -0.16 | -0.16 | -0.14 |
| Other Cheese | mil. pounds | Baseline | 5,884 | 5,970 | 6,044 | 6,114 | 6,201 | 6,267 | 6,335 | 6,407 | 6,495 | 6,191 |
| | mil. pounds | Decision | -3 | -5 | -7 | -8 | -10 | -11 | -12 | -12 | -13 | -9 |
| | percent | Decision | -0.05 | -0.08 | -0.11 | -0.14 | -0.16 | -0.17 | -0.19 | -0.19 | -0.20 | -0.15 |
| Butter | mil. pounds | Baseline | 1,441 | 1,398 | 1,392 | 1,401 | 1,422 | 1,439 | 1,462 | 1,487 | 1,515 | 1,440 |
| | mil. pounds | Decision | -1 | -1 | -1 | -1 | -1 | -1 | -1 | -1 | -1 | -1 |
| | percent | Decision | -0.06 | -0.09 | -0.09 | -0.09 | -0.09 | -0.09 | -0.09 | -0.09 | -0.09 | -0.09 |
| Nonfat dry milk | mil. pounds | Baseline | 1,001 | 1,010 | 1,015 | 1,032 | 1,061 | 1,082 | 1,116 | 1,151 | 1,187 | 1,073 |
| | mil. pounds | Decision | -3 | -5 | -7 | -8 | -8 | -8 | -8 | -8 | -8 | -7 |
| | percent | Decision | -0.29 | -0.53 | -0.71 | -0.77 | -0.76 | -0.76 | -0.73 | -0.69 | -0.68 | -0.66 |
| Dry whey | mil. pounds | Baseline | 567 | 552 | 536 | 521 | 509 | 494 | 480 | 468 | 458 | 509 |
| | mil. pounds | Decision | 0 | -1 | -1 | -1 | -1 | -1 | -1 | -1 | -1 | -1 |
| | percent | Decision | -0.07 | -0.11 | -0.13 | -0.15 | -0.17 | -0.18 | -0.18 | -0.19 | -0.19 | -0.15 |

Attachment B

Table 14.  Federal Order Cash Receipts

| | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class I | mil. $ | Baseline | 6,195 | 6,407 | 6,569 | 6,728 | 6,843 | 6,831 | 6,902 | 6,912 | 6,939 | 6,703 |
| | mil. $ | Decision | -102 | -77 | -62 | -53 | -49 | -47 | -46 | -46 | -46 | -59 |
| | percent | Decision | -1.64 | -1.20 | -0.95 | -0.79 | -0.71 | -0.68 | -0.66 | -0.66 | -0.66 | -0.87 |
| Class II | mil. $ | Baseline | 3,541 | 3,753 | 3,959 | 4,085 | 4,182 | 4,283 | 4,372 | 4,449 | 4,568 | 4,133 |
| | mil. $ | Decision | -6 | -4 | -5 | -3 | -3 | -3 | -2 | -1 | -2 | -3 |
| | percent | Decision | -0.17 | -0.11 | -0.11 | -0.08 | -0.07 | -0.07 | -0.05 | -0.03 | -0.04 | -0.08 |
| Class III | mil. $ | Baseline | 6,677 | 7,142 | 7,486 | 7,789 | 8,021 | 8,131 | 8,313 | 8,420 | 8,564 | 7,838 |
| | mil. $ | Decision | -122 | -99 | -86 | -78 | -74 | -74 | -73 | -73 | -74 | -84 |
| | percent | Decision | -1.83 | -1.38 | -1.15 | -1.00 | -0.93 | -0.91 | -0.88 | -0.87 | -0.87 | -1.07 |
| Class IV | mil. $ | Baseline | 1,970 | 1,967 | 2,020 | 2,068 | 2,120 | 2,174 | 2,234 | 2,290 | 2,362 | 2,134 |
| | mil. $ | Decision | -14 | -16 | -18 | -19 | -20 | -21 | -21 | -21 | -23 | -19 |
| | percent | Decision | -0.73 | -0.80 | -0.91 | -0.92 | -0.93 | -0.96 | -0.95 | -0.93 | -0.96 | -0.90 |
| Total | mil. $ | Baseline | 18,383 | 19,268 | 20,034 | 20,671 | 21,167 | 21,420 | 21,820 | 22,071 | 22,434 | 20,808 |
| | mil. $ | Decision | -244 | -196 | -172 | -154 | -146 | -144 | -142 | -141 | -145 | -165 |
| | percent | Decision | -1.33 | -1.02 | -0.86 | -0.75 | -0.69 | -0.67 | -0.65 | -0.64 | -0.64 | -0.79 |

