# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ARKANSAS DAIRY COOPERATIVE ASSOCIATION, INC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:08-cv-01426 (EGS) |
| UNITED STATES DEPARTMENT OF AGRICULTURE | ) ) ) | |
| Defendant, | ) ) | |
| INTERNATIONAL DAIRY FOODS ASSOCIATION, | ) ) ) | |
| Intervening Defendant, | ) ) | |
| AGRI-MARK, INC, et al., | ) ) | |
| Intervening Defendant. | ) ) | |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

GREGORY G. KATSAS
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

JAMES GILLIGAN
Assistant Branch Director

KYLE R. FREENY
Trial Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
P.O. Box 883, Washington, DC 20044
Telephone: (202) 514-5108
Facsimile: (202) 616-8202
Email: Kyle.Freeny@usdoj.gov
*Counsel for Defendant*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATUTORY AND REGULATORY BACKGROUND ...............................................2

    I.      Background on the Milk Industry ........................................................2
    II.     Regulation of the Price of Milk Through Marketing Orders ...................4
    III.    Computation of Milk Prices Per Class and the "Make Allowance" .......................6
    IV.    USDA's Decision to Increase Make Allowances ....................................9

ARGUMENT ...................................................................................................................11

I.       PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS
        ON THE MERITS OF THEIR CLAIMS ............................................................12

    A.     Plaintiffs' Claim under 7 U.S.C. § 608c(18) Cannot Succeed .............................12

         1.     Plaintiffs' Claim Depends on a Misreading of the Statute .......................12

              a.     Section 608c(18) Applies Only to Initial Decisions
                    Adopting a Pricing System .........................................................13

              b.     Section 608c(18) Deals Only with the Final Prices, Not Make
                    Allowances ...................................................................................15

              c.     Section 608c(18) Does Not Require That Prices
                    Vary "Directly" With Producer Costs ...........................................18

              d.     Any Ambiguity Must Be Resolved by Reference to USDA's
                    Construction .................................................................................20

         2.     USDA Did, In Fact, Consider the § 608c(18) Factors as Part of This
              Rule-Making ..............................................................................21

    B.     Plaintiffs' Are Similarly Unlikely To Succeed on Their Claim Under
         the 2008 Farm Bill ..............................................................................23

    C.     Plaintiffs' Challenge to the Rule's Effective Date Is Moot ...................28

II.     Plaintiffs Have Failed to Establish Irreparable Harm .......................................29

III.    The Balance of Harms Weighs Heavily Against Granting Extraordinary Relief ............30

CONCLUSION ...............................................................................................................32

**INTRODUCTION**

Through this action, plaintiffs attempt to set aside extensive and careful decision-making by the United States Department of Agriculture ("USDA") in the complex area of milk price regulation. To regulate in this field, USDA establishes minimum milk prices through a series of formulas. Embedded in these formulas are factors referred to as manufacturing (make) allowances. These so-called make allowances approximate the costs of transforming raw milk into different milk products, such as cheese and butter. Plaintiffs, a small group of milk producers, challenge USDA's recent decision updating these make allowances to reflect present manufacturing costs. Contrary to plaintiffs' attempt to portray otherwise, USDA's decision was based on extensive proceedings, including testimony from all sides and consideration of countless economic conditions bearing on the issue, including economic conditions unique to producers.

Plaintiffs' request for preliminary injunctive relief should be denied, because plaintiffs have failed to make any of the required showings for such relief. Plaintiffs' conclusory assertions of harm are insufficient to establish irreparable injury. They have also not accurately evaluated the harm to dairy manufacturers nationwide if their request for preliminary relief is granted, nor to the public interest, both of which – as the Secretary concluded in issuing the challenged rule on an emergency basis – strongly favor permitting the new adjustments to go into place.

Plaintiffs also cannot establish a substantial likelihood of success on the merits, because their claims are based on a misreading of the relevant statutes, as well as the record of USDA's decision. Section § 608c(18) of the Agricultural Marketing Agreement Act does not require the

-1-

Secretary to base make allowances on producer costs, as plaintiffs suggest. The make allowances are a measure of *manufacturers'* costs; that they contains no direct input for producer costs is hardly a surprise. Instead, it is the pricing formulas *as a whole* that are designed to account for producer costs, consistent with § 608c(18). Because the relevant provision in § 608c(18) constrained only the initial decision to fix milk prices according to these formulas – and not to subsequent adjustments to the make allowances – it does not apply here. And even if it did, it is evident from the decision and the underlying record that USDA considered the factors set forth in § 608c(18). Plaintiffs' similar claim under the § 608c(17)(G), as amended by § 1504 of the Food, Conservation, Energy and Act, fails for similar reasons, and also more fundamentally because § 1504, which took effect on May 22, 2008, does not apply retroactively to the hearing USDA conducted in this case.

Nearly all of the arguments raised by plaintiffs here were raised and rejected in Bridgewater Dairy, LLC v. USDA, No. 3:07-CV-104, 2007 U.S. Dist. LEXIS 12209, *3-4 (N.D. Ohio Feb. 22, 2007), a challenge to an earlier decision adjusting make allowances. Just as the district court denied preliminary injunctive relief there, so should this Court deny such relief here.

## STATUTORY AND REGULATORY BACKGROUND

## I.    Background on the Milk Industry

USDA has for many decades operated a complex regulatory scheme governing large segments of the milk industry. Congress first authorized this scheme in the Agricultural Marketing Agreement Act of 1937 (AMAA), in recognition of the destabilizing forces present in an unregulated milk market. See Lamers Dairy, Inc. v. USDA, 379 F.3d 466, 469 (7th Cir.

2004). Fluid milk (i.e. beverage milk) tends to command a higher price than milk that is used to manufacture other dairy products like butter and cheese.[1] See Alto Dairy v. Veneman, 336 F.3d 560, 562 (7th Cir. 2003). Milk prices will vary based on end-use even where the quality of the milk is exactly the same. Id. This price disparity engendered unhealthy competition among dairy farmers ("producers") to sell as much milk as possible to distributors ("handlers") of fluid milk in order to maximize profits. Id. But because the supply of milk is generally greater than the demand for it in fluid form, surplus milk must be channeled to other less profitable uses like butter and cheese. See Lehigh Valley Coop. Farmers, Inc. v. United States, 370 U.S. 76, 79 (1962). This phenomenon is aggravated by natural seasonal variations in milk production, with greater supply in the "flush" spring and summer months; in contrast, demand for fluid milk is fairly constant across seasons. See Lamers Dairy, 379 F.3d at 469. In an unregulated market, the price of milk was depressed during these periods of higher production, as dairy farmers competed to sell off the glut of milk before it perished. See Defiance Milk Prods. Co. v. Lyng, 857 F.2d 1065, 1066 (6th Cir. 1988).

The AMAA was enacted "to remove [this] ruinous and self-defeating competition among producers" for fluid sales. Zuber v. Allen, 396 U.S. 168, 180-81 (1969). It was not, however, intended to insulate producers entirely from market forces, or to boost the price of milk beyond its true value in the marketplace. Quite the contrary, it was intended to ensure that all farmers

---

[1] This difference in value is at least in part attributable to the fact that fluid milk is sold to consumers only within a limited geographic region due to its high perishability, whereas more stable manufactured products must compete directly with products across multiple geographic areas. See Defiance Milk Products Co.,v. Lyng, 857 F.2d 1065, 1066 (6th Cir. 1988). It also reflects the fact that demand for fluid milk is less elastic than demand for other processed milk products. See 73 Fed. Reg. 35,306, 35,307 (June 20, 2008).

shared in the profits of milk production "according to the value of goods and services rendered."

Id.  A healthy dairy market is one in which there is enough fluid milk to satisfy demand and there

are ready outlets (namely manufacturers) to which producers can channel their surplus milk in

order to clear supplies.  See Brannan v. Stark, 185 F.2d 871, 876 (D.C. Cir. 1950).

## II.    Regulation of the Price of Milk Through Marketing Orders

To accomplish these aims, USDA issues regional milk-marketing orders that govern the

terms and conditions of the dairy industry in specific geographic regions.  The milk of roughly

50,000 farmers is pooled under one federal milk marketing order or another.  See Milk in the

Northeast and Other Marketing Areas; Interim Order Amending the Orders, 73 Fed. Reg. 44,617,

44617 (July 31, 2008).   For purposes of these orders, USDA classifies milk according to the end

use to which it is sold:  Class I (for fluid milk products); Class II (for soft dairy products like

yogurt and cottage cheese); Class III (for hard and spreadable cheeses); and Class IV (for butter,

evaporated milk, and dried milk).  See 7 C.F.R. § 1000.40.  The minimum prices for each class

of milk are currently set through a series of different formulas that attempt to estimate the

minimum value of that milk.  See 7 C.F.R. § 1000.50.  Not surprisingly given its higher value in

an unregulated marketplace, price for Class I milk are generally the highest.  See Lamers Dairy,

379 F.3d at 471.  The system is structured so that "the final amount paid by each handler equals

the value of the milk that the handler has purchased."  Id. at 469.

Notwithstanding the different class prices under this scheme, to prevent the "ruinous"

competition among producers for fluid milk (Class I) sales that the AMAA is meant to avoid,

producers are guaranteed to be paid a uniform minimum price for the milk they sell to handlers,

regardless of the end use to which it is put.  See 7 U.S.C. § 608c(B)(ii).  This uniform minimum

price, known as the "blend price," is the weighted average price of milk sold among the different categories of end-use within a marketing order.  It is calculated by multiplying the price for each class of milk by the volume of milk sold in each class within a given marketing order, and then dividing the resulting number by the total volume of milk sold within that order.  See Stew Leonard's v. Glickman, 199 F.R.D. 48, 50 (D. Conn. 2001) (providing demonstration of weighted average calculation).  This system "eliminate[s] the potential situation where one producer, who sold milk to a fluid processor, would get a higher milk price than his neighbor who sold to a cheese plant." Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 462 F.3d 249, 255 (3d Cir. 2006).  That, in turn, eliminates the unhealthy incentive for producers to compete to sell at ever lower prices.  Id.

In sum, federal marketing orders "provide[] a uniform blend price for sellers of raw milk while imposing non-uniform obligations on the dealers purchasing milk."[2] West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 189 n.1 (1994).  Milk marketing orders set the minimum amount that a producer can expect to receive for its milk, but they leave parties free to negotiate for higher prices.  See Farmers Union Milk Mktg. Coop. v. Yeutter, 930 F.2d 466, 468-49 (6th Cir. 1991).  Market conditions in a particular region can and often do lead parties to contract for prices in excess of the blend price, referred to as "over-order premiums."  Id.

_____

[2] A "producer settlement fund" is used as a pooling mechanism to settle the difference between the uniform amount that producers are guaranteed to be paid and the non-uniform amount that different handlers are accountable to producers for.  See Lansing Dairy, 39 F.3d at 1344.

III.     **Computation of Milk Prices Per Class and the "Make Allowance"**

To calculate a weighted average and thus arrive at the blend price that is paid to producers, USDA must calculate and announce the minimum milk prices for each class of end-use on a monthly basis.  Currently, the value of raw milk is derived from the wholesale price of various dairy products in the marketplace.  The formulas used, referred to as product-pricing formulas, have been in place since 2000.

Under the product-pricing system, calculation of class milk prices depends on various "component prices" for the individual components of raw milk: butterfat, nonfat solids, protein, and other solids.  See generally 7 C.F.R. § 1000.50.  These component prices are calculated according to product-pricing formulas containing three inputs:  (1) dairy product commodity prices as reported weekly in a survey conducted by USDA's National Agricultural Statistical Service (NASS), (2) make allowances, and (3) yield factors.  The NASS data provide input on the sales prices for manufactured dairy products in the month at issue.  Make allowances, which are the subject of this litigation, represent the cost that manufacturers incur in transforming raw milk into one pound of milk product, such as butter or cheese.  See Bridgewater, 2007 U.S. Dist. LEXIS 12209, at *3-4 .  The final input, the product yield factor, represents the amount of a manufactured dairy product that can be produced per hundredweight (100 pounds) of milk.  While the value of the NASS input is constantly fluctuating based on market conditions, the make allowance and yield factor are both fixed by regulation.  The absolute value of these latter two inputs differs among the various price formulas, but the three inputs bear the same relationship in all of them.  See 7 C.F.R. § 1000.50(*l*)-(o).

These formulas use the NASS commodity prices as a starting point, from which is

subtracted the make allowance to account for the portion of the price attributable to the manufacturing process. This amount is then multiplied by the yield factor to convert the number into a milk-equivalent basis.[3] The resulting number represents the value of the milk supplied by the producers. Since the make allowance is subtracted from NASS commodity prices in these formulas, minimum class prices are inversely related to the make allowances: when the make allowance increases, the minimum milk price decreases.

From a more global perspective, these product-pricing formulas begin with a known value – the value of dairy products in the wholesale market – and from that, extrapolate backwards to arrive at that portion of this value that is attributable to the raw milk supplied by producers. To accomplish this, USDA must account for the portion of that price attributable to the costs of the manufacturing process. This amount is represented by the make allowance. At the same time, however, these pricing formulas limit the ability of manufacturers to offset increased costs of production. Like producers, manufacturers of dairy goods can attempt to recover their costs by raising their prices, to the extent the market will bear it. But when the prices of manufactured goods are raised, this increase is subsequently recaptured by the reporting of higher wholesale product prices to NASS. Accordingly, any increase in the selling price of manufactured goods will increase the price manufacturers must pay producers for raw milk,

---

[3] For example, the component butterfat price, as presently in effect, is defined on a per pound basis as:

> [T]he U.S. average NASS AA Butter survey price reported by the Department for the month less 17.5 cents, with the result multiplied by 1.211.

7 C.F.R. § 1000.50(*l*). In this pricing formula, 17.5 cents represents the cost, as determined by USDA, of producing one pound of butter from raw milk (the make allowance). The number 1.211 represents the yield factor, used to convert the remaining value into a milk-equivalent.

without allowing manufacturers to recover their higher manufacturing costs. Thus, if the make

allowance does not appropriately reflect manufacturing costs, manufacturers' viability in the

market may be compromised. See Milk in the Northeast and Other Marketing Areas; Tentative

Partial Final Decision, 73 Fed. Reg. 35,306, 35,324 (June 20, 2008).