Table 15. Net Government Removals of Nonfat Dry Milk Through the Milk Price Support Program (MPSP)

| | Units | Scenario | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 9 Yr. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NDM Net Govt. Removals[1] | mil. pounds | Baseline | 7 | 4 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 2 |
| | mil. pounds | Decision | -1 | -1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MPSP Outlays[2] | mil. $ | Decision | -1 | -1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Govt. Outlays | mil. $ | Decision | -1 | -1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] Net government removals equals support price purchases minus unrestricted sales.

[2] MPSP outlays are not projected in the model.  The change is computed by multiplying NDM net removal quantities by the NDM support price of $0.80.  No attempt is made to estimate changes in storage, handling, transportation, processing, and packaging costs.

Attachment B

Government Outlays

With decreased milk production, manufacturing supplies tighten and in turn result in higher product prices. These elevated product prices are the reason that government removals under the Milk Price Support Program (MPSP) do not rise above baseline levels even though milk prices fall slightly below baseline over the projection period (Table 15). Government removals of nonfat dry milk fall by 1 million pounds in the first two years of the projection period, but return to baseline levels in 2010. Government outlays similarly fall by $1 million in the first two years before returning to baseline levels. (It is assumed that current MPSP make allowances remain in effect for the nine-year projection period.[3])

Summary of Results

The impacts of the proposed changes to the Class III and Class IV pricing formulas contained in the tentative partial final decision are summarized as changes from the USDA baseline on an annual basis and as a nine-year average change from 2008-2016. Impacts on the Federal order system are considered to be in the context of the broader U.S. market for milk and dairy products.

Producers. The U.S all-milk price falls an average $0.06 per cwt (0.39 percent) from a baseline level of $16.22 per cwt over the nine-year projection period. The average Federal order minimum blend price at test averages $0.11 per cwt (0.68 percent) below the baseline level of $16.43 per cwt. The lower milk prices result in a tightening of production. In turn, Federal order marketings fall an average 145 million pounds (0.11 percent) below the baseline average of 126.5 billion pounds. Federal order cash receipts decrease an average $165 million (0.79 percent) from the $20.8 billion baseline receipts. U.S. marketings average 240 million pounds (0.13 percent) per year below the baseline average of 187.8 billion pounds. The lower marketings coupled with lower farm milk prices result in an average decline of $156 million (0.51 percent) in producer revenue from the baseline average of $30.4 billion.

Milk Manufacturers and Processors. Increases to the make allowances in Federal order minimum price formulas are advantageous for dairy product manufacturers. Average wholesale prices over the projection period exceed baseline by the following: cheddar cheese by $0.0176 per pound (1.14 percent), butter by $0.0346 per pound (1.89 percent), nonfat dry milk by $0.0090 per pound (0.88 percent), and dry whey by $0.0034 per pound (0.94 percent).

In spite of the higher product prices, the make allowance changes are substantial enough that the nine-year average component prices fall from baseline levels. The changes are as follows: butterfat decreases by $0.0014 per pound (0.07 percent), protein decreases by $0.0451 per pound (1.96 percent), nonfat solids decreases by $0.0018 per pound (0.22 percent) and the other solids price by decreases by $0.0001 per pound (0.05 percent). Lower component prices are carried through to lower skim milk pricing factors. The Class III skim price falls an average $0.14 per cwt (1.72 percent) from a baseline average level of $8.16 per cwt and remains the Class I price mover.

---

[3] USDA Farm Service Agency Milk Price Support Program Fact Sheet (July 2004); accessed at http://www.fsa.usda.gov/Internet/FSA_File/2004milkpstable.pdf.