The make allowances used in the formulas to establish Class III and IV minimum prices

are uniform throughout the country, irrespective of marketing order, see Milk in the New

England and Other Marketing Areas; Decision on Proposed Amendments to Marketing

Agreements and to Orders, 64 Fed. Reg. 16,026, 16,096 (Apr. 2, 1999), consistent with USDA's

longstanding determination that manufactured dairy products compete in a national market. See

59 Fed. Reg. at 42,424. In contrast, Class I milk prices vary by marketing order. 64 Fed. Reg. at

16109. The Class I pricing formulas begin with the uniform Class III and IV calculations but are

adjusted by location-specific "differentials" that account for local supply and demand conditions.

See 7 C.F.R. § 1000.52. This litigation involves amendments to the make allowances for Class

III and Class IV formulas that affect the prices that manufactures must pay for milk nationwide.[4]

Finally, to better understand the central statutory provision at issue in this litigation, 7

U.S.C. § 608c(18), it is noteworthy that USDA does not base any of its minimum price

calculations on the "parity price" for milk. The concept of "parity price" refers to the price that

would give a unit of an agricultural commodity the same purchasing power that it had in the

pre-World War I "base period" (from 1910 to 1914), with some adjustment made for agricultural

prices in the last ten years. See 7 U.S.C. § 1301(1). Although USDA (through the NASS)

---

[4] As described above, however, the price that manufacturers ultimately pay for Class III and IV milk is not the same as the blend price producers receive for that milk.

calculates and publishes the parity price for milk on a monthly basis, none of the minimum milk

price calculations is a function of the parity price, nor have they been for many years, because the

Secretary has determined that parity price is not reasonable.  See 7 U.S.C. § 608c(18).

**IV.    USDA's Decision to Increase Make Allowances**

USDA recently engaged in rule-making to adjust the make allowances in the Class III and

Class IV pricing formulas, which were last revised in 2006.  See Tentative Final Decision, 73

Fed. Reg. 35306, 35308 (June 20, 2008).  A notice of the proposed rule-making was published

on February 9, 2007, see Notice of Hearing, 72 Fed. Reg. 6179 (February 9, 2007), and three

public sessions of hearing were held February 26-March 2, 2007, April 9-13, 2007, and July

9-11, 2007.  During these thirteen days of hearing, some 30 witnesses presented live testimony

before an administrative law judge, and 78 exhibits were entered into evidence.[5]  USDA also

took judicial official notice of numerous documents, including government data on fuel and feed

prices.  See March 2, 2007 Transcript, at 1152-55 (Exhibit 1, hereto).  The hearing closed on July

11, 2007, after which numerous post-hearing briefs were filed.  In addition to the comments,

exhibits, and testimony received in connection with the hearing, USDA conducted its own

economic analysis of the impact of increasing make allowances using an econometric model.

See Economic Analysis, Class III and IV Pricing Formulas, Tentative Partial Final Decision

(March 2008) (Docket Entry 4-4).  That model accounted for various economic factors, including

feed costs incurred by producers.  See USDA Agricultural Baseline Projections to 2016, at 2

---

[5] Unofficial copies of transcripts, briefs, and other documents related to this proceeding
are available at:
http://www.ams.usda.gov/AMSv1.0/ams.fetchTemplateData.do?template=TemplateO&navID=I
ndustryMarketingandPromotion&leftNav=IndustryMarketingandPromotion&page=FMMOrder1
6

(April 2007) (Exhibit 2, hereto).[6]

A tentative partial final decision was issued on June 16, 2008, and published in the Federal Register four days thereafter.  See 73 Fed. Reg. 35,306.  USDA concluded that "current make allowance levels are not reflective of the costs manufacturers incur in processing raw milk into the finished products of cheese, butter, [nonfat dry milk] and dry whey," id. at 35,324, and that the make allowances needed to be adjusted to reflect the significant increase in these costs, id.  USDA noted that while "the *costs of producing milk* are reflected in the supply and demand conditions for the dairy products," the increased costs incurred by manufacturers in *processing that milk* can only be recovered by regulatory modification of the make allowances.  Id. (emphasis added).  In sum, USDA concluded that if it did not increase the make allowance to reflect current conditions, the pricing formulas would not produce an accurate valuation of milk. Id. at 35,323.  USDA used the same type of data to calculate the new proposed make allowances that had been used to calculate the previous make allowance adjustments in 2006.  Id. at 35,324.

Through referendum, the requisite number of producers approved the proposal to increase make allowances.  See 73 Fed. Reg. at 44618; see also 7 U.S.C. § 608c(9)(B) (requiring approval of a milk marketing order by two-thirds of milk producers or producers responsible for two-thirds of the milk produced within area covered by order).  USDA also found an urgent need to increase make allowances, and thus after the referendum vote, adopted the proposed rule as an interim final rule on July 31, 2008, to take effect on an emergency basis.  See 73 Fed. Reg. at 44618.

The Interim Final Rule, published on July 31, 2008, amends all marketing orders to

---

[6] See http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5056335.

increase the make allowances in Class III and IV pricing formulas, effective September 1, 2008.[7]
73 Fed. Reg. at 44,617. This adjustment does not alter the underlying method by which class
prices or component prices are calculated. Id. at 35,330. Rather, it increases the values of four
separate make allowances and one yield factor, all of which were pre-existing components of the
pricing formulas. See id. at 44,619 (amending 7 C.F.R. § 1000.50(*l*), (m), (n), (n), (o), and (q)).
In the Interim Final Rule, the Secretary specifically found that "[t]he minimum prices specified in
the orders as hereby amended on an interim basis, are such prices as will reflect" the price of
feeds, available supplies of feeds, and other economic conditions which affect market supply and
demand for milk. Id. at 44,618.

## ARGUMENT

Plaintiffs have failed to satisfy the rigorous standards for issuance of a preliminary
injunction, which is "an extraordinary and drastic remedy, one that should not be granted unless
the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520
U.S. 968, 972 (1997) (emphasis added). To prevail, plaintiffs bear the burden of establishing "1)
a substantial likelihood of success on the merits, 2) that [they] would suffer irreparable injury if
the injunction is not granted, 3) that an injunction would not substantially injure other interested
parties, and 4) that the public interest would be further by the injunction." See Katz v.
Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001), quoting CityFed Fin. Corp. v. Office
of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995).

---

[7] The agency subsequently determined, as an accommodation, that it would postpone this
effective date by one month to allow orderly litigation and determination of plaintiffs' request for
a preliminary injunction.

## I.    PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS

### A.    Plaintiffs' Claim under 7 U.S.C. § 608c(18) Cannot Succeed

Plaintiffs' primary challenge to the make allowance adjustments is that they failed to comport with 7 U.S.C. § 608c(18), which sets forth certain economic factors that should inform the initial setting of milk prices.  This claim is based on an erroneous reading of that subsection, which does not constrain USDA in the manner suggested by plaintiffs.  It also reflects an inaccurate view of the rule-making proceedings, during which the Secretary did consider producer costs and other economic factors in amending the marketing orders.

### 1.    Plaintiffs' Claim Depends on a Misreading of the Statute

Plaintiffs assert that 7 U.S.C. § 608c(18) requires the agency to ensure that the adjusted make allowances – and not the minimum prices and price formulas, as a whole – reflect the economic factors set forth in that subsection.  They further suggest that it requires a "direct," rather "indirect," relationship between prices and economic factors.  There is no basis for this construction in the statute's text, its history, or in its longstanding interpretation, acceded to by courts, Congress, and regulated entities alike.  Section 608c(18) is entirely satisfied by the Secretary's determination, when he first adopted the prevailing product-pricing formulas, that the formulas will account for the factors set forth in that subsection by their very design.  See 64 Fed. Reg. at 16,905.  It is clear from the statutory language that the second and third sentences of § 608c(18) on which plaintiffs rely apply only when the Secretary first fixes minimum prices using a new pricing methodology, and only to minimum prices as a whole, not to each input (e.g. make allowances) used to derive those prices.  It is also clear that § 608c(18) can be satisfied by an indirect relationship between prices and economic conditions.  Were it not clear, however, under

<u>Chevron, U.S.A., Inc. v. NRDC, Inc.</u>, 467 U.S. 837 (1984), the agency's reasonable construction of the statute to that effect must control.

      **a.**        **Section 608c(18) Applies Only to Initial Decisions Adopting a Pricing System**

The text of § 608c(18) makes clear that after the Secretary initially fixes minimum milk prices for a marketing order at a price other than parity, he is not bound to revisit every enumerated economic factor each time he makes an adjustment to those prices to account for changed circumstances. This conclusion is the only interpretation that gives any effect to each sentence of that subsection.

The first sentence of § 608c(18) directs the Secretary to ascertain the parity price of milk – i.e. the current buying power of milk relative to its historical buying power – as a guidepost for establishing minimum prices in any milk marketing order:

> The Secretary of Agriculture, prior to prescribing any term in any marketing agreement or order, or amendment thereto, relating to milk or its products, if such term is to fix minimum prices to be paid to producers or associations of producers, or prior to modifying the price fixed in any such term, shall ascertain the parity prices of such commodities

7 U.S.C. § 608c(18). USDA regularly calculates the parity price. The second sentence directs the Secretary to adjust that parity price as necessary based on consideration of certain economic factors:

> [The parity price] shall, for the purpose of such agreement, order, or amendment, be adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated agreement, order, or amendment relates.

<u>Id.</u>

The third sentence details the manner in which the Secretary is to depart from the traditional reliance on parity prices, if he finds them unreasonable in light of economic factors:

> Whenever the Secretary finds, upon the basis of the evidence adduced at the hearing . . . that the parity prices of such commodities are not reasonable in view of the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, he shall fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest.

Id.  The Secretary has not set milk prices at parity for many years, since it is much higher than necessary to ensure an adequate milk supply.  Instead, he has fixed minimum prices first through a competitive pay price series[8] and then through the product-pricing formulas in use today. Plaintiffs do not challenge the Secretary's longstanding determination that the parity price should not be used because they are not reasonable.

The fourth sentence, at issue in this lawsuit, sets forth the procedure for making further adjustments to minimum milk prices once the Secretary has already fixed minimum prices at a level other than parity using the procedures outlined in the first three sentences:

> Thereafter, as the Secretary finds necessary on account of changed circumstances, he shall, after due notice and opportunity for hearing, make adjustments in such prices.

Id.  While the fourth sentence still requires that the rule-making process include a hearing, it contains no language mandating consideration of each of the economic factors articulated in the second and third sentences.  Once the Secretary has fixed prices at a level other than parity, the fourth sentence enables the Secretary to adjust minimum milk prices in response to "changed

---

[8] Under the competitive pay price series, the minimum price was indexed to the price of Grade B milk, which is not regulated by marketing orders.  USDA was forced to abandon this system in favor of the product-pricing system, as production of Grade B had declined to the point that it no longer provided a reliable indicator of market conditions.  See 64 Fed. Reg. at 16,091.

-14-

circumstances," without specifically requiring re-consideration of all other economic factors.

The use in fourth sentence of the term "changed circumstances," rather than a recapitulation of the economic factors listed in both the second and third sentences, indicates that the fourth sentence should be given a distinct meaning. See Soliman v. Gonzales, 419 F.3d 276, 283 (4th Cir. 2005). This is especially true since Congress demonstrated a willingness to re-articulate the mandatory economic factors word-for-word in the second *and* third sentences. See Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv., 416 F. Supp. 2d 92, 100 (D.D.C. 2006) (Sullivan, J.), quoting Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Put summarily, the fourth sentence provides the Secretary with greater discretion to adjust prices to respond to changed circumstances, once he has initially fixed prices at a level other than parity in accordance with the third sentence.

Any other reading of the fourth sentence renders meaningless the terms "thereafter," "changed conditions," and "as the Secretary finds necessary." See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."). The plain language of the text distinguishes between the initial fixing of the prices at a level other than parity (the second and third sentences) and any subsequent adjustments "thereafter" (the fourth sentence). This Court should not read § 608c(18), as plaintiffs' construction would require, "in a manner that renders superfluous the final sentence of that provision." See National Ass'n of Broadcasters v. Librarian of Congress, 146 F.3d 907, 926 (D.C. Cir. 1999).

-15-

### b. Section 608c(18) Deals Only with the Final Prices, Not Make Allowances

Even if § 608c(18) constrained subsequent adjustments to the *minimum prices*, there would still be no support for plaintiffs' argument that the statute requires that adjustments to *make allowances* reflect producer costs. On its face, § 608c(18) provides that only the overall *price* should reflect the enumerated economic factors. It most assuredly does not mandate that every variable or input used to calculate that price also reflect those economic factors.

The Eighth Circuit reached a similar conclusion in Minnesota Milk Products Ass'n v. Glickman, 153 F.3d 632 (8th Cir. 1998). There, plaintiff-producers unsuccessfully contended that the Class I "differential" – one input in the Class I pricing formula – violated § 608c(18) because it was not adjusted to reflect the § 608c(18) factors. Id. at 645. The court concluded that "[i]t is the total Class I price . . . and not just the differential, that must satisfy the statute." Id. And in the court's view, the fact that the agency had already determined that the Class I pricing formula reflected the statutory factors was sufficient to satisfy § 608c(18). Id. at 644-545.

Similarly here, the make allowances adjusted on July 31, 2008, need not conform to § 608c(18), so long as the overall pricing formulas for Class III and Class IV minimum prices reflect the statutory factors. And that is in fact the case. When USDA first adopted the pricing system presently in place, it determined that the overall design of the formulas would automatically account for the economic factors set forth in § 608c(18):

> The pricing system contained in this decision will . . . account[] for changes in feed costs and feed supplies indirectly. The product price formulas adopted in this rule should reflect accurately the market values of the products made from producer milk used in manufacturing. As feed costs increase with a resulting decline in production, commodity [dairy] prices would increase as a result of manufacturers attempting to secure enough milk to meet their needs. Such increases in commodity prices would mean higher prices for [raw] milk. The opposite would be true if feed costs were declining. Additionally,

-16-

> since Federal order prices are minimum prices, handlers may increase their pay prices [to producers] in response to changing supply/demand conditions even when Federal order prices do not increase.

64 Fed. Reg. at 16,095; see also 67 Fed. Reg. at 67,915 (noting that statutory requirements "were fulfilled by the Class III and Class IV component price calculation."). Having made this determination in 1999 when it initially fixed those minimum price formulas, USDA is not bound to revisit it each time it adjusts the value assigned to some factor within those formulas, because the underlying design of the formulas remains unchanged and accords with § 608c(18).