Attachment B

Consumers.  The retail price of fluid milk is expected to decrease an average of $0.0094 per gallon (0.27 percent) from the baseline average price of $3.4135 over the nine-year projection period due to the lower Class I price.  Consumers respond, albeit modestly, to the decreased prices as evidenced by the average 32 million pound (0.07 percent) increase in Class I marketings from a baseline average of 45 billion pounds over the projection period.  Class II marketings increase overall, indicating an increase in consumption of soft products consistent with the slight decline in Class II prices.  Consumer demand for hard manufactured dairy products is more elastic than for fluid milk and soft products, that is, consumers are more responsive to changes in price.  It is projected that consumers will face higher prices for hard manufactured dairy products such as cheese, butter and nonfat dry milk and as a result, Class III and Class IV marketings fall from baseline levels.

Government Outlays.  With the expiration of the MILC program, and no activity under DEIP, any change to government outlays occurs through MPSP purchases.  Baseline level prices are high enough that few government purchases are expected.  Under the proposed changes, removals change only slightly at the beginning of the projection period; remaining unchanged in from baseline in the long run projection.

Conclusions

The proposed changes to Class III and Class IV pricing formulas result in lower Federal order prices as well as higher manufactured product prices.  Thus, the gap between the price of milk and the wholesale prices received by dairy product manufacturers widens.  At the same time, milk producers face lower prices and respond by cutting back on production, leading to lower marketings and producer revenues.

The decrease in the Federal minimum price for Class I milk is passed on to consumers in the form of a slightly lower retail price for fluid milk which increases consumption.  However, tighter milk supply bolsters manufactured product prices and in turn lowers consumption of cheese, butter, and nonfat dry milk.  Class I and Class II marketings increase, but not enough to counteract the lower prices, allowing average receipts to fall across all classes.  Though prices for Class III and Class IV milk decrease under the proposed changes, the decreased consumption of the associated dairy products and the increase in Class I and Class II product consumption causes a shift in dairy product allocation.

21

Attachment B

Appendix

Current Price Formulas

Note: Milk prices are per 100 pounds or cwt., rounded to the nearest cent.
Component prices are per pound, rounded to nearest one-hundredth cent.
Cheese, dry whey, butter, and nonfat dry milk prices are weighted monthly averages of weekly
NASS survey prices, rounded to the nearest one-hundredth cent.

Class I:
Class I Price = (Class I skim milk price x 0.965) + (Class I butterfat price x 3.5).
Class I Skim Milk Price = Higher of advanced Class III or IV skim milk pricing factors +
applicable Class I differential.
Class I Butterfat Price = Advanced butterfat pricing factor+ (applicable Class I differential divided
by 100).
Note: Advanced pricing factors are computed using applicable price formulas listed below, except
that product price averages are for two weeks.

Class II:
Class II Price = (Class II skim milk price x 0.965) + (Class II butterfat price x 3.5).
Class II Skim Milk Price = Advanced Class IV skim milk pricing factor + $0.70.
Class II Butterfat Price = Butterfat price + $0.007.
Class II Nonfat Solids Price = Class II skim milk price divided by 9.

Class III:
Class III Price = (Class III skim milk price x 0.965) + (Butterfat price x 3.5).
Class III Skim Milk Price = (Protein price x 3.1) + (Other solids price x 5.9).
Protein Price = ((Cheese price – 0.1682) x 1.383) + ((((Cheese price – 0.1682) x 1.572) - Butterfat
price x 0.9) x 1.17).
Other Solids Price = (Dry whey price – 0.1956) times 1.03.
Butterfat Price = (Butter price – 0.1202) times 1.20.