It is therefore neither inappropriate nor surprising that, while USDA considers producer costs in fixing prices, it declined to modify the make allowances to account for those costs. The make allowance is the input in the product-pricing formula that accounts the costs *manufacturers* incur in transforming raw milk into other dairy products. In order to extrapolate the value that raw milk contributes to the commodity prices of dairy products – and thereby approximate raw milk's true value in the marketplace – these manufacturer costs must be included as part of the formula. The costs of *producing milk*, in contrast, are in the aggregate "reflected in the supply and demand conditions" that affect the NASS commodity prices of dairy products. See 73 Fed. Reg. at 35,324. Plaintiffs' insistence that the make allowance – rather than the formula as a whole – reflect producers' costs misapprehends the underlying pricing mechanisms.

Because the challenged rule-making "[d]id not modify the portion of the formulas which indirectly incorporates feed costs and supply," see Bridgewater Dairy, 2007 U.S. Dist. LEXIS 12209, at *21, § 608c(18) imposed no additional requirements in this instance.

-17-

c.     **Section 608c(18) Does Not Require That Prices Vary "Directly" With Producer Costs**

Plaintiffs contend, without persuasive authority, that accounting for producer costs through the economic design of the price formulas is insufficient to satisfy § 608c(18). In plaintiffs view, § 608c(18) requires a "direct" relationship between producer costs and pricing formulas, Pls. Br. at 13, although they say no more about what such a relationship might entail. Nowhere in the text of the statute is such a *direct* relationship mandated. The statute requires the Secretary to adjust prices "as *he finds* will reflect" the listed factors. 7 U.S.C. § 608c(18) (emphasis added). The Secretary has found that the minimum prices automatically reflect the statutory factors, see 64 Fed. Reg. 16,095, a finding that plaintiffs do not challenge. The only appellate court to consider this issue – the Eighth Circuit in Minnesota Milk Products – concluded that the language § 608c(18) confers considerable discretion on the Secretary, 153 F.3d at 641, and agreed with him that the third and fourth sentences of the statute are satisfied where a pricing formula "automatically" accounts for the listed factors. See 153 F.3d at 644-45. Plaintiffs therefore cannot establish a substantial likelihood of success on this point.

Bridgewater Dairy is also highly instructive here, as it is on all fours with this case. There, plaintiffs challenged the make allowance adjustments made in 2006, and USDA responded similarly, asserting that the product-pricing formulas, by design, took into account the statutory factors. The district court credited this determination, finding that the underlying pricing system "has been designed to account for" various producer costs. Bridgewater Dairy, 2007 U.S. Dist. LEXIS 12209, at *21. Thereafter, the court concluded that this "indirect consideration," id. at *19, was sufficient to satisfy § 608c(18). Id. at *22. Because the rule at issue in the instant case will not change the underlying pricing system discussed approvingly in

-18-

Bridgewater Dairy, see 73 Fed. Reg. at 35,330, the same result should obtain here.

Plaintiffs cite only two authorities in support of their position that § 608c(18) prescribes a direct relationship, neither of which bolsters their argument: Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1343 (6th Cir. 1995), and St. Albans Cooperative Creamery, Inc. v. Glickman, 68 F. Supp. 2d 380 (D. Vt. 1999). Lansing Dairy undermines, rather than supports plaintiffs' position, since there the Sixth Circuit concluded that § 608c(18) "is not a model of clarity or succinctness." Id. at 1351. In light of the obvious ambiguity in the statute, the court deferred to USDA's construction. Id. Even the Bridgewater Dairy court, which was bound by Lansing Dairy, concluded that it provided no support for plaintiffs' position.[9] Id. at 14.

St. Albans is similarly of little assistance to plaintiffs. Congress legislatively overruled St. Albans by directing the Secretary to adopt and implement the final USDA rule (subject to one amendment) that the St. Albans court had temporarily enjoined. See Pub. L. No. 106-113, 115 Stat. 1501 (Nov. 29, 1999); see also 64 Fed. Reg. 70867, 70868 (Dec. 17, 1999). Such congressional action "severely undermine[s]" any persuasive value the case might otherwise have had. See Bridgewater, 2007 U.S. Dist. LEXIS 12209, at *16. The reasoning of St. Albans is also susceptible to significant criticism. The court relied heavily on the fact that § 608c(18) does not explicitly use the term "indirect" in describing the necessary considerations. 68 F. Supp. 2d at 390. By the same token, however, the term "direct" can be found nowhere in the statute. The requisite relationship between price and economic conditions is left to the Secretary, based on what *he finds* will satisfy that statute.

---

[9] Moreover, nowhere in Lansing Dairy does the court state, even in dicta, that "direct" consideration must be made of the § 806c(18) factors.

**d.      Any Ambiguity Must Be Resolved by Reference to USDA's Construction**

Significantly, even if there were ambiguity as to whether § 608c(18) required USDA to separately consider producer costs when adjusting make allowances, USDA's construction of the statute must be accorded controlling deference as long as it is a reasonable one.  See Chevron, 467 U.S. at 843-44; see also  See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.").  This deference is particularly appropriate when negotiating the "labyrinth of the federal milk marketing regulation provisions."  See Zuber, 396 U.S. at 172; Blair v. Freeman, 370 F.2d 229, 232 (D.C. Cir. 1966) ("A court's deference to administrative expertise rises to zenith in connection with the intricate complex of regulation of milk marketing.").

USDA's reading of § 608c(18) is entirely reasonable – it gives meaning to key statutory terms in the fourth sentence, (e.g., "thereafter," "changed conditions," and "as the Secretary finds necessary") that would otherwise be otherwise be superfluous.  See Walker v. Bain, 257 F.3d 660, 667 (6th Cir. 2001).  It is also reasonable as a practical matter – it requires that when prices are initially fixed, they must be calculated so that they reflect the full range of economic conditions; once that occurs, the fourth sentence of § 608c(18) provides the Secretary with the flexibility to respond to "changed circumstances" without having to undertake a re-evaluation of the underlying pricing system.

It was also entirely reasonable for USDA to decline to modify the make allowances on the

-20-

basis of producer costs.  The nature of the pricing formulas limit the ability of manufacturers to recover their increased costs, absent an increase in the make allowances.  These same formulas ensure that the value of raw milk that goes into manufactured dairy products is returned to producers.  The Secretary reasonably concluded that § 608c(18) requires no more.

## 2.     USDA Did, In Fact, Consider the § 608c(18) Factors as Part of This Rule-Making

Plaintiffs allege that the Secretary "failed to consider [the] separate factors enumerated in the AMAA" as part of the rule-making proceeding at issue here.  Pls. Br. at 12.  As discussed above, because the challenged rule did not fix prices initially or adopt a new pricing system, the Secretary was not obliged to reconsider § 608c(18) compliance or the enumerated factors.  Even so, the Secretary did, in fact, consider these factors as part of the rule-making proceeding.  This Court's review of the manner in which he considered them must be highly deferential, especially in light of the highly technical issues involved.  See State Farm Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("[A] court is not to substitute its judgment for that of the agency." ); see also Stark v. Wickard, 321 U.S. 288, 310 (1944) ("Technical details of the milk business are left to the Secretary and his aides.").  Accordingly, even if the Court were inclined to adopt plaintiffs' unusual construction of § 608c(18), plaintiffs cannot establish a substantial likelihood of success on the merits of their claim.

In deciding to raise make allowances, USDA conducted an economic analysis to assess the affect that a make allowance adjustment would have on the revenue of handlers and producers, on consumer prices, and on the milk supply.  See Docket Entry 4-4; see also 73 Fed. Reg. at 35,307.  The econometric model used in this analysis included consideration of various producer costs, including feed prices.  See February 26, 2007 Hearing, Transcript at 111-118

-21-

(Exhibit 3, hereto); see also Ex. 2 at 2. This econometric model also incorporated data on over-order premiums, which themselves reflect supply and demand conditions. Having projected the effect of a change based on these and other factors, the agency concluded that the "minimum prices specified in the orders as hereby amended on an interim basis, are such prices as will reflect the [§ 608c(18)] factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest." In the face of USDA's economic analysis, plaintiffs ultimately concede that USDA "indirectly consider[ed]" producers' costs. Pls. Br. at 12. This concession is fatal to their claim, because § 608c(18), if applicable here, requires no more.

Moreover, it was entirely reasonable for USDA to consider national economic conditions, see Pls. Br. at 13-15, as these conditions are the "economic conditions which affect market supply and demand" in each marketing area. See 7 U.S.C. § 608c(18). USDA determined a number of years ago that the value of Class III and IV milk is driven by the national market for the dairy products for which the milk is used. 59 Fed. Reg. at 42,424; see also 73 Fed. Reg. at 35,325. Because manufactured dairy products are less perishable, they compete across a wider market than does fluid milk. See Defiance Milk, 857 F.2d at 166. As a consequence, USDA has determined that it is appropriate to look to the national market to assess the value of Class III and IV milk. See 64 Fed. Reg. at 16,100. Although plaintiffs take issue with this longstanding determination, see Pls. Br. at 12-14, they cite no evidence in this proceeding or prior ones that render the determination arbitrary or capricious. Therefore, plaintiffs have no likelihood of success with respect to this challenge.[10]

---

[10] It is also worth noting that, while Class III and IV prices are uniform nationally, the blend price that producers are guaranteed to be paid does vary across marketing areas to reflect local economic conditions. That is because the blend price is a *weighted average* of all minimum

Finally, plaintiffs argue that USDA's decision was arbitrary and capricious because, in calculating the overall cost of manufacturing dairy products, it considered survey data from California, a state whose milk industry is not federally regulated. Pls.' Br. at 15-16. This contention is belied by USDA's reasoned explanation for its consideration of those costs, in the face of a similar argument:

> On its face, [it] may seem reasonable [to] exclude[] California plants. However, the argument does not consider other important factors that affect the marketing conditions for milk and dairy products represented by California's dairy sector and its impact on the supply and demand for milk and dairy products nationally. Cheese, butter and NFDM compete in a national marketplace and as such the prices established under the Class III and Class IV product-pricing formulas need to be reflective of marketing conditions that directly affect determining the minimum value of raw milk.

73 Red. Reg. at 35,325. That plaintiffs disagree with this assessment is hardly a basis for upsetting the agency's extensively considered decision, or for enjoining that decision from going into effect. See Emergency Coalition to Defend Educ. Travel v. U.S. Dep't of Treasury, 498 F. Supp. 2d 150, 166 (D.D.C. 2007). And the fact that the make allowance is in some cases based on data specific to certain areas – the best and more accurate data available – does not in any way affect compliance with § 608c(18).

## B.    Plaintiffs' Are Similarly Unlikely To Succeed on Their Claim Under the 2008 Farm Bill

Presumably recognizing that their § 608c(18) claim has no more chance of success here than it had in Bridgewater Dairy, plaintiffs add an additional claim under § 1504 of the 2008

---

class prices within a marketing order, including Class I prices that are adjusted to reflect local conditions. Each marketing order will have unique Class I prices and a unique allocation of milk among the different classes of milk based on local supply and demand conditions. Thus, the blend price necessarily "incorporates regional and national measures: it is a measure of supply and demand conditions in each order as well as a measure of national supply and demand conditions that are reflected in the class prices." 59 Fed. Reg. at 42,425.

Food, Conservation, and Energy Act ("2008 Farm Bill"), which directs the Secretary, "[a]s part of any hearing to adjust make allowances," to "determine the average monthly prices of feed and fuel incurred by dairy producers in the relevant," "consider the most recent monthly feed and fuel price data available," and "consider those prices in determining whether or not to adjust make allowances." Pub. L. No. 110-246 § 1504, 122 Stat. 1651, 1721 (2008), codified at 7 U.S.C. § 608c(17)(G). This claim does nothing to bolster plaintiffs' likelihood of success in this case.

For similar reasons as those detailed above, USDA complied with § 1504 of the Farm Bill. During the hearing held in connection with this rule-making, official notice was taken of various statistics, including data on the costs of feed, a fuel index, and other economic factors as determined by NASS, a division of USDA. See March 2, 2007 Transcript, at 1152-55.[11] That the Secretary ultimately adjusted the make allowance notwithstanding the official notice of these data is not evidence that they were not considered. See Brady v. FERC, 416 F.3d 1, 10 (2005); cf. Jones v. Bergland, 456 F. Supp. 635, 648 (E.D. Penn. 1978) ("Although some farmers testified that their operating expenses had increased, the Secretary was not bound thereby to increase their minimum price."). This provision does not require that the Secretary *base* make allowances on these producer costs. Indeed, the amendment's very language contemplates that there will be situations in which the Secretary will decide to raise make allowances notwithstanding his consideration of these factors. See 7 U.S.C. § 608c(17)(G) (Secretary shall "consider" factors "in determining whether *or not* to adjust make allowances" ) (emphasis added).

---

[11] Archived NASS reports are available at:
http://usda.mannlib.cornell.edu/MannUsda/viewDocumentInfo.do?documentID=1002

Plaintiffs' claim under the Farm Bill fails for an even more basic reason, though – § 1504 was not in effect during the relevant time period.  Section 1504 sets forth certain procedures the Secretary must follow "[a]s part of any hearing to adjust make allowances."  But the provision did not take effect until May 22, 2008, see Pub. L. No. 110-246, § 4, long after the hearing in question had closed on July 11, 2007.  See supra at p. 9.  It is elementary that an effective date marks the date on which parties must begin to conform their conduct to a statute's substantive mandates.  See Hamdan v. Rumsfeld, 548 U.S. 557, 659 (2006) (Scalia, dissenting) ("An effective-date provision does not render a statute applicable to conduct that occurred at an earlier date.") (internal quotations omitted).  Thus, even if this Court were to conclude that § 1504 imposed additional mandates not met during the hearing in question, the Secretary could hardly be faulted for not conforming a 2007 hearing to those mandates, which did not go into effect until almost a year later.

The fact that the rule at issue in this case was published after the statute's effective date is of no consequence.  Section 1504 of the 2008 Farm Bill revises the procedures for amending marketing orders as set forth in 7 U.S.C. § 608c(17), but, as relevant here, stipulates that USDA must consider producers' feed and fuel costs "[a]s part of any *hearing* to adjust make allowances . . . ."  7 U.S.C. § 608c(17)(G) (as amended by § 1504) (emphasis added).  A hearing is but one element of the larger rule-making process, defined in USDA regulations as "the part of the proceeding which involves the submission of evidence."  7 C.F.R. § 900.2(h).  Congress is presumed to have been aware of this regulatory definition when it used the term in legislation.  See Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85 (1988).