Class IV:
Class IV Price = (Class IV skim milk price x 0.965) + (Butterfat price x 3.5).
Class IV Skim Milk Price = Nonfat solids price times 9.
Nonfat Solids Price = (Nonfat dry milk price - 0.157) times 0.99.
Butterfat Price = See Class III.
Somatic Cell Adjustment Rate = Cheese price x 0.0005, rounded to fifth decimal place. Rate is per
1,000 somatic cell count difference from 350,000

Attachment B

August 8, 2008

*By e-mail to dana.coale@usda.gov*

Ms. Dana Coale
Deputy Administrator USDA-AMS
STOP 0231-Room 2971,
1400 Independence Avenue, SW
Washington, DC 20250-0231

*Re:    Interim Final Rule, Milk in the Northeast and other Marketing Areas,*
*        [Docket No. AMS-DA-07-0026; AO-14-A77, et al.; DA-07-02-A],*
*        73 Fed. Reg. 44617 (July 31, 2008)*

Dear Ms. Coale:

Although I am addressing this letter to you, I have taken the liberty to send it to others within Dairy Programs, AMS, and the Office of the General Counsel because time is critical.  With vacations, flex time, out of office trips, conferences, and the like, I am not sure if you would be in and wanted to make sure it got the attention it deserved.

This letter is written on behalf of Arkansas Dairymen's Cooperative Association, Inc., Columbia River Dairy, LLC, Continental Dairy Products, Inc., Lone Star Milk Producers, Inc., Maryland and Virginia Milk Producers Cooperative, Central Sands Dairy, LLC, Select Milk Producers, Inc., United Dairymen of Arizona, and Zia Milk Producers, Inc. in their capacities as dairy producers under the Federal Milk Marketing Orders and individual dairies Columbia River Dairy, LLC and Central Sands Dairy, LLC. ("Dairy Producers").

After reviewing all of the information I came to the conclusion that this hearing process is now fatally flawed.  Rather than rushing off to litigation, I thought it appropriate to point out to you the one issue that has arisen since the record was closed but before your decision and this rule.  I do so in the hope that you and your department will concur that the Interim Rule does not comply with the law and must be withdrawn and the hearing either reopened or a new one commenced to make the necessary corrections.

The changing event was the passage of the Farm Bill.  That statute became effective May 19,

Attachment C

Page 2 of  4
Ms. Dana Coale
Re: Interim Final Rule, Milk in the Northeast
and other Marketing Areas
August 8, 2008

2008.[1] The Farm Bill amended the Agricultural Marketing Agreement Act to include the following requirement regarding all make allowance hearings:

> (G) MONTHLY FEED AND FUEL COSTS FOR MAKE ALLOWANCES.--As part of any hearing to adjust make allowances under marketing orders commencing prior to September 30, 2012, the Secretary shall--
> (i) determine the average monthly prices of feed and fuel incurred by dairy producers in the relevant marketing area;
> (ii) consider the most recent monthly feed and fuel price data available; and
> (iii) consider those prices in determining whether or not to adjust make allowances.[2]

The Interim Final Rule arises out of the Proposed Rule; Tentative Partial Final Decision[3], which was announced a full month after the effective date of the statute.  The hearing process in which the Tentative Partial Final Decision was a part falls within the ambit of the FCEA.  The operative terms are "any hearing to adjust make allowances" and "commencing prior to September 30, 2012."  The word "any" is all encompassing.  This hearing, without question, commenced prior to September 30, 2012. This hearing considered and set make allowances and the decision, with the exception of correcting a technical error in butterfat yields, only changes make allowances.

We have reviewed the Tentative Final Decision and the Economic Analysis to see if the standard was met.  It was not.  Nowhere in the Tentative Final Decision does USDA identify the average costs of feed and fuel incurred by producers by month and within the different marketing areas.  More telling is that the Decision is openly hostile to consideration of feed costs by producers in being part of the consideration.  A review of the accompanying economic analysis provides no such numbers.  As a matter of fact, a search for the words "feed" and "fuel" find no hits.  Further there is no individual marketing area analysis of any kind.

I am sure your legal counsel will tell you that Congress has the right to change the rules and law in the middle of lawsuits and administrative proceedings, just like it has done here.  We have to deal with the law as it is at the time, not was or will be.  Legally we must assume Congress was fully aware of the pending hearings considering make allowances.  That it described what hearings to be included as those any commencing before the sunset four years later rather than after the

---

[1]Food, Conservation, and Energy Act of 2008, Pub. L. 110-246, §4.