Moreover, it is clear from the text of § 1504 as a whole that Congress appreciated the

distinction between a hearing and the larger process of amending a marketing order, of which the hearing is only a part.  For example, in addition to the reference to a "hearing" in amended 7 U.S.C. § 608c(17)(G), the statute refers to "the hearing" in provisions establishing deadlines for a hearing's completion, id. § 608c(17)(C)(i)(I), and for submission of "post-hearing" briefs, id.§ 608c(17)(C)(ii), yet elsewhere refers in distinct terms to the "rulemaking process," id. § 608c(17)(B)(i)) (requiring promulgation of supplemental rules of practice related to amendments of orders) and to the agency's "final decision," id. § 608c(17)(C)(iv)) (specifying time for issuing final decisions on proposed amendments).  Thus, where Congress intended in § 608c(17) to require the Secretary to observe certain requirements as part of the "rulemaking process," or in issuing a "final decision," it knew how to do so.  Its reference to a "hearing[s]" in § 608c(17)(G) thus should not be read to encompasses the entire process of amending a marketing order.  See Soliman, 419 F.3d at 283 ("Where Congress has utilized two distinct terms within the same statute, the applicable canons of statutory construction require that we endeavor to give different meaning to those terms . . . .").

Because the statute, by its plain language, governs only hearings conducted after the statute's effective date and because the hearing at issue had been completed nearly a year earlier, the Court need look no further in concluding that plaintiffs cannot ultimately succeed on this claim.  See Ardestani v. INS, 502 U.S. 129, 135 (1991).  Even were there some doubt, however, this doubt must be resolved in favor of USDA, for two separate reasons.

First, any ambiguity in the meaning of the term "hearing" in § 1504(G) must be resolved by reference to the agency's reasonable construction of that term.  See Chevron, 467 U.S. at 843-44.  It is entirely reasonable to conclude that the statute did not require USDA to revisit every

prior rule-making to adjust make allowances.  In contrast, plaintiffs' simplistic construction –

that § 1504 applies to all hearings, regardless of their date of conclusion – is without limiting

principle.  It would require the agency to reopen not just the present hearing, but also presumably

all make allowance hearings extending back to the adoption of the product-pricing formulas,

including the hearing that formed the basis for the make allowances presently in effect.[12]  The

administrative burdens and disruption of settled expectations attendant to such an undertaking

would be immeasurable.  Such an absurd intent should not so lightly be imputed to Congress.

See County of Los Angeles v. Shalala, 192 F.3d 1005, 1019 (D.C. Cir. 1999).

Second, absent clear congressional direction to the contrary, "legislation must be

considered as addressed to the future, not to the past. . . ."  See Gersman v. Group Health Ass'n,

975 F.2d 886, 895 (D.C. Cir. 1992), quoting Union Pacific R.R. Co. v. Laramie Stock Yards,

Co., 231 U.S. 190, 199 (1913).  There is a strong presumption against retroactivity, defined,

among other things, as anything that would "impose new duties with respect to transactions

already completed," Landgraf v. Usi Film Prods., 511 U.S. 244, 280 (1994), or "change[] the

legal consequences of acts completed before [a statute's] effective date," id. at 269, quoting

Miller v. Florida, 482 U.S. 423, 430 (1987).  The construction of § 1504 advanced by plaintiffs

would undeniably be retroactive, and therefore presumptively erroneous.  The hearing at issue in

this case was extensive, consisting of thirteen days of testimony over the course of almost seven

---

[12] Even if § 1504 were read to apply to rule-making proceedings that had not yet been
finally resolved, this would have a serious unsettling impact.  Notably, the make allowances
currently in effect (i.e. prior to the challenged adjustment) were set by Interim Final Rule.  See
71 Fed. Reg. 78333 (December 29, 2006).  Under such a construction, the agency would
presumably need to reopen that hearing as well and revisit the ultimate conclusion of that rule-
making, even though the make allowances set by that interim rule presently govern the entire
federal marketing system.

months.  It was concluded on July 11, 2007, after which no additional evidence could be

submitted and USDA could begin its exacting decision-making process.  See 7 C.F.R. § 900.10.

By March 2008, two months prior to the Farm Bill's effective date, the Secretary had already

completed an extensive economic analysis detailing the projected effect of the agency's tentative

decision.  To construe § 1504 to apply to this completed hearing process would "impose new

[legal] duties" with respect to that completed hearing, precisely the kind of retroactive effect that

Congress is presumed to eschew.  See Landgraf, 482 U.S. at 280.  There is nothing in the

statute's text or its history to suggest that Congress intended to render the prior hearing

proceedings useless and require the agency to start anew.  Accordingly, the strong presumption

that § 1504 applies only prospectively must hold.

Because § 1504 governs only the conduct of hearings and because the hearing in question

had closed long before the provision went into effect, it has no bearing on the present

controversy.

## C.     Plaintiffs' Challenge to the Rule's Effective Date Is Moot

Plaintiffs' claim that the agency failed to provide 30 days between publication of the

Final Interim Rule and its effective date is moot in light of the additional one-month delay in that

effective date.  See Air Line Pilots Ass'n, Int'l v. Northwest Airlines, Inc., 199 F.3d 477, 486-87

(D.C. Cir. 1999) 78  (noting that voluntary action will moot claim where there is no "cognizable

danger of recurrent violation").  Accordingly, this claim is no longer properly before this Court.

See Honig v. Doe, 484 U.S. 305, 317 (1988).  Even if it were, however, this claim is without

merit.  As clearly specified in the Final Interim Rule, its effective date was set as September 1,

2008, the date on which the minimum prices established under the orders would first take effect

using the new make allowances in the Class III and IV formulas.  See 73 Fed. Reg. 44,618.  The

fact that those new prices would be *announced* several days earlier is of no consequence.

## II.    Plaintiffs Have Failed to Establish Irreparable Harm

Plaintiffs have not only failed to establish any likelihood of success of the merits of their

claims, but they also have failed to discharge their burden of establishing that they will be

irreparably harmed if the new make allowances are not enjoined.  "Irreparability of injury is a

very high standard." Am. Coastal Line Joint Venture, Inc. v. U.S. Lines, Inc., 580 F. Supp. 932,

936 (D.D.C. 1983).  It must be "both certain and great; it must be actual and not theoretical."

See Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  It also must be of

sufficient magnitude to warrant the drastic relief sought.  See Sandoz, Inc. v. FDA, 439 F. Supp.

2d 26, 31-32 (D.D.C. 2006) (harm must be "more than simply irretrievable"), aff'd by 2006 U.S.

App. LEXIS 22343 (D.C. Cir. Aug. 20, 2006).   Plaintiffs' allegations of harm fall into two

categories – economic harm resulting from unspecified contractual arrangements and economic

harm resulting from a reduction in the Class III and Class IV minimum prices, as adjusted by the

new make allowances.  Both of these conclusory allegations fall short of this high bar.  For this

reason alone, a preliminary injunction is unwarranted.  See White Eagle Coop. Ass'n v. Johanns,

396 F. Supp. 2d 954, 960 (D. Ind. 2005).

Plaintiffs' assertion that they stand to lose money as a result of contractual arrangements

with handlers,[13]  Pls. Br. at 10, is far too bare and conclusory to establish irreparable injury.  See

---

[13] Plaintiffs assert that this harm will accrue on August 22, 2008, the day on which the
advanced pricing factors for Class I milk are announced.  Pls. Br. at 10.  Because the effective
date of the challenged rule-making has been postponed by one month, the relevant date – from
plaintiffs' perspective – would now presumably be September 19, 2008, when those same pricing
factors are next announced.

Wisconsin Gas, 758 F.2d at 674.  Plaintiffs fail to specify the nature of these contracts, the

relevant terms, and the manner in which the make allowances might affect these terms.  See Pls.

Ex. D, E, F.  Moreover, the contracts plaintiffs refer to are the contracts they themselves enter

into for the sale of their milk.  As make allowances affect only minimum prices for raw milk,

there is nothing in USDA's adjustment of the make allowances to prevent them from contracting

to charge whatever price in excess of the minium (i.e. an over-order premium) that the market

will bear.  Even if plaintiffs entered into less remunerative contracts following the effective date

of the new make allowances, they cannot "satisfy the irreparable harm criterion when the alleged

harm is self-inflicted" in that fashion.  FIBA Leasing Co. v. Airdyne Indus., Inc., 826 F. Supp.

38, 39 (D. Mass. 1993) .  Accordingly, injury from these voluntary private arrangements would

not amount to irreparable harm, even if it were not so speculative.  See St. Albans, 68 F. Supp.

2d at 390-91 (citing "failure to mitigate . . . foreseeable losses" from contractual arrangements).

Entirely separately, plaintiffs have failed to adduce any evidence that they will suffer

concrete harm *as a result of the method by which the Secretary adjusted the make allowance*.

This is true even with respect to their claim that they will lose revenue as a result of a decrease in

minimum prices.  To warrant an injunction, plaintiffs must show that they will suffer concretely

not merely from the increase in make allowances, but that the Secretary's asserted failure to

consider the factors identified by plaintiffs has resulted in the make allowances being at a higher

level than they would otherwise have been.  See Getty Images News Servs. v. Dep't of Defense,

193 F. Supp. 2d 112, 123 (D.D.C. 2002) (relevant comparison for irreparable harm is between

challenged system and one that comports with requirements asserted by plaintiffs).  Without this

showing, extraordinary relief to enjoin the entire agency rule-making is inappropriate.  See id.

### III.    The Balance of Harms Weighs Heavily Against Granting Extraordinary Relief

Set against this absence of any concrete, irreparable harm to plaintiffs is the very real

harm to other parties and to the dairy industry as a whole if a preliminary injunction is granted.

Most obviously, to the extent that plaintiffs establish a real irreparable harm, it is entirely

counterbalanced by the harm that would result to handler-manufacturers if the new rule is

enjoined.  Every dollar that would be secured to plaintiffs as a result of a preliminary injunction

will be lost to manufacturers, who will pay higher minimum prices than they will under the new

rule.  See Bridgewater Dairy, 2007 U.S. Dist. LEXIS 12209, at *23-24; see also Pls. Br. at 4-5

("[p]roducers want lower make allowances and manufacturers want higher make allowances");

see also Miles Decl. ¶ 5 ("virtually every cent of the decrease in federal minimum price results in

a lower price received from buyers").

More importantly from the perspective of USDA, the health and viability of the entire

dairy industry would be harmed if the challenged rule-making is not allowed to take effect.  See

Bridgewater Dairy, 2007 U.S. Dist. LEXIS 12209, at *25.  The Secretary has already determined

that the status quo poses a serious threat to the industry.  73 Fed. Reg. at 35,330.  If the make

allowances continue to underestimate manufacturer costs, the market for surplus milk may

diminish.  For this reason, make allowances that fail to account for the true costs of

manufacturing are not  "in the best long-term interests of dairy farmers, processors or

consumers."  67 Fed. Reg. at 67,915; see also Jones, 456 F. Supp. 650 (noting "symbiotic

relationship" between producers and handlers).  Producers, after all, rely on manufacturers as an

outlet for disposing of surplus milk that would otherwise go to waste.  See Brannan, 185 F.2d at

876; see also Transcript of February 27, 2007 Hearing at 372 (McDowell) (Exhibit 4, hereto)

(insufficient make allowance "creates a problem for producers, because they don't have a market for their milk."). As the district court in Bridgewater Dairy concluded under very similar circumstances, there is "no significant public interests that weigh in favor of granting" extraordinary relief. 2007 U.S. Dist. LEXIS 12209, at *24-25; see also White Eagle Coop., 396 F. Supp. 2d 954 at 961 ("The purpose of the milk marketing scheme is to maximize the benefit to the largest number of producers, rather than to minimize a potential negative impact on a handful of producers."). The Court should decline plaintiffs' invitation to enjoin a carefully-considered rule that is in the interests of handlers nationwide and the industry more generally, all in order to benefit a small group of producers.

**CONCLUSION**

For the foregoing reasons, plaintiffs' request for preliminary injunction should be denied.

Dated: August 28, 2008                          Respectfully submitted,

                                               GREGORY G. KATSAS
                                               Assistant Attorney General

                                               JEFFREY A. TAYLOR
                                               United States Attorney

                                               JAMES GILLIGAN
                                               Assistant Branch Director

                            By:    /s/ Kyle R. Freeny
                                   KYLE R. FREENY (Cal. Bar # 247857)
                                   Trial Attorney, Federal Programs Branch
                                   U.S. Department of Justice, Civil Division
                                   P.O. Box 883, Washington, DC  20044
                                   Telephone:  (202) 514-5108
                                   Facsimile:   (202) 616-8202
                                   Email:  Kyle.Freeny@usdoj.gov
                                   *Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| ARKANSAS DAIRY COOPERATIVE ) | |
| ASSOCIATION, INC, et al., ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:08-cv-01426 (EGS) |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF AGRICULTURE ) | |
| Defendant, ) | |
| ) | |
| INTERNATIONAL DAIRY FOODS ) | |
| ASSOCIATION, ) | |
| Intervening Defendant, ) | |
| ) | |
| AGRI-MARK, INC, et al., ) | |
| Intervening Defendant. ) | |
| _____ ) | |

# Exhibit 1

1032

1       VOLUME  V

2       BEFORE  THE  SECRETARY  OF

3    THE  UNITED  STATES  DEPARTMENT  OF  AGRICULTURE

4          AGRICULTURAL  MARKETING  SERVICES

5

6    In the Matter of Proposed    ) Docket Numbers

7    Amendments to Tentative      ) AO-14-A77, et al ,

8    Marketing Agreements         ) DA-07-02

9    and Orders                   )

10

11              National Public Hearing

12              Friday, March 2 , 2007

13                9 24 o'clock a m

14              Holiday Inn Select

15              15471 Royalton Road

16            Strongsville, Ohio 44136

17

18   BEFORE

19              JUDGE  VICTOR  W  PALMER

20           US  ADMINISTRATIVE  LAW  JUDGE

21     UNITED  STATES  DEPARTMENT  OF  AGRICULTURE

22

23

24   COURT  REPORTERS  OF  AKRON,  CANTON  AND  CLEVELAND

25              1-800-804-7787

1152

1    cross-examination at the next session, or simply

2    to note that **it** is there.

3              JUDGE PALMER:     I tell you what. I

4    don't think we need to mark **it** and confuse

5    ourselves.  I will give you a ruling.  I don't

6    regard **it** as an inappropriate ex parte

7    communication.

8              MR. VETNE:        All right.  Thank

9    you.

10             Secondly, I have some official notice

11   requests, which I think would be useful to get

12   them in at this time.