[2]Food, Conservation, and Energy Act of 2008, Pub. L. 110-246, §1504(G) amending 7 U.S.C.A. 608c(17).

[3]Proposed Rule; Tentative Partial Final Decision, 73 Fed. Reg. 35306 (June 20, 2008).

Attachment C

Page 3 of  4
Ms. Dana Coale
Re: Interim Final Rule, Milk in the Northeast
and other Marketing Areas
August 8, 2008

enactment insures that this proceeding was to be included.

In summary, the failure to consider the statutory factors is fatal to the Interim Final Rule.  The Dairy Farmers respectfully request that USDA immediately withdraw the rule and either terminate the hearing proceedings or commence appropriate proceedings to fully address the requirements of the law.

Consideration of this demand will take time.  But there is a way whereby the Department can delay implementation as it considers its options.  In email correspondence with your office on August 31, 2008, I inquired as to the meaning the Department was placing on the phrase "Effective Date: September 1, 2008" in the published rule meant effective for prices announced after September 1 for milk marketed on and after that date or for prices announced for milk marketed in September. As you know, the pricing formulas modified by the Interim Final Rule will become effective according to regulations on August 22, 2008.  In a timely response from your office via Erin Taylor, I was informed that it would be effective August 22, 2008.

Dairy Producers consider this premature use of the rule.  The APA, 5 USCA § 553, and 7 CFR §900.14 both require publication or service of a substantive rule be made not less than 30 days before its effective date.  The Interim Final Rule  was published July 31, 2008. That it will apply to milk in September misses the point of advanced pricing.  On August 22, only 22 days after the publication, the prices for milk will be fixed and not subject to change.  That is insufficient time to adjust pricing programs to the new prices charged to customers, or, as here, consider the legality of the rule itself.

The Department could announce as part of Dairy Market News, that the first price announcement under the Rule, if one does come out, would be September 19.  That would provide your Department additional time to consider its options in withdrawing this rule.

As you know Dairy Producers and this office have long participated in this and other hearings.  We are fully prepared and willing to assist the Department in its compliance with the law as it withdraws the rule and considers future proceedings.  At the same time, we are fully prepared to immediately commence litigation to obtain judicial relief if necessary.  Frankly, we would rather work with you than challenge you in court.

Time is short.  Any action must be taken before August 22.  We see the middle of next week, Wednesday, Thursday at the latest, as the last day to which we can reasonably delay filing while we wait for a response.  A response in agreement with our assessment before that time would alleviate that need.

Thank you for giving your consideration to this letter.


Attachment C

Page 4 of  4
Ms. Dana Coale
Re: Interim Final Rule, Milk in the Northeast
and other Marketing Areas
August 8, 2008

Sincerely yours,
YALE LAW OFFICE, LP


Benjamin F. Yale

xc: Clients identified in letter
    Gino Tosi, Assistant Deputy Administrator
    Lloyd Day, Administrator, AMS
    Garrett Stevens, Office of the General Counsel

Attachment C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ARKANSAS DAIRY COOPERATIVE ASSOCIATION, INC., et al., | ) ) ) | |
| --PLAINTIFFS, | ) ) | Civil Case No.: |
| v. | ) ) | JUDGE |
| UNITED STATES DEPARTMENT OF AGRICULTURE, | ) ) ) | |
| --DEFENDANT. | ) ) | |

**DECLARATION OF RANCE MILES**
**IN SUPPORT OF THE**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Rance Miles, being of lawful age, declares under penalty of perjury pursuant to 28 U.S.C. §1746:

1.    My name is Rance Miles-and my business address is 320 W. Hermosa Street, Artesia, NM 88210.

2.    The following is given on my own personal knowledge and belief and in support of the plaintiffs' motion for a preliminary injunction.

3.    I am the Chief Financial Officer for Plaintiffs Select Milk Producers, Inc. (Select) and Continental Dairy Products, Inc. (Continental). In that role as I am responsible for oversight of the billing, blending and producer payroll functions for these cooperatives.