13             I will give them to you.  They are

14   from CDFA, in addition to what has been

15   received.

16             JUDGE PALMER:     C --

17             MR. VETNE:        CDFA, California

18   Department of Food and Agriculture.

19             JUDGE PALMER:     CDFA.

20             MR. VETNE:        The Web site is

21   www.cdfa.ca.gov/dairy.  In the "Hearings and

22   Outcomes" subpage of that hearing matrix. Class

23   IV-A and IV-B hearing of June 1, 2006, from that

24   the panel report dated 7/21/06, the final

25   results. statement of determination of 7/21/06

1153

1   which was a determination by the Secretary of

2   Agriculture adopting the panel report.

3            And additionally, under dairy

4   publications on that Web site --

5            JUDGE PALMER:    Under which?

6            MR. VETNE:        Dairy publications

7   on that Web site, at the bottom of the page,

8   there is a report entitled "Estimated Impact

9   Analysis of 2005 Utility and Labor Rates on

10  Butter, Nonfat Dry Milk, Whey Powder and Cheese

11  Manufacturing Costs," which is an illustration

12  of CDFA's indexing of 2004 costs to 2005

13  changes.

14           From Dairy Programs AMS, I ask

15  official notice of the November 2002 economic

16  analysis on final Class III and IV make

17  allowance decision, and similarly, the November

18  2006 final economic analysis of the tentative

19  final decision, which I don't think has been

20  noticed at this point.

21           From Economic Research Service. which

22  is www.ers.usda.gov, I ask official notice of

23  the annual -- no, of the Monthly Livestock,

24  Dairy and Poultry Outlook Report for 2006

25  through 2007 date of briefing.

1154

1    And from USDA NASS, at the Web site

2    is www.nass.usda.gov, three publications, one is

3    Dairy Products Annual Publication through April

4    2007, that is publication for -- sorry, through

5    2007, starting in 2000, which is an April

6    release each year.  And then it usually comes

7    out in April, but just in case it is not, the

8    monthly publications of the same document for

9    '06 and '07 to date of briefing.

10    Okay.  An annual publication called

11    "Agricultural Prices," which is ordinarily

12    released in July of each year for prior year

13    data, again from 2000 to the last publication

14    and then monthly for '06 and '07.

15    Also from NASS, a publication called

16    "Crop Production, Annual Summary," which is

17    released in January, the most recent one was

18    released in January for the prior year. 2000 to

19    2006 and then monthly through '07 date of

20    briefing.

21    And from the Office of Chief

22    Economist of USDA, the baseline reports that we

23    have been referring to for 2000 through 2007.

24    Those were released in February, and the URL for

25    that is www.usda.gov/oce.

1155

1    And then, finally, remaining an

2    historical baseline data accessible through a

3    link from the Office of Chief Economist site on

4    the ERS Web site, and it contains an explanation

5    of the baseline, how it works, and prior issues

6    of the baseline.  And that is accessible through

7    www.ers.usda.gov/briefing/baseline.

8        That concludes my request of official

9    notice at this time.

10       JUDGE PALMER:    Anybody have any

11   problem with that?  It sounds to me like they

12   are all Government publications, so we will take

13   official notice of them.  They all appear to be

14   relevant for the matter of the hearing.  We will

15   take official notice of each of the publications

16   that you have stated.

17       MR. VETNE:        Okay.  Then one

18   final request here, at the beginning of the

19   hearing. I brought up an issue and I am renewing

20   it now.

21       That is, the prior record that

22   brought us here, the record from the 2006 make

23   allowance hearing, which of the Class III and IV

24   price formula, addressed only make allowances

25   not yields, not surveys

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| ARKANSAS DAIRY COOPERATIVE | ) | |
| ASSOCIATION, INC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08-cv-01426 (EGS) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

# Exhibit 2

**USDA Agricultural Marketing Service (AMS) Dairy Programs**

**National Econometric Model Documentation**

**For Model Calibrated To**
*USDA Agricultural Baseline Projections to 2016*

**April 2007**

**Economic Analysis Staff**

**Office of the Chief Economist**

**Dairy Programs**

**Introduction**

Dairy Programs' Office of the Chief Economist maintains a dynamic econometric model of the U.S. dairy industry to support its economic analysis and forecasting responsibilities. The model is comprehensive, including the supply of milk, the allocation of butterfat and nonfat solids to fluid milk and the major manufactured dairy products, and consumer demand for milk and dairy products. The model's supply and demand equations are estimated using data from years 1980 through 2005. The model includes variables for the Federal Milk Marketing Order (FMMO) system, Milk Price Support Program (MPSP), and Milk Income Loss Contract (MILC) program. It is specified to generate long-term supply, demand, and price projections that are consistent with USDA's official baseline projections.[1] The model is estimated and simulated with SAS statistical software (SAS Institute, Inc., SAS/ETS User's Guide, Version 9.1).

The model simultaneously forecasts milk production, fluid milk and manufactured dairy product consumption, dairy manufacturing allocation, dairy product prices, and farm milk prices sequentially along the designated time path of 2006 through 2016. Butterfat and nonfat solids are allocated through the use of conversion factors consistent with farm milk and dairy products. Prices for dairy products, fluid milk, and farm milk are solved within the model to achieve equilibrium conditions for supply and demand.

**Analytical Framework**

Dairy Product Composition – Butterfat and Nonfat Solids

The requirements of fluid and manufactured dairy products for nonfat solids and butterfat are estimated with reported historical data. These milk and component uses are classified on a basis consistent with the FMMO system as follows:

> Class I—fluid uses
> Class II—soft manufactured products (frozen products and other Class II)
> Class III—cheese and dry whey
> Class IV—butter, nonfat dry milk (NFDM), whole dry milk, and canned milk.[2]

Fluid use data are obtained from the USDA Economic Research Service. Butterfat and nonfat solids content for fluid milk are determined from FMMO and California data. Modeled manufactured products include American cheese, other-than-American cheese (other cheese), butter, canned milk, whole dry milk, NFDM, total frozen products, and other Class II products. Data for manufactured products as reported by the National

---

[1] Dairy baseline forecasts are developed by an Interagency Commodity Estimates Committee at USDA. Intercept terms for the model are modified for each projection year as needed to calibrate the model to approximate baseline forecasts. For information on USDA's official baseline, see http://www.usda.gov/oce/commodity/ag_baseline.htm, U.S. Department of Agriculture, Office of the Chief Economist, World Agricultural Outlook Board, OCE-2007-1.

[2] The term "canned milk" in this documentation refers to evaporated or sweetened condensed milk in consumer-type packages.

Agricultural Statistics Service (NASS) is used for all modeled dairy products with the exception of other Class II. Other Class II is treated as a composite solids-equivalent product, historically calculated as the residual butterfat and nonfat solids after meeting all other model product requirements.

The nonfat solids and butterfat pounds required for each product are established by multiplying the production of hard manufactured products and the demands for fluid, frozen, and other Class II products by the appropriate conversion factors in Table 1. Frozen products and other Class II products are treated as aggregates. The factors for the aggregate frozen product are recent year weighted averages across all frozen products. The other Class II solids requirements were established in the historical data by the residual butterfat and nonfat solids left when accounting for all solids in Class I, III, IV, and total frozen products. The proportions of the solids in "other Class II" for the forecast period are held at recent averages.

Milk Supply

The model estimates milk production via milk per cow and number of cows (Table 2). The number of cows is estimated as a function of the milk-feed price ratio, the ratio of the boning and utility cow slaughter price to the all milk price, and trend variables. The year-over-year change in milk production per cow is estimated as a function of the previous year's all-milk price, and current-year feed costs. Prices are deflated by the Consumer Price Index (CPI) for all products as reported by the Bureau of Labor Statistics, U.S. Department of Labor (BLS).[3] Each equation includes dummies to adjust for unusual circumstances over the historical period. The average MILC payment per hundredweight (cwt.) is computed by dividing total MILC payments by U.S. milk production. For years when the MILC program is active, the average MILC payment per cwt. is added to the all-milk price.

Demand for Fluid Milk and Dairy Products

Per capita demands for fluid milk and manufactured dairy products are estimated as functions of product prices, per capita income, and other factors (Table 3). Dairy product prices are deflated by the CPI for all products, the CPI for food, or in the case of butter, the CPI for fats and oils. Per capita disposable income is deflated by the CPI for all products. Total consumption for each specific product or product aggregate is specified as per capita demand times the projected population for each year. Fluid milk demand responds to the CPI for fresh whole milk, per capita disposable income, and trend. The CPI for fresh whole milk is estimated as a function of the CPI for all products and the Class I price at 3.25 percent butterfat test, using the average Class I differential plus the estimated over- order Class I premium (Table 4). The average retail price for fresh

---

[3] Data for all CPIs are from BLS.

**Table 1: Dairy Product Conversion Factors (percentages)**

| Products | Butterfat and nonfat solids required per product unit | |
|---|---|---|
| | Butterfat | Nonfat Solids |
| Producer milk | 3.67 | 8.75 |
| Butter | 80.40 | 1.00 |
| American cheese [1] | 36.80 | 85.10 |
| Other cheese [2] | 28.70 | 85.80 |
| Nonfat dry milk | 0.80 | 96.20 |
| Canned milk | 7.90 | 18.50 |
| Dry whey | 1.10 | 95.00 |
| Dry whole milk | 26.50 | 71.00 |
| Fluid milk | 2.05 | 8.92 |
| Ice cream-regular | 12.00 | 10.00 |
| Ice cream-lowfat | 6.00 | 11.00 |
| Ice Cream-nonfat | 2.00 | 14.00 |
| Sherbet | 2.00 | 2.00 |
| Frozen yogurt | 1.70 | 9.00 |
| Other frozen products | 6.00 | 7.70 |
| Total frozen products [3] | 9.10 | 9.90 |
| Other Class II [4] | 46.00 | 54.00 |

[1] Based on Van Slyke Formula for cheddar Cheese, reflects solids required for production, not the actual percentage in final product.

[2] Weighted average of other cheeses, reflects solids required for production, not the actual percentage in final product.

[3] Derived a weighted average frozen product category.  Ice Cream products are assumed to weigh 4.5 lbs. per gallon, other frozen products are assumed to weigh 6 lbs. per gallon.

[4] Other Class II composite solids equivalent product.

fortified whole milk in gallons as reported by BLS is estimated in the model as a function of the CPI for whole milk.  For frozen products, demand responds to the average retail price of ice-cream as reported by the BLS.  The retail price of ice-cream is estimated as a function of the Class II price at test and its own lag.  The demand for other Class II products responds to the CPI for other dairy products.  The six hard manufactured product demand equations are specified at the wholesale level. Wholesale prices for cheese, butter and NFDM, and dry whey represent estimates of the annual average NASS product prices used in the FMMO price formulas.  Adjustments for leap year are included in the forecast period.

**Table 2. Milk Supply**

| Dependent variable | Parameter | Estimate | t-Value | Pr > \|t\| | Price elasticities | R-Square |
|---|---|---|---|---|---|---|
| log (number of cows) | Intercept | 0.666 | 0.73 | 0.4753 | | |
| | log (All-milk price / Feed value) [1] | 0.029 | 1.46 | 0.1638 | 0.029 | |
| | log (Trend: year minus 1979) | -0.013 | -1.50 | 0.1540 | | |
| | lag (log (Number of cows)) | 0.929 | 9.61 | <.0001 | | |
| | log (Boning and utility cow slaughter price / all milk price) | -0.013 | -1.04 | 0.3148 | -0.013 | |
| | Dummy for 1984: Milk Diversion Program | -0.021 | -2.11 | 0.0510 | | |
| | Dummy for 1986: Milk Production Termination Program | -0.020 | -1.59 | 0.1316 | | |
| | Dummy for 1987: Milk Production Termination Program | -0.043 | -3.47 | 0.0032 | | |
| | Dummy for 1998 | -0.013 | -1.32 | 0.2064 | | 0.9715 |
| Year-over-year change in milk per cow [2] | Intercept | 333 | 2.29 | 0.0327 | | |
| | lag (All-milk price / CPI all) [1] | 6,393 | 2.44 | 0.0236 | 0.039 | |
| | Feed value / CPI all | -19,203 | -2.63 | 0.0157 | -0.041 | |
| | Dummy for 1984: Milk Diversion Program | -297 | -1.67 | 0.1098 | | 0.9952 |

[1] For years when the Milk Income Loss Contract (MILC) program is in operation, the average MILC payment (total MILC payments/milk production) is added to the all milk price.

[2] Price elasticities are computed for milk per cow, not the year-over-year change in milk per cow, at the means of the explanatory variables.

## Manufacturing Allocation

Manufacturing allocation is estimated directly from historical data for American and other cheeses, dry whey, dry whole milk, and canned milk (Table 5). American and other cheese production responses vary as functions of the gross returns of milk in each cheese relative to milk in butter and NFDM powder. Cheese production also responds to the previous year's marketing conditions: domestic commercial disappearance, imports, and net government removals. Dry whey production responds to its own price, cheese production, estimated milk solids used in whey protein concentrate production, and trend variables. Dry whole milk production responds to its own price, the previous year's dry whole milk production, and dry whole milk exported under the Dairy Export Incentive Program (DEIP). Production of canned milk lacks significant price responsiveness and is modeled as a function of trend and as a substitute for dry whole milk.