4.    These cooperatives entirely consist of dairy farmers located in the states of New Mexico, Kansas, Oklahoma, Texas, Ohio, Indiana, and Michigan. Select markets and pool milk primarily in the Southwest Milk Marketing Order, Order 126. It has also provided milk to

1

Attachment D

plants and customers who are regulated under orders 5, 6, 7, 32, and 131. Continental markets milk in the Mideast, Appalachia, Southeast and Florida orders. Its prices are dependent upon the Order 33 blend price.

5.   I have experience in negotiating, billing, and reviewing the contracts and common terms for pricing milk in the FMMOs. Pricing of milk is sold at the Federal order minimum prices plus adjustments. Generally the adjustments reflect local market conditions. Changes in the underlying minimum prices do not change the adjustments. Virtually every cent of decrease in the federal minimum price results in a lower price received from the buyers and, in turn, a lower blend price which we can pay our producers' income.

6.   Our primary market for our members milk includes producers who bottle milk, make ice cream, yogurt or cheese. The changes to make allowances will also reduce prices for milk sold to those plants.

7.   By using the changed prices as reported by USDA in the USDA Agricultural Marketing Service (AMS), Economic Analysis Class III and IV Pricing Formulas, Tentative Partial Final Decision March 2008, Table 2, p. 4. , I estimate that the aggregate losses for the members of Continental and Select would have approximated $1,750,956 for June. Volumes do vary from month to month, but losses in that range will occur in September if the amendments are implemented.

8.   There is no way whereby we can pass on these costs to our customers. Our members will have to absorb them.

9.   The Mideast Milk Marketing Order has characteristics different from other marketing areas in the Nation. It has a mix of manufacturing and Class I not found in the other orders. Milk from that region flows into the Southeast and it's the demand for milk in the bottle in the

2

Attachment D

Southeast that impacts local prices in the Mideast.

10.    If the prices go in effect on August 22, 2008, and later the rule is held invalid, we will not be

able to recover the difference from our customers.

Executed on August 11, 2008

3

Attachment D

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ARKANSAS DAIRY COOPERATIVE | ) | |
| ASSOCIATION, INC., et al., | ) | |
| | ) | Civil Case No.: |
| --PLAINTIFFS, | ) | |
| | ) | JUDGE |
| V. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, | ) | |
| | ) | |
| --DEFENDANT. | ) | |

<u>DECLARATION OF FRANK SHECKARSKI</u>
<u>IN SUPPORT OF THE</u>
<u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>

Frank Sheckarski, being of lawful age, declares under penalty of perjury pursuant to 28

U.S.C. §1746:

1.      My name is Frank Sheckarski and my business address is 400 East College, Roswell, NM

Attachment E

88201.

2.    The following is given on my own personal knowledge and belief and in support of the plaintiffs' motion for a preliminary injunction.

3.    I am the Manager for Plaintiff Zia Milk Producers, Inc. (ZIA).  In that role as I am responsible for oversight of the billing, blending and producer payroll functions for ZIA.

4.    Our cooperative entirely consists of dairy farmers located in the states of New Mexico and Texas.  We market and pool milk primarily in the Southwest Milk Marketing Order, Order 126.  We have also provided milk to plants and customers who are regulated under orders 5, 7, and 32.

5.    I am aware of the contracts and common terms for pricing milk in the FMMOs.  Pricing of milk is sold at a price that uses the Federal order minimum prices with adjustments.  Every cent of decrease in the federal minimum price results in a lower price received from the buyers and, in turn, a lower blend price which we can pay our producers' income.

6.    Our primary market for our members' milk is not only customers who bottle milk, but also customers who make cheese, powder, ice cream, and yogurt.  The changes to make allowances will also reduce prices for milk sold to those plants.

7.    By using the changed prices as reported by USDA in the USDA Agricultural Marketing Service (AMS), Economic Analysis Class III and IV Pricing Formulas, Tentative Partial Final Decision March 2008, Table 2, p. 4. , I estimate that the aggregate losses for the members of Zia would have approximated $250,000.00 for June.  Volumes do vary from month to month, but losses in that range will occur in September if the amendments are implemented.

8.    There is no way whereby we can pass on these costs to our customers.  Our members will

Attachment E

have to absorb them.