4

**Table 3. Per Capita Demand and Related Equations**

| Dependent Variable | Parameter | Estimate | t-Value | Pr > \|t\| | Price and Income Elasticities [1] | R-Square |
|---|---|---|---|---|---|---|
| U.S. fluid milk | Intercept | 232.016 | 10.74 | <.0001 | | |
| | CPI fresh whole milk / CPI all | -0.349 | -3.57 | 0.0017 | -0.154 | |
| | Per capita disposable income / CPI all | 3.702 | 2.24 | 0.0356 | 0.238 | |
| | Trend: year minus 1979 | -2.893 | -9.20 | <.0001 | | 0.9775 |
| | | | | | | |
| Butter | Intercept | -0.740 | -0.70 | 0.4905 | | |
| | log (Butter price / CPI fats and oils) | -0.125 | -1.38 | 0.1852 | -0.031 | |
| | log (Per capita disposable income / CPI all) | 0.956 | 2.10 | 0.0505 | 0.233 | |
| | lag (log (butter per capita)) | 2.102 | 3.66 | 0.0018 | | |
| | Dummy for 1989-1992 | -0.265 | -2.95 | 0.0085 | | |
| | Dummy for 1999 | 0.315 | 2.71 | 0.0143 | | |
| | Dummy for 2004 | 0.151 | 1.19 | 0.2479 | | 0.9069 |
| | | | | | | |
| log (American cheese) [2] | Intercept | 2.679 | 5.47 | <.0001 | | |
| | log (Cheddar cheese price / CPI food) | -0.124 | -1.34 | 0.1955 | -0.124 | |
| | (Per capita disposable income / CPI all) | | | | | |
| | * Dummy for years after 1996 | 0.026 | 4.36 | 0.0003 | 0.389 | |
| | log (Trend: year minus 1979) | | | | | |
| | *Dummy for years before 1997 | 0.111 | 3.75 | 0.0012 | | 0.9384 |
| | | | | | | |
| Other cheese | Intercept | -17.126 | -1.92 | 0.0690 | | |
| | log (Mozzarella wholesale price / CPI for food) | -4.295 | -1.57 | 0.1311 | -0.295 | |
| | log (Per capita income / CPI all) | 10.594 | 2.86 | 0.0093 | 0.729 | |
| | log (Trend: year minus 1979) | 1.970 | 2.71 | 0.0131 | | 0.9757 |
| | | | | | | |
| log (NFDM) | Intercept | 4.081 | 8.55 | <.0001 | | |
| | log (NFDM price / CPI food) | -0.753 | -6.68 | <.0001 | -0.753 | |
| | Dummy for years 1994-1997 | 0.391 | 5.97 | <.0001 | | 0.7757 |
| | | | | | | |
| log (Dry whey) [3] | Intercept | 2.065 | 4.95 | 0.0003 | | |
| | log (Dry whey price / CPI food) | -0.164 | -1.07 | 0.3066 | -0.164 | |
| | Trend: year minus 1979 | -0.035 | -8.01 | <.0001 | | |
| | Dummy for year 1994 | 0.145 | 1.66 | 0.1222 | | |
| | Dummy for year 1998 | 0.186 | 2.01 | 0.0680 | | 0.8312 |
| | | | | | | |
| log (Canned milk) | Intercept | 4.157 | 2.71 | 0.0127 | | |
| | log (Evaporated milk price / CPI food) | -0.990 | -2.05 | 0.0527 | -0.990 | |
| | Trend: year minus 1979 | -0.044 | -4.19 | 0.0004 | | 0.7962 |

(Table 3 continued on next page.)

5

**Table 3. Per Capita Demand and Related Equations Continued**

| Dependent Variable | Parameter | Estimate | t-Value | Pr > \|t\| | Price and Income Elasticities | R-Square |
|---|---|---|---|---|---|---|
| log (Dry whole milk) | Intercept | -0.959 | -7.77 | <.0001 | | |
| | log (Dry whole milk price / CPI all) | -1.168 | -2.75 | 0.0119 | -1.168 | |
| | Dummy for years before 1991 | 0.380 | 2.33 | 0.0299 | | |
| | Dummy for years after 2000 | -1.150 | -10.21 | <.0001 | | 0.7543 |
| log (Frozen products) | Intercept | 5.037 | 15.49 | <.0001 | | |
| | log (Retail price of ice cream / CPI all) | -0.471 | -8.59 | <.0001 | -0.471 | |
| | log (Per capita income / CPI all) | 0.007 | 4.75 | 0.0001 | 0.007 | |
| | Trend: year minus 1979 | -0.010 | -4.73 | 0.0001 | | |
| | Dummy for years after 2003 | -0.094 | -6.50 | <.0001 | | 0.8754 |
| log (Other Class II solids) | Intercept | 2.392 | 4.81 | <.0001 | | |
| | CPI other dairy products / CPI all | -0.018 | -5.88 | <.0001 | -1.110 | |
| | Per capita disposable income / CPI all | 0.098 | 2.03 | 0.0549 | 1.336 | |
| | Trend: year minus 1979 | -0.037 | -3.87 | 0.0009 | | 0.8142 |

[1] For equations where elasticities are not constant, they are computed at the means of the explanatory variables.

[2] The income elasticity for American cheese is calculated for the years 1997 through 2005.

[3] The equation for dry whey demand uses data from 1989 through 2005.

**Table 4. Retail prices**

| Dependent Variable | Parameter | Estimate | t-Value | Pr > \|t\| | Price and Income Elasticities [1] | R-Square |
|---|---|---|---|---|---|---|
| Retail ice cream price | Intercept | -0.016 | -0.26 | 0.7967 | | |
| | Class II price at test | 0.022 | 5.35 | <.0001 | 0.145 | |
| | lag (Retail ice cream price) | 0.882 | 30.85 | <.0001 | 0.860 | 0.9793 |
| log (CPI fresh whole milk) | Intercept | -0.188 | -0.70 | 0.4914 | | |
| | Log (Class I price at 3.25 percent including average Class I differential and over-order payment) | 0.531 | 4.38 | 0.0002 | 0.531 | |
| | log (CPI all) | 0.729 | 19.27 | <.0001 | 0.729 | 0.9727 |
| log (Retail price, fresh whole milk, fortified, per gallon) | Intercept | -2.534 | -6.46 | 0.0002 | | |
| | log (CPI fresh whole milk) | 0.704 | 9.10 | <.0001 | 0.704 | 0.9156 |

[1] For equations where elasticities are not constant, they are computed at the means of the explanatory variables.

[2] The equation for the retail price, fresh whole milk, fortified, uses data from 1996 through 2005.

**Table 5. Manufacturing Allocation Equations**

| Dependent variable | Parameter | Estimate [1] | t-Value | Pr > \|t\| | R-Square |
|---|---|---|---|---|---|
| log (Production, American cheese) | Intercept | 0.374 | 0.59 | 0.5621 | |
| | log (Gross value American cheese / Gross value butter-NFDM) | 0.151 | 0.77 | 0.4484 | |
| | lag (log (Domestic commercial disappearance of American cheese + net government removals of American cheese - imports of American cheese)) | 0.955 | 12.01 | <.0001 | |
| | Dummy for years 1980-1983 | 0.050 | 1.74 | 0.0984 | |
| | Dummy for year 1999 | 0.075 | 1.80 | 0.0884 | |
| | Dummy for year 2000 | 0.053 | 0.95 | 0.3523 | 0.9322 |
| log (Production, other cheese) | Intercept | 0.296 | 2.34 | 0.0290 | |
| | log (Gross value other cheese / Gross value butter-NFDM) | 0.067 | 0.83 | 0.4136 | |
| | lag (log (Domestic commercial disappearance of other cheese - imports of other cheese)) | 0.969 | 53.24 | <.0001 | 0.9960 |
| log (Production, dry whey) | Intercept | -7.637 | -1.70 | 0.1054 | |
| | log (Wholesale price whey / CPI food) | 0.169 | 2.15 | 0.0446 | |
| | log (Production of American cheese + Production of other cheese) | 1.761 | 3.24 | 0.0043 | |
| | Estimated solids used in whey protein concentrate production * Dummy for years after 1992 | -0.001 | -3.65 | 0.0017 | |
| | Trend | -0.026 | -1.34 | 0.1976 | |
| | Dummy for years after 2003 | -0.190 | -3.39 | 0.0031 | |
| | Dummy for year 2001 | -0.169 | -2.67 | 0.0153 | 0.8479 |
| log (Production, dry whole milk) | Intercept | 1.029 | 2.29 | 0.0328 | |
| | log (Wholesale price dry whole milk / CPI food) | 0.651 | 3.01 | 0.0069 | |
| | log (lag (Production of dry whole milk) | 0.785 | 8.20 | <.0001 | |
| | Dry whole milk exported under DEIP | 0.005 | 2.18 | 0.0417 | |
| | Dummy for year 2001 | -0.906 | -5.25 | <.0001 | 0.7025 |
| log (Production, canned milk) | Intercept | 7.129 | 44.97 | <.0001 | |
| | log (Production of dry whole milk) | -0.069 | -2.44 | 0.0234 | |
| | log (Trend: year minus 1979) | -0.183 | -8.55 | <.0001 | 0.8279 |

[1] Since equations are in double-log form with respect to price, coefficients can be interpreted as elasticities.

Butterfat allocation and nonfat solids allocation are estimated for specified dairy products as well as for fluid milk using conversions factors in Table 1.  These amounts are subtracted from butterfat and nonfat solids estimates for milk marketed to estimate residual butterfat and nonfat solids available for butter and NFDM production.[4]  Conversion factors from Table 1 are used to determine production quantities from the residual butterfat and nonfat solids.

To accurately account for butterfat and nonfat solids content, it is necessary to make some adjustments to avoid duplication.  Historical data used to account for duplication are taken for the most part from *Dairy Products, Utilization and Production Trends* by the American Dairy Product Institute.  For the forecast period, the proportion of NFDM used in cheese to total cheese production is estimated as a function of the butter/cheese price ratio and trend (Table 6).  Condensed skim milk used in cheese is estimated as an inverse function of NFDM used in cheese and trend.  Other types of duplication, such as nonfat solids used for fluid milk fortification, are accounted for as constant percentages of the applicable dairy product quantities produced.

**Table 6. Duplication Adjustment Equations**

| Dependent variable | Parameter | Estimate | t-Value | Pr > \|t\| | R-Square |
|---|---|---|---|---|---|
| Nonfat dry milk used in cheese / total cheese production | Intercept | 0.024 | 2.37 | 0.0298 | |
| | Wholeseale butter price / wholesale cheese price | -0.018 | -1.92 | 0.0722 | |
| | lag (Nonfat dry milk used in cheese / total cheese production) | 0.765 | 5.83 | <.0001 | 0.6225 |
| Condensed skim milk used in cheese | Intercept | -15.103 | -0.41 | 0.6834 | |
| | Nonfat dry milk used in cheese | -0.120 | -2.29 | 0.0347 | |
| | log (Trend: year minus 1979) | 34.585 | 2.27 | 0.0365 | 0.2694 |

These duplication equations use data from 1985 through 2005.

Stocks

Year-end stocks are estimated for American cheese, other cheese, butter, and NFDM.[5]  Estimating ending stock values is complicated by their volatility.  For this reason

---

[4] NASS makes a distinction between NFDM and skim milk powders.  NFDM is skim milk that has been dried with no alterations made to its content other than possible vitamin fortification.  Skim milk powders include protein standardized milk powders and blends.  Production of skim milk powders for export purposes have become an important factor in recent years.  For years prior to 2005, skim milk powders were not included in NASS surveys.  Skim milk powders are included in the *Dairy Products 2005 Annual Summary*.  In the model, NFDM production includes skim milk powder for 2005, and NFDM production projections include skim milk powder.

[5] For fluid milk and dairy products other than American cheese, other cheese, butter, and NFDM, a simplifying assumption is made that the products are consumed in the same time period as produced.

**Table 7. Annual Average Stock Equations**

| Dependent variable | Parameter | Estimate | t-Value | Pr > \|t\| | R-Square |
|---|---|---|---|---|---|
| log (Butter stocks) | Intercept | 1.369 | 2.08 | 0.0492 | |
| | log (Wholesale butter price / CPI all) | -0.346 | -1.21 | 0.2403 | |
| | log (lag (Butter ending stocks)) | 0.736 | 4.04 | 0.0006 | 0.5787 |
| log (American cheese) | Intercept | 1.400 | 2.74 | 0.0120 | |
| | log (Wholesale cheese price / CPI all) | -0.249 | -3.04 | 0.0060 | |
| | log (lag (American cheese ending stocks)) | 0.773 | 8.88 | <.0001 | 0.8743 |
| log (Other cheese) | Intercept | -1.301 | -1.76 | 0.0920 | |
| | log ( Wholesale mozzarella price / CPI all) | -0.708 | -3.12 | 0.0050 | |
| | log (lag (Other cheese ending stocks)) | 0.650 | 6.00 | <.0001 | 0.8942 |
| log (NFDM) | Intercept | 3.248 | 4.59 | 0.0002 | |
| | log (Wholesale NFDM price / CPI all) | -0.301 | -1.37 | 0.1853 | |
| | log (lag (NFDM ending stocks) | 0.255 | 1.52 | 0.1434 | |
| | Dummy for 2000 | 0.520 | 2.14 | 0.0447 | 0.5758 |
| log (Whey) | Intercept | 1.606 | 4.30 | 0.0003 | |
| | log (Wholesale whey price / CPI food) | -0.759 | -7.92 | <.0001 | |
| | log (lag (Average whey stocks)) | 0.125 | 1.20 | 0.2443 | 0.7333 |

a two-step process is used. First, average stock values are estimated (Table 7). For each year, this value is the simple average of the monthly ending stocks. For each equation, the average stock value has a negative relationship with the product price and a positive relationship with its own lag. Second, year-end stocks are estimated from average stocks, reflecting the typical seasonal relationship that exists between average stocks and year-end stocks (Table 8). For American cheese and NFDM, lags of ending stocks are also used as explanatory variables.

<u>Milk Price Support Program Equations</u>

Net government removals are defined as support price purchases plus DEIP removals minus unrestricted sales of government stocks. For each product (NFDM, cheese, and butter) net government removals are estimated as a negative log-linear function of the wholesale price minus the support price, with dummies and trends included to obtain adequate fit to historical data (Table 9). Use of the log-linear form acknowledges that government removals increase at an increasing rate as the value of the average wholesale price minus the support price gets smaller.

**Table 8. Annual Ending Stock Equations**

| Dependent variable | Parameter | Estimate | t-Value | Pr > \|t\| | R-Square |
|---|---|---|---|---|---|
| log (Butter) | Intercept | 0.671 | 1.37 | 0.1830 | |
| | log (Average butter stocks) | 0.716 | 5.94 | <.0001 | 0.5710 |
| | | | | | |
| log (American cheese) | Intercept | -1.445 | -2.36 | 0.0275 | |
| | log (Average American cheese stocks) | 1.276 | 10.58 | <.0001 | |
| | lag (American cheese ending stocks) | -0.001 | -2.18 | 0.0405 | 0.9553 |
| | | | | | |
| log (Other cheese) | Intercept | -0.206 | -0.67 | 0.5078 | |
| | log (Average other cheese stocks) | 1.026 | 16.42 | <.0001 | 0.9616 |
| | | | | | |
| log (NFDM) | Intercept | -0.634 | -1.10 | 0.2840 | |
| | log (Average NFDM stocks) | 1.172 | 8.26 | <.0001 | |
| | lag (NFDM ending stocks) | -0.003 | -1.87 | 0.0747 | 0.7416 |
| | | | | | |
| log (Whey) | Intercept | 1.955 | 3.31 | 0.0032 | |
| | log (Average whey stocks) | 0.467 | 2.81 | 0.0101 | |
| | Dummy for year 1986 | -0.266 | -2.00 | 0.0578 | 0.3449 |

## Import and Export Equations

Butter imports and commercial NFDM exports are projected by the model (Table 10). In observing the history of imports and exports of the various products included in the model, butter imports and commercial NFDM exports appear to be the most price responsive. Imports and exports for other dairy products are exogenous in the model. For projected scenarios, a simplifying assumption is made that imports and exports of other dairy products remain at baseline levels.