9.     Zia is a member of the Greater Southwest Agency which consists of four cooperatives, including Select Milk Producers, Inc. and Lone Star Milk Producers, Inc.  Markets in which milk is sold are similar to those for Zia.  I estimate that had the rule been in effect for June, the total reduction in monies for all producers in the Greater Southwest Agency would have been about $4,500,000.00.

10.    The majority of sales for bottled milk are in the urban triangle of DFW, Houston and San Antonio.  Much of the milk is supplied from the west and north of that area including New Mexico and West Texas.  The cheese and other manufacturing plants are primarily located in the New Mexico and West Texas areas.  There are no emergency marketing conditions existing in this market justifying an immediate reduction in milk prices.

11.    If the prices go in effect on August 22, 2008, and later the rule is held invalid, we will not be able to recover the difference from our customers.


Executed on August 11, 2008              /s/   Frank  Sheckarski


Attachment E

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| ARKANSAS DAIRY COOPERATIVE ASSOCIATION, INC., et al., | ) ) ) | Civil Case No.: |
| --PLAINTIFFS, | ) ) | JUDGE |
| V. | ) ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, | ) ) ) | |
| --DEFENDANT. | ) | |

**DECLARATION OF MARK HOCKING
IN SUPPORT OF THE
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Mark Hocking, being of lawful age, declares under penalty of perjury pursuant to 28 U.S.C.

§1746:

1.      My name is Mark Hocking and my business address is 2008 S Hardy Dr., Tempe, AZ 85282.

Attachment F

2.    The following is given on my own personal knowledge and belief and in support of the plaintiffs' motion for a preliminary injunction.

3.    I am the Chief Financial Officer for Plaintiff United Dairymen of Arizona (UDA). In my role as CFO, I am responsible for oversight of the billing, blending and producer payroll functions for UDA.

4.    Our cooperative entirely consists of dairy farmers located in the states of Arizona and California. We market and pool milk primarily in the Arizona Milk Marketing Order, Order 131, and constitute over eighty percent of the milk pooled on that order. We have also provided milk to plants and customers who are regulated under orders 5, 6, 7, 126, 131 and the California state order. We have also received milk at our plant from producers and plants in orders 32, 126, 131, and California.

5.    Pricing of milk we sell on behalf of our producers is directly related to the Federal order blend price. Every cent of decrease in the federal minimum price will reduce our producers' income regardless of whether the sale is subject to an existing contract, a contact made in the future, or on a spot basis.

6.    The proposed changes in the USDA make allowances which will reduce the minimum prices, directly reduce our producers' income.

7.    Not only do these changes reduce the price of milk paid by plants making cheese and NFDM, but other, higher value plants that bottle milk and make ice cream and yogurt.

8.    Applying the changes to Class III and IV prices as reported by USDA in the USDA Agricultural Marketing Service (AMS), Economic Analysis Class III and IV Pricing Formulas, Tentative Partial Final Decision March 2008, Table 2, p. 4. reduced by

Attachment F

approximately thirty to thirty one cents cents per hundred weight if the amendments to the make allowances are implemented, and the aggregate losses for the members of UDA would have approximated $902,000. We would expect losses in that range to continue in September and beyond as a result of the changes in the make allowances.

9.    There is no way whereby we can pass on these costs to our customers. Our members will have to absorb them.

10.   As part of our responsibilities to our members and our customers we seek to be aware of ongoing economic conditions in our marketing area. The market conditions described by USDA in the Tentative Partial Final Decision of June 20, 2008 do not reflect the market conditions in our primary marketing area.

11.   If the prices go in effect on August 22, 2008, and later the rule is held invalid, we will not be able to recover the difference from our customers.