Butter imports are controlled to some extent by a tariff rate quota (TRQ) that allows limited imports at lower in-quota tariff rates and unlimited imports at higher over-quota tariff rates. Butter imports have usually exceeded the TRQ since it has been in place. The model assumes that the quota is filled each year, and thus only over-quota imports are estimated. Since data concerning in-quota imports is readily available from the Foreign Agriculture Service since 1997, the equation is estimated using 1997 through 2005 data. Over-quota butter imports are estimated as a log-linear function of the difference between the domestic butter price and the FOB Northern Europe butter price. As the value of the domestic price minus the FOB Northern Europe price increases, imports increase at an increasing rate.

Commercial NFDM exports are estimated as a log-linear function of the difference between the domestic NFDM price and the FOB Oceania skim milk powder price. As

**Table 9. Net Government Removals Equations** [1]

| Dependent variable | Parameter | Estimate | t-Value | Pr > \|t\| | R-Square |
|---|---|---|---|---|---|
| log (net NFDM removals) | Intercept | 6.742 | 125.11 | <.0001 | |
| | Wholesale NFDM price | | | | |
| | - NFDM support price | -0.292 | -6.92 | <.0001 | |
| | Dummy for 1980 | -0.438 | -2.14 | 0.0436 | |
| | Dummy for 2002 | 0.464 | 2.86 | 0.0091 | 0.8746 |
| log (net butter removals) [2] | Intercept | 5.350 | 55.91 | <.0001 | |
| | Wholesale butter price | | | | |
| | - butter support price | -0.096 | -5.76 | <.0001 | |
| | Trend * Dummy for years before 1994 | 0.080 | 6.01 | <.0001 | 0.9373 |
| log (net cheese removals) [3] | Intercept | 4.192 | 3.07 | 0.0054 | |
| | Wholesale cheese price | | | | |
| | - cheese support price | -0.141 | -4.69 | 0.0001 | |
| | Dummy for years before 1989 | 2.155 | 1.58 | 0.1278 | 0.9248 |

[1] Net government removals equals support price purchases plus Dairy Export Incentive Program (DEIP) removals minus unrestricted sales.

[2] The equation for net butter removals applies to observations for which the wholesale butter price exceeds the support price by more than 15 cents. For projected scenarios, if the wholesale price minus the support price is projected to be more than 15 cents, net government removals remain at baseline levels.

[3] The equation for net cheese removals applies to observations for which the wholesale cheese price exceeds the support price by more than 10 cents. For projected scenarios, if the wholesale price minus the support price is projected to be more than 10 cents, net government removals remain at baseline levels.

**Table 10. Import and Export Equations**

| Dependent variable | Parameter | Estimate | t-Value | Pr > \|t\| | R-Square |
|---|---|---|---|---|---|
| log (butter imports over tariff rate quota) [1] | Intercept | -1.417 | -0.79 | 0.4552 | |
| | Wholesale butter price | | | | |
| | - FOB Northern Europe butter price | 4.992 | 2.73 | 0.0291 | 0.7721 |
| log (Commercial NFDM exports) | Intercept | 3.750 | 6.58 | 0.0001 | |
| | Wholesale NFDM price | | | | |
| | - FOB Oceania skim milk powder price | -6.114 | -2.82 | 0.0200 | |
| | Dummy for years after 2004 | 2.066 | 1.53 | 0.1607 | 0.6607 |

[1] In-quota butter imports are assumed to be filled over the projection period.

the value of the domestic price minus the FOB Northern Europe price gets smaller, exports increase at an increasing rate.[6]

Milk Income Loss Contract Program Equations

The USDA Farm Service Agency (FSA) makes MILC payments on a monthly basis when the Boston Class I milk price falls below $16.94 per cwt.  FSA issues payments up to a maximum of 2.4 million pounds of milk produced and marketed by each operation per fiscal year.  For any month in which the Boston milk price exceeds $16.94 per cwt., FSA makes no MILC payments for that month.  Production for each operation during that month does not count toward the 2.4 million pound limit (cap).  For the period from December 2001 through September 2005 the payment rate was 45 percent of the difference between the Boston Class I price and $16.94 per cwt.  For Oct. 1, 2005, through Aug. 31, 2007, the payment rate is 34 percent of the difference.  For September 2007, the payment rate is zero.  The program expires at the end of the fiscal year ending September 30, 2007.

Data concerning milk cows and milk production grouped by dairy farm size is readily available from NASS since 1993.  This data is used to estimate distributional information for milk production and operations had the MILC program been in effect continuously since 1993 (Table 11).[7]  The percent of total milk production for operations producing less than 2.4 million pounds has declined since 1993.  According to the estimates, the number of dairy farms exceeding the cap increased through 1997 but has remained fairly flat since then.  For the forecast period, model equations assume that these trends will continue (Table 12).

The model projects an annual Boston Class I price consistent with the USDA baseline. Since MILC payments are made monthly, it is necessary to make an assumption about the distribution of monthly values for the Boston Class I price given an annual average.[8] For this purpose, it is assumed that the distribution monthly deviations from the average annual Boston Class I price in the projection period will have the same pattern as the

---

[6] While NASS makes a distinction between skim milk powders and NFDM with respect to production data, export data do not.  Milk powders not exceeding 1.5 percent butterfat are all included in the same category of *Schedule B - Statistical Classification of Exports from the United States*.
[7] The methods used for estimating the distributional information for production and operations are taken from an unpublished manuscript by J. Michael Price, Richard P. Stillman, and Ralph Seeley, *The Food and Agricultural Policy Simulator: Implementation of the Milk Income Loss Contract Program*, USDA Economic Research Service, January 3, 2003.  Other aspects of the model with respect to the MILC program build upon their work as well.
[8] If the annual average Boston Class I price were assumed to be constant throughout the year, MILC payments could be understated or overstated.  For example, if the average Boston Class I price for a particular year was projected to be $16.94, and the price was assumed to be constant throughout the year, no MILC payments would be projected.  Given the volatility of prices in recent years, this is not a reasonable assumption.

distribution for the period from January 2000 through December 2005.[9]  The histogram in Figure 1 displays the distribution of Boston Class I prices from January 2000 through December 2005.  The histogram uses 10 bins.  The midpoint of the range for the lowest bin is $2.92 less than the average Boston Class I price over the period.  The midpoint of each successive bin is $0.95 higher, with the highest bin having a midpoint that is $5.67 higher than the average Boston Class I price.  Each bin has a proportional weight given the frequency of monthly occurrences over the five-year period.[10]  When the annual Boston Class I price increases or decreases, the model assumes that the monthly distribution of Boston Class I prices increases or decreases by the same amount.  However, for the projection period, the values of the lower bins of the distribution are floored at $13.15, the Boston Class I value corresponding to the $9.90 support price for manufactured milk.

The model assumes that an operator with less than 2.4 million pounds of production in a year (small operator), can be expected to receive MILC payments any time that the program is in effect and the Boston Class I price is less than $16.94.  MILC payments for small operators are projected as follows:

Payments for small operations in a projection year (mil. $) =

$$\sum_{i=1}^{10} \max\{0, \max[0.01\ r\ (16.94 - (p + b_i))\ \gamma\ q\ w_i),\ 0.01\ r\ (16.94 - 13.15\ q\ w_i]\}$$

where:

r = 0.45 for December 2001 through September 2005
        and 0.34 for October 2005 through August 2007
$p$ = the annual average Boston Class I price
$b_i$ = the price deviation from the annual average for the $i^{th}$ bin
$\gamma$ = the proportion of milk produced by small operators
$q$ = total milk production
$w_i$ = the weight associated with the $i^{th}$ bin

---

[9] There are two reasons for using this time period:  (1) The support price for milk has been set at $9.90 during this time period.  Since the USDA baseline assumes that the support price will remain the same throughout the projection period, the volatility in prices should be similar.  (2) If data from before 2000 were used, there could be some discontinuity due to Federal order reform.
[10] The method used to project the distribution of prices is similar to a method developed by Dale Leuck of USDA Farm Service Agency.

**Table 11. Estimated Distributional Information for Milk Production and Operations Had the MILC Program Been in Effect Continuously Since 1993**

| Calendar year | Milk production | Milk production of operations producing less than 2.4 million pounds | Percent of total production for operations producing less than 2.4 mil. pounds | Number of operations producing at least 2.4 mil. Pounds | MILC-eligible production for operations producing at least 2.4 mil. pounds | Total MILC-eligible production | Percent of total production eligible for MILC payments |
|---|---|---|---|---|---|---|---|
| | *mil. pounds* | *mil. pounds* | *%* | *#* | *mil. pounds* | *mil. pounds* | *%* |
| 1993 | 150,636 | 88,789 | 58.9 | 9,557 | 22,937 | 111,726 | 74.2 |
| 1994 | 153,602 | 84,187 | 54.8 | 10,042 | 24,100 | 108,287 | 70.5 |
| 1995 | 155,292 | 82,652 | 53.2 | 10,775 | 25,861 | 108,512 | 69.9 |
| 1996 | 154,006 | 77,083 | 50.1 | 11,164 | 26,793 | 103,876 | 67.4 |
| 1997 | 156,091 | 74,185 | 47.5 | 11,612 | 27,869 | 102,054 | 65.4 |
| 1998 | 157,441 | 73,767 | 46.9 | 10,718 | 25,723 | 99,490 | 63.2 |
| 1999 | 162,711 | 70,910 | 43.6 | 11,045 | 26,508 | 97,418 | 59.9 |
| 2000 | 167,658 | 66,830 | 39.9 | 11,474 | 27,538 | 94,367 | 56.3 |
| 2001 | 165,332 | 62,246 | 37.6 | 10,853 | 26,048 | 88,294 | 53.4 |
| 2002 | 169,758 | 58,675 | 34.6 | 10,917 | 26,200 | 84,875 | 50.0 |
| 2003 | 170,394 | 56,111 | 32.9 | 10,857 | 26,057 | 82,168 | 48.2 |
| 2004 | 170,806 | 53,493 | 31.3 | 10,725 | 25,740 | 79,233 | 46.4 |
| 2005 | 176,989 | 52,686 | 29.8 | 10,815 | 25,956 | 78,642 | 44.4 |

**Table 12. Model Equations for MILC Program Distributional Information**

| Dependent variable | Parameter | Estimate | t-Value | Pr > |t| | R-Square |
|---|---|---|---|---|---|
| log (Percent of total milk production for operations producing less than 2.4 mil. pounds) | Intercept | 4.089 | 358.45 | <.0001 | |
| | Trend: year minus 1993 | -0.058 | -35.95 | <.0001 | 0.9916 |
| Number of operations with milk production of at least 2.4 million pounds | Intercept | 5909.991 | 3.32 | 0.0089 | |
| | Lag (number of operations with milk production of at least 2.4 million pounds) | 0.452 | 2.77 | 0.0219 | |
| | (Trend: year minus 1993) * dummy before 1998 | 140.457 | 2.15 | 0.0600 | 0.5393 |

14



To achieve a cutoff at the end of August 2007, payments for small producers are first estimated as though the program were effective for the entire calendar year; this estimate is then multiplied by 8/12. In this analysis, estimated payments are projected for the time period when they accrue. Payments may actually be made to producers for a few months following the month when they accrue.

The average operator with at least 2.4 million pounds of production in a year (large operator), can be expected to receive payments for about three months of the year on average. Since producers are allowed to select the months for which they will be receiving MILC payments, an assumption is made that they will choose the months when prices are typically the lowest. For the period from January 2000 through December 2004, payments were typically 93 percent lower than average during the months of February through April. The equation for payments for large operators reflects the 2.4 million pound limit per operation and payments based on Boston Class I prices that are 93 percent of the annual average.

Payments for large operations in a projection year (mil. \$) =

$$\sum_{i=1}^{10} \max\{0, \max[0.01\ r\ (16.94 - 0.93(p + b_i))\ 2.4\ n\ w_i),$$
$$0.01\ r\ (16.94 - 13.15)\ 2.4\ n\ w_i]\}$$

where:

r = 0.45 for December 2001 through September 2005
            and 0.34 for October 2005 through August 2007
p = the annual average Boston Class I price
$b_i$ = the price deviation from the annual average for the $i^{th}$ bin
n = number of operations producing at least 2.4 million pounds
$w_i$ = the weight associated with the $i^{th}$ bin


The MILC program has an effect on production response because payments are tied to current marketings. There are insufficient data available to estimate the production response of small producers versus large producers. For this reason, the model production response is based on total MILC payments divided by milk production. This amount per cwt. is added to the all-milk price in the equations for the number of milk cows and the yield per cow.


Farm and Handler Milk Prices

Fluid milk processors regulated by FMMOs generally pay the Federal order Class I price plus a market-generated over-order payment. Federal order class prices are calculated from the Federal order price formulas using the estimated dairy product prices.[11] Class I over-order payment historical estimates are based on annual averages of announced cooperative Class I prices in selected cities. Class I over-order payments in the model are estimated as a function of the ratio of U.S. Class I to Class III and IV uses, and total cheese production (Table 13). This allows Class I over-order payments to vary as supply and demand conditions change. The Federal order Class I price plus the over-order payment applies to U.S. fluid milk in the model.

The equation for the U.S. all-milk price received by producers for farm milk is a function of Federal order minimum prices and market forces as reflected by dairy product prices and quantities. The equation has two terms other than the intercept. The first is a U.S. "blend" price calculated using Federal order class prices and U.S. quantities of butterfat and skim milk. Since the majority of U.S. milk is subject to Federal order pricing, prices for milk outside of Federal order regulation are similar due to competitive factors. The second term consists of a proxy for dairy processor revenue divided by U.S. milk marketings. The proxy makes use of data available for prices and quantities of major dairy products; comprehensive proprietary dairy processor revenue data are unavailable. Thus, the estimated U.S. all-milk price incorporates the Federal order minimum prices that prevail for the majority of the milk, dairy product prices, Class I over-order payments, fluid milk quantities, and dairy product quantities.