Executed on August 11, 2008                    /s/

Mark Hocking, CFO
United Dairymen of Arizona

Attachment F

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

ARKANSAS DAIRY COOPERATIVE )
ASSOCIATION, INC., et al.,           )
                                                    )     Civil Case No.:
       --PLAINTIFFS,                      )
                                                    )     JUDGE
                       V.                          )
                                                    )
UNITED STATES DEPARTMENT OF   )
AGRICULTURE,                             )
                                                    )
       --DEFENDANT.                     )

**DECLARATION OF TRAVIS CAMPSEY**
**IN SUPPORT OF THE**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Travis Campsey, being of lawful age, declares under penalty of perjury pursuant to 28 U.S.C. Sec1746:

1.   My name is Travis Campsey and my business address is 217 Baird Lane, Windthorst, TX 76389. The following is given on my own personal knowledge and belief and in support of the plaintiffs' motion for a preliminary injunction.  I am the Chief Financial Officer  for Plaintiff Lone Star Milk Producers, Inc. (Lone Star).  Plaintiff Arkansas Dairy Cooperative Association (ADCA) is a member of Lone Star. In my role as CFO, I am responsible for oversight and/or review of the billing, blending and producer payroll functions for Lone Star.

2.   I oversee the prices that plants are billed for milk marketed from Lone Star members.  These prices are based upon the minimum class and component prices announced by the various Federal Milk Market Administrators in the different orders in which we market milk.  Any change in those prices, whether the result of changes in market prices or the result of changes in the formulas, directly results in a corresponding change in the amount that we can bill to the plants that receive our milk and collect for the benefit of our producers.

3.   As part of the process of billing plants and paying our producers, we have to settle up with the Producer Settlement Funds in each of the orders where we market milk.  These orders include the Southwest Milk Marketing Order, Appalachian Milk Marketing Order, Southeast Milk Marketing Order, Central Milk Marketing Order, and the Florida Milk Marketing Order.

4.   We account to the Producer Settlement Funds at the minimum prices for which the plant uses the milk and we receive back a blend price irrespective of the uses.  We receive regular minimum prices announcements from USDA through the milk market administrators based upon the formulas found at 7 C.F.R. Part 1000.50.

5.  The blend price we receive from the Producer Settlement Fund is the beginning point for determining what we pay our member producers. We then add premiums and other income and deduct approved expenses for marketing, hauling, testing, and the like. Every reduction in the blend price reduces the pay price our producer members ultimately receive.

6.  When Lone Star sells its members' milk to a processing plant, the price we receive is based on the announced federal minimum class prices. Each sale is based on the minimum price and is adjusted for the distance between the farm and the plant, which reflects the cost to move milk to the plant. The terms of sale of raw milk by Lone Star are identical to the terms of sale for milk throughout the federal system. That is, the federal minimum price serves as the base for any sale of raw milk. Some of our sales contracts are long-term, some are short-term, and some are single event spot sales. But in each instance, the federal minimum prices are what our farmers receive, adjusted for the relative location of the farm to the plant and subject to the income and expense adjustments set forth in paragraph 5.

7.  Our contracts are based on prevailing market conditions and supply and demand for raw milk. Those supply and demand conditions have not and will not change as a result of lower minimum prices. Accordingly, we cannot go back to the market to renegotiate our contracts to cover these losses.

8.  Every cent of decrease in the federal minimum price will reduce our producers' income regardless of whether the sale is subject to an existing contract, a contact made in the future, or on a spot basis.

9.  USDA reductions in minimum prices directly reduce our producers' income.

10.    I am familiar with how other cooperatives do their billing, settle with the Producer Settlement Funds, and pay their producers.  The method I just described is consistent with industry practices.

11.    Applying the changes to Class III and IV prices as reported by USDA in the USDA Agricultural Marketing Service (AMS), Economic Analysis Class III and IV Pricing Formulas, Tentative Partial Final Decision March 2008, Table 2, p. 4. reduced by approximately thirty to thirty-two cents per hundred weight if the amendments to the make allowances are implemented, and the aggregate losses for the members of Lone Star would have approached or exceeded $550,000.00 for the month of June alone.  Losses for September would be approximately the same.

12.    Once USDA announces minimum prices on August 22, 2008, our contractual agreements with our Class I and Class II milk buyers become fixed-price obligations.  If the Interim Order is not set aside by this Court before August 22, 2008, the resulting reductions in our producer income cannot be recovered and will be permanently lost income.

Executed on August 15, 2008          /s/ Travis Campsey
                                                        Travis Campsey