---

[11] See http://www.ams.usda.gov/dyfmos/mib/cls_prod_cmp_pr.htm for Federal Milk Order Price Information.

**Table 13. Class I Over Order Payments, All Milk Price Equations**

Computations not requiring econometric estimation

Wtd. avg. US fat price
   using FO min. prices

$$\frac{\sum\limits_{j=I}^{IV} \left( (\text{Fat per US Class Use})_j * (\text{Federal Order Class Fat Price})_j \right)}{\sum\limits_{j=I}^{IV} (\text{Fat per US Class Use})_j}$$

Wtd. avg. US Skim price
   using FO min. prices

$$\frac{\sum\limits_{j=I}^{IV} \left( (\text{Skim Milk per US Class Use})_j * (\text{Federal Order Class Skim Milk Price})_j \right)}{\sum\limits_{j=I}^{IV} (\text{Skim Milk per US Class Use})_j}$$

Wtd. avg. US "blend" price         (((1 - US all-milk fat test) / 100) * Wtd. avg. US Skim price using FO min. prices)
   using FO min. prices                + US all-milk fat test * Wtd. avg. US fat price using FO min. prices

Proxy for dairy
   processor revenue            Class I price at test plus over order premiums * U. S. fluid use
                        + Domestic comm. disappearance other cheese * mozzarella wholesale price
                        + Domestic comm. disappearance American cheese
                              * cheddar cheese wholesale price
                        + Domestic comm. disappearance butter * butter wholesale price
                        + Domestic comm. disappearance NFDM * NFDM wholesale price
                        + Net government removals butter * butter support price
                        + Net government removals cheese * cheese support price
                        + Net government removals NFDM * NFDM support price

Econometric Estimations

| Dependent variable | Parameter | Estimate | t-Value | Pr > \|t\| | R-Square |
|---|---|---|---|---|---|
| log (Class I over order payments) | Intercept | -17.958 | -4.50 | 0.0002 | |
| | log (US Class I use / | | | | |
| | (US Class III use + US Class IV use) | 2.452 | 3.00 | 0.0066 | |
| | log (Total cheese production) | 2.106 | 4.32 | 0.0003 | |
| | Dummy for years after 1999 | 0.527 | 4.71 | 0.0001 | 0.8610 |
| log (All milk price) | Intercept | -1.763 | -2.52 | 0.0192 | |
| | log (Wtd. avg. U.S. "blend" price | 0.685 | 9.90 | <.0001 | |
| | using Federal order class prices) | | | | |
| | log (Proxy for dairy processor revenue | | | | |
| | / Total of U.S. marketing of milk) | 0.218 | 3.12 | 0.0048 | 0.9482 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ARKANSAS DAIRY COOPERATIVE ) | |
| ASSOCIATION, INC, et al., ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:08-cv-01426 (EGS) |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF AGRICULTURE ) | |
| Defendant, ) | |
| ) | |
| INTERNATIONAL DAIRY FOODS ) | |
| ASSOCIATION, ) | |
| Intervening Defendant, ) | |
| ) | |
| AGRI-MARK, INC, et al., ) | |
| Intervening Defendant. ) | |
| _____ ) | |

# Exhibit 3

1

1          VOLUME I

2        BEFORE THE SECRETARY OF

3    THE UNITED STATES DEPARTMENT OF AGRICULTURE

4        AGRICULTURAL MARKETING SERVICES

5

6  In the Matter of Proposed   ) Docket Numbers

7  Amendments to Tentative     ) AO-14-A77, et al,

8  Marketing Agreements        ) DA-07-02

9  and Orders                  )

10

11          National Public Hearing

12        Monday, February 26, 2007

13          9 16 o'clock a m

14          Holiday Inn Select

15          15471 Royalton Road

16        Strongsville, Ohio 44136

17

18  BEFORE

19        JUDGE VICTOR W  PALMER

20      US ADMINISTRATIVE LAW JUDGE

21    UNITED STATES DEPARTMENT OF AGRICULTURE

22

23

24  COURT REPORTERS OF AKRON, CANTON AND CLEVELAND

25          1-800-804-7787

111

1    second.

2              MR. YALE:          The question is, if

3    we withdrew the separate III and IV, H and then

4    I think it is K through -- or L and M would then

5    be --

6              MR. CESSNA:        H, L and M.

7              MR. YALE:          Of B and A?  Of

8    Appendix A and Appendix B.

9              MR. CESSNA:        Well, Scenario H is

10   in Exhibit 7, and in Exhibit 7-B, that is L and

11   M.

12             MR. YALE:          But it is a

13   tremendous service that you have done, we

14   appreciate that very much.  So it would be H, L

15   and M.

16             JUDGE PALMER:      Are withdrawn?

17             MR. YALE:          Well, they are not

18   going to be relevant, unless somebody else has

19   something.  But they are instructive, because it

20   does tell the industry the impact of having that

21   policy decision of a single class butterfat.

22             JUDGE PALMER:      Questions?  Yes,

23   sir?

24        CROSS-EXAMINATION (BY MR. ROSENBAUM)

25             MR. ROSENBAUM:     Hi, Steve Rosenbaum

112

1    from the International Dairy Foods Association.

2    I guess I will just ask a question and y'all can

3    decide who will answer it, although sometimes

4    that ends up being -- no one wants to answer it.

5              But anyway, I have some questions

6    about the baseline material.  So Exhibit 8, if I

7    could ask y'all to pull that out, and page 4 is

8    where I have some initial questions.

9              JUDGE PALMER:    Of which one?

10             MR. ROSENBAUM:    Eight.  Now, my

11   understanding is that USDA has an existing

12   baseline projection through 2015, correct?

13             MR. CESSNA:    That's correct.

14             MR. ROSENBAUM:    Except for

15   adjusting that to reflect the newly adopted make

16   allowances, the baseline you are working off of

17   for the analyses that you presented today are

18   the same as the underlying USDA baseline; is

19   that correct?

20             MR. CESSNA:    That's correct.

21             MR. ROSENBAUM:    I take it that

22   baseline is used for purposes other than Federal

23   Order analyses, correct?

24             MR. CESSNA:    That's correct.

25             MR. ROSENBAUM:    On the Table 2,

1    there are a series of items relating to the milk

2    supply.  I want to make sure I understand how

3    these -- how these operate, at least in a

4    general sense.  I take it that in your

5    projection, in the underlying baseline

6    projection, you have made certain projections

7    regarding what you believe the all-milk price

8    will be through 2015, correct?

9             MR. McDOWELL:    The process of

10   putting together the baseline is done by a

11   committee.  And so the baseline is not a

12   forecast in a strict statistical sense.  It is a

13   plausible trajectory of quantity and prices.

14   Okay.

15             So with regard to how our model

16   works, these are our equations, but we have to

17   true up to what the baseline is.  And so, when

18   we do our policy analysis, we are looking at

19   changes off the baseline, and that is what works

20   through these equations.

21             MR. ROSENBAUM:    Okay.  All right.

22   But I take it your baseline would, for example

23   have some projection as to all-milk price.

24   correct?

25             MR. McDOWELL:    It does.

114

1          MR. ROSENBAUM:    And also some

2    projection as to feed value; is that right?

3          MR. McDOWELL:    It does.

4          MR. ROSENBAUM:    What is feed value,

5    for these purposes?

6          MR. McDOWELL:    NASS publishes a

7    milk/feed price ratio. And the commodities used

8    for that feed price, that feeds into that ratio

9    are corn, soybean meal, I think soybean meal and

10   hay.

11         MR. CESSNA:    Alfalfa hay.

12         MR. McDOWELL:    What we do is we

13   pick off from the baseline that deals with those

14   other commodities, those prices, and in the same

15   proportions that NASS uses to create the price

16   and that is what we use.

17         MR. ROSENBAUM:    Okay. And you are,

18   therefore, able to determine what impact a

19   change in the relationship between the all-milk

20   price and the feed value will have on the number

21   of cows, is that what this is showing?

22         MR. McDOWELL:    Yes, yes.

23         MR. ROSENBAUM:    And the price

24   elasticity there of .025, could you just, so I

25   understand it. a .025 -- let me start that

115

1    again.   A .025 change in what will result in

2    a -- let me put that differently.

3             A 1 percent change in what will

4    result in a .025 percent change in what?  If I

5    stated that correctly.

6             MR. McDOWELL:    A 1 percent change

7    in the milk/feed price ratio will result in a

8    .025 percent change in the number of cows.

9    short-term.

10            MR. ROSENBAUM:    Okay.

11            JUDGE PALMER:    Meaning that the

12   more feed costs, the less cows you are going to

13   have?  Is that right, is that a simplification

14   of how it works?

15            MR. McDOWELL:    That works.

16            MR. ROSENBAUM:    Or is it, the

17   higher the feed cost as a percentage of the

18   all-milk price, the fewer cows you will have?

19            MR. McDOWELL:    That's correct.

20            MR. ROSENBAUM:    And you are

21   tracking that in terms of number of cows in the

22   top portion of Table 2, as I understand it, but

23   then you have a separate track for

24   year-over-year change in milk per cow?  You have

25   "all-milk price over CPI all."  Can you explain

116

1    for me what that is capturing.

2              MR. McDOWELL:    In the milk per

3    cow, right?

4              MR. ROSENBAUM:    Yes.

5              MR. McDOWELL:    Notice that the --

6    is this whole thing lagged or is it just --

7              JUDGE PALMER:    You can leave their

8    conversation off and let them talk.

9              (Thereupon, a discussion was held off

10             the record.)

11             JUDGE PALMER:    Now Mr. McDowell

12   will answer.

13             MR. McDOWELL:    The lag applies to

14   the all-milk price here on the milk per cow, but

15   it is the current year feed value that is in

16   action there.  So we broke that up a little bit

17   and improved the fit.

18             MR. ROSENBAUM:    All right.  You

19   have a parameter feed value over CPI all.

20   correct?

21             MR. McDOWELL:    Oh, the CPI is a

22   deflator.

23             MR. ROSENBAUM:    I see.

24             MR. McDOWELL:    It is getting it

25   into constant dollars.

1           MR. ROSENBAUM:    Okay.  Well, then

2  tell me what -- you have two price elasticities

3  here, which are the same, except for one is

4  negative and the other isn't.  Can you just

5  explain what those two are, what they are

6  capturing?

7           MR. McDOWELL:    The first one says

8  that if an increase of 1 percent in the all-milk

9  price takes place, in the following year, there

10  will be a .036 increase in the milk per cow.

11           Similarly, with respect to feed

12  value, if a 1 percent increase in feed value

13  takes place, in the current year, there will be

14  a negative .036 percent change in the milk per

15  cow.

16           MR. ROSENBAUM:    So the first of

17  those is capturing what the impact is of milk

18  production per cow as the milk price changes.

19  and the second is capturing what the milk per

20  cow output is as a reflection of changes in the

21  feed value?

22           MR. McDOWELL:    That's correct.

23           MR. ROSENBAUM:    And in both cases.

24  you are eliminating general inflation by

25  dividing it over a CPI all?

118

1              MR. McDOWELL:    Yes.

2              MR. ROSENBAUM:    If you could turn

3    then to the next page, Table 3, we now have

4    some, among other things, some elasticities for

5    various products, correct?

6              MR. McDOWELL:    That's right.

7              MR. ROSENBAUM:    With respect to

8    U.S. fluid milk, the first entry for which you

9    have a parameter that has a corresponding

10   elasticity is Class I price at fluid test, plus

11   over-order premium, over CPI all, correct?

12             MR. McDOWELL:    That's correct.

13             MR. ROSENBAUM:    Once again, the

14   "over CPI all" is simply a way to eliminate

15   general inflation?

16             MR. McDOWELL:    That's correct.

17             MR. CESSNA:    That's correct.

18             MR. ROSENBAUM:    Now, tell me what

19   you are showing here, a 1 percent increase in

20   the price of what results in a negative .048 of

21   what?

22             MR. McDOWELL:    Well, what we are

23   looking at here is the price of milk as

24   delivered to plants.  And so we are estimating

25   that price to be the Class I price, the Federal

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————
                                    )
ARKANSAS DAIRY COOPERATIVE          )
ASSOCIATION, INC, et al.,           )
                     Plaintiffs,    )
                                    )
         v.                         )    Civil Action No. 1:08-cv-01426 (EGS)
                                    )
UNITED STATES DEPARTMENT            )
OF AGRICULTURE                      )
                     Defendant,     )
                                    )
INTERNATIONAL DAIRY FOODS           )
ASSOCIATION,                        )
              Intervening Defendant, )
                                    )
AGRI-MARK, INC, et al.,             )
              Intervening Defendant. )
—————————————————   )

# Exhibit 4

210

1                          VOLUME II

2                   BEFORE THE SECRETARY OF

3        THE UNITED STATES DEPARTMENT OF AGRICULTURE

4               AGRICULTURAL MARKETING SERVICES

5

6    In the Matter of Proposed   ) Docket Numbers

7    Amendments to Tentative     ) AO-14-A77, et al ,

8    Marketing Agreements        ) DA-07-02

9    and Orders                  )

10

11                 National Public Hearing

12                Tuesday, February 27, 2007

13                   9 10 o'clock a m

14                    Holiday Inn Select

15                   15471 Royalton Road

16                Strongsville, Ohio 44136

17

18   BEFORE

19                 JUDGE VICTOR W  PALMER

20               US ADMINISTRATIVE LAW JUDGE

21        UNITED STATES DEPARTMENT OF AGRICULTURE

22

23

24   COURT REPORTERS OF AKRON, CANTON AND CLEVELAND

25                    1-800-804-7787

1    Q.    You talk about rock and a hard place and

2    you talk about regionality.  So let's talk about

3    the rock and the hard place.  Doesn't it reach a

4    point where the economics of concentration and

5    modernization and all these other things that

6    are going on in this global marketplace, that

7    those plants that are geared towards a regional

8    application, that need the higher cost, are not

9    going to be able to do it through modifications

10   of minimum prices and survive in that type of

11   environment?

12   A.    There is that possibility, particularly if

13   we don't have adequate make allowances.  And if

14   that happens, that creates a problem for

15   producers, because they don't have a market for

16   their milk.  It creates a whole array of

17   problems, which we are trying to avoid.

18   Q.    Now, if you have a situation where plants

19   are profitable at making cheddar cheese, for

20   example, and I think you mentioned that they are

21   thinking, "If I am making a profit. I would like

22   to make more profit by making more cheese"?

23   A.    Correct.

24   Q.    Don't we have a situation with too

25   lucrative of make allowances that we will