**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ARKANSAS DAIRY COOPERATIVE** | ) | |
| **ASSOCIATION, INC., et al.,** | ) | |
| | ) | **Case No. 1:08-CV-01426 (EGS)** |
| **--PLAINTIFFS,** | ) | |
| | ) | **Judge Emmet G. Sullivan** |
| **v.** | ) | |
| | ) | **[Oral Hearing Set for** |
| **UNITED STATES DEPARTMENT OF** | ) | **September 16, 2008]** |
| **AGRICULTURE, et al.,** | ) | |
| | ) | |
| **--DEFENDANTS.** | ) | |

**PLAINTIFFS REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A
PRELIMINARY INJUNCTION**

## I.    Introduction and Summary

Dairy Producer plaintiffs meet the requirements for a preliminary injunction. They are likely to succeed on the merits. This Court has jurisdiction and producers have standing to seek immediate judicial review of USDA changes to milk marketing orders that reduce their income. USDA has failed to comply with Section 1504 of the Food, Conservation and Energy Act of 2008. The obligation on USDA imposed by FCEA does apply to the current, ongoing rulemaking to change make allowances because it commenced prior to September 30, 2012 and as of enactment had not concluded with findings and a final decision. The mere fact that the triggering event (commencement of a hearing) occurred prior to the enactment of the statute does not make it retroactive or excuse USDA compliance because at the time of enactment USDA had not made any

1

considerations or determinations such as those mandated by the FCEA.  USDA can, and must, meet all of the requirements of the law as it exists when it amends make allowances in milk marketing orders.

The Formula Rule is also not in accordance with law because USDA has not complied with subsection 18 of the AMAA, which requires that USDA "shall fix such prices as he finds will reflect such factors [the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply] and demand for milk and its products *in the marketing area*..."[1] Neither the USDA nor the Intervenors have identified how USDA met the requirement of the AMAA to consider the impacts of its make allowance changes on each of the affected marketing areas.  The data referenced by the Defendants in support of USDA's actions are not calculated and considered on a marketing order basis.  Instead, they are national figures and even include milk produced in areas outside of the marketing areas.

Finally, the balance of harm analysis favors the Plaintiffs because they will incur unrecoverable losses on all of their milk at a rate of nearly twice that claimed by intervening manufacturers.  In some marketing areas, the ration is 12 to one.  Plaintiffs must fully absorb their losses, while manufacturers have and can continue to  pass the costs of their finished products on to consumers.

The Plaintiffs are thus able to satisfy the requirements for issuance of a preliminary injunction, and an order enjoining USDA from implementing the Formula Decision is appropriate.[2]

---

[1]7 U.S.C.A. § 608c(18) (emphasis added).

[2]Plaintiffs agree with USDA that their claim that at least 30 days notice before implementation of the rule has been rendered moot by USDA's decision to defer implementation until October.

**II.    This court has jurisdiction to hear a claim by Producer Plaintiffs seeking judicial review of a rule that reduces their prices.**

The Supreme Court and this Circuit have held that producers have standing to seek judicial review of milk marketing orders that decrease producer income under the marketing order.  Plaintiffs bring this suit challenging a Final Rule which USDA admits will reduce payments into the producer settlement fund of approximately $250 million the first year.  Unlike dairy processors, Dairy Producers have no administrative remedy available under the AMAA.  Accordingly, dairy producers who challenge a USDA rule which will reduce producer income have standing to seek judicial review.

Although USDA has not questioned the producers' standing to bring this challenge, IDFA (an intervenor in this action) claims that producers do not have standing to seek judicial review.[3] But IDFA's argument stands in conflict with decades of Supreme Court precedent and precedent from this Circuit which has held that producers have standing to bring suits challenging improper regulations which reduce their income.  Fundamentally, because the Act does not provide producers with an administrative remedy, without judicial review, producers would have no ability to protect their interests under the Act.

In its 1944 decision in *Stark v. Wickard*, the Supreme Court appropriately recognized that fact when it noted that producers who voluntarily chose to bring themselves within the Act would

---

[3]IDFA brief at 9-14.

3

do so "without a right of challenge" were the right to judicial review not afforded to them.[4]  The Court acknowledged that in the AMAA, "there is no direct judicial review granted by the statute"[5] but further explained that "[t]he Act bears on its face the intent to submit many questions arising under its administration to judicial review."[6]  The Court further explained that "when Congress passes an Act empowering administrative agencies to carry on governmental activities the power of those agencies is circumscribed by the authority granted.  This permits the Court to participate in law enforcement ..."[7]  The Court held that dairy producers did have standing to challenge agency action.

Forty years later, the Supreme Court again recognized this "presumption in favor of judicial review" when it decided *Block v. Community Nutrition Institute*.[8]  In *CNI*, the Court recited its holding in *Stark v. Wickard* when it said, "This Court determined in *Stark v. Wickard* [internal citations omitted] that dairy producers could challenge certain administrative actions even though the Act did not expressly provide them a right to judicial review."[9] The Court again recognized that because there was "no forum" in which the challenged actions of the Secretary could or would be challenged, judicial review was "necessary to ensure achievement of the Act's most fundamental objectives, to-wit, the protection of the producers of milk and milk products."[10]

---

[4]*Stark v. Wickard*, 321 U.S. 288, 303 (1944).

[5]*Id.* at 307-08.

[6]*Id.* at 308.

[7]*Id*. at 309-10.

[8]*Block v. Community Nutrition Institute*, 467 U.S. 340 (1984).

[9]*Id.* at 351.

[10]*Id.* at 352.

Those Supreme Court holdings remain in effect today and are binding on this Court, despite IDFA's attempts to minimize the impact of those decisions. Similarly, this Circuit has followed the holdings of the Supreme Court and recognized a producer's standing to bring claims such as this. IDFA's legal argument rests in part on its reading of this Circuit's decision in *Benson v. Schofield.*[11] But in that case, the producers did not challenge regulations that impaired the producer settlement fund, which distinguishes those producers from the producers in *Stark v. Wickard* and those bringing the instant challenge. In that way, *Benson* is probably actually consistent with *Stark v. Wickard* which expressly recognized that judicial review was limited to circumstances in which "a complainant possesses something more than a general interest in the proper execution of the laws that he is in a position to secure judicial intervention".[12]

Similarly, IDFA relies on this district court's decision in *Northwest Ind. Dairy Producers Assoc.*[13] for its claim that dairy farmers never have standing. But the facts in that case are completely inapposite to those here as well. In that case, four handlers and one producer sued to enjoin a USDA rule.[14] Ordinarily, producer and handler interests run opposite of each other. Under the unique circumstances presented, the court found that the producer's claims were the same as those of the handlers. Since judicial review of the handlers' claims was precluded by the AMAA's administrative exhaustion requirement, the producer likewise did not have standing.[15] IDFA

---

[11]*Benson v. Schofield,* 236 F.2d 719 (D.C. Cir. 1956).

[12]*Stark v. Wickard*, 321 U.S. at 304.

[13]*Northwest Ind. Dairy Producers Association v. Veneman*, 312 F. Supp. 2d 23 (D.D.C. 2004).

[14]*Id*. at 25.

[15]*Id.* at 27.

inappropriately makes the leap that since the court in *Northwest Ind. Dairy Producers Assoc.* denied manufacturing cooperatives and a dairy farmer standing under the unique facts of that case, dairy farmers must never have standing.

A review of decisions in this and other circuits shows that IDFA's claim that producers are without standing is nothing more than disingenuous stretching of a few factually distinguishable cases in order to misrepresent the state of the law regarding a producer's right to judicial review. For instance, about ten years after *Benson* was decided, this Circuit held that "Appellants, Pennsylvania *dairy producers ... have standing* to present their claim that the nearby differential provision exceeded the statutory power of the Secretary."[16] The Court explained that the producer appellants had standing "to invoke the protection of equity to insure that their statutory right to minimum price protection is not being improperly diminished."[17] This is exactly the situation here; producers are seeking to preserve their minimum price protection from diminution.

In more recent years, the issue of standing under the AMAA has centered on whether the party bringing the challenge is a "producer" or a "handler." In *Edaleen Dairy, LLC v. Johanns*, this Circuit again considered the issue of producer standing in the case of a producer-handler, a hybrid operating as both a producer and a handler.[18] This Circuit distinguished the right to initially seek judicial review between entities who were suing in their capacity as a handler and those suing in their capacity as a producer. In *Edaleen,* this Circuit affirmed prior decisions which held that a person asserting a handler interest must exhaust administrative remedies before acquiring a judicial

---

[16]*Blair v. Freeman*, 370 F.2d 229, 234 (D.C. Cir. 1966) (emphasis added).

[17]*Id*. at fn 15.

[18]*Edaleen Dairy, LLC v. Johanns,* 467 F.3d 778 (D.C. Cir. 2006).

right of review, but went on to find that, "In contrast, when a producer-handler asserts an injury *in its capacity as a producer*, then it may be able to immediately bring suit in district court."[19] To the extent that *Benson* could be read so as to foreclose producers' access to the courts, the *Edaleen* decision certainly overrules it. No claim has been made, as none can be made, that Dairy Producers are not suing to protect producer interests.

A producer's standing to challenge agency action has been widely recognized in other circuits as well. For instance, in *Alto Dairy v. Veneman*,[20] the Seventh Circuit held that the Administrative Procedure Act provided statutory jurisdiction for a producer's challenge to a flawed on-the-record rulemaking under the AMAA. Judge Posner clearly stated the holding in *Alto*, "we conclude that producers can seek judicial review of marketing orders that pinch them."[21] In reaching that conclusion, the Seventh Circuit relied on the Second Circuit's decision in *Dairylea Co-op v. Butz*,[22] which held that "Dairylea is a *producer* and as such was not required to exhaust any administrative remedy before invoking the jurisdiction of the District Court and indeed had no administrative remedy to exhaust."[23]

The Fifth Circuit has also allowed producer cooperatives to challenge the merger of some smaller orders.[24] The Sixth Circuit has held that producers could bring a legal challenge to USDA

---

[19]*Id.* (emphasis added).

[20]*Alto Dairy v. Veneman,* 336 F.3d 560 (7th Cir. 2003).

[21]*Id.* at 569.

[22]*Dairylea Co-op. v. Butz*, 504 F.2d 80 (1974).

[23]*Id.* at 82 (emphasis added).

[24]*Suntex Dairy v. Bergland*, 591 F.2d 1063, 1065-67 (5th Cir.1979).

actions making changes to the zone adjustments within an order.[25]  In that case, the Sixth Circuit

rejected the Ninth Circuit's holding in *Pescosolido v. Block*,[26] which had held that a producer's sole

remedy was voting on the order and determined that *Pescosolido* was an extreme decision, noting

that "the purpose of the AMAA is wealth distribution in favor of milk producers."[27]  The *Farmers*

*Union* court also noted that  "the purpose of the AMAA strongly favors judicial review of aspects

of market orders that concern producers in lawsuits brought by producers."[28]  It also said, "We

believe that the legislative purpose of increasing producers' prices would be furthered by allowing

them to challenge actions that they believe reduce those prices illegitimately."[29]

Finally, the Eight Circuit in *Minnesota Milk Producers Assn. v. Madigan,* followed the Sixth

Circuit in *Farmers Union* finding its analysis of *Community Nutrition* and rejection of *Pescosolido*

persuasive.[30]  Given this long series of decisions, including decisions of the Supreme Court and this

Circuit, the only proper decision is that Dairy Producers have standing to bring this challenge.  The

Intervenors' argument is without merit and unsupported by the law.

### III.    Section 1504(G) of the Food, Conservation and Energy Act of 2008 applies to this rulemaking proceeding.

The issuance by USDA of the Formula Decision on June 20, 2008, was that step in adjusting

make allowances which Congress contemplated to be the "part of *any hearing*. . . commencing prior

---

[25] *Farmers Union Milk Marketing Co-op v. Yeutter*, 930 F.2d 466, 471-74 (6th Cir. 1991).

[26]*Pescosolido v. Block*, 765 F.2d 827, 832-33 (9th  Cir. 1985).

[27]*Farmers Union*, 930 F.2d at 474.

[28]*Id*. at 473.

[29]*Id* at 474.

[30]*Minnesota Milk Producers Assn. v. Madigan,* 956 F.2d 816, 818 (8th Cir. 1992).

to September 30, 2012 "[31] wherein the USDA would make the determinations and considerations mandated by the FCEA. Intervenor Agri-Mark alone argues that the FCEA was enacted after the date USDA issued its Formula Decision. Agri-Mark is incorrect about the date of enactment. The FCEA was first enacted into law on May 22, 2008, which is its effective date. The USDA Formula Decision was published on June 20, 2008, nearly a month after the FCEA became law.

At the time that USDA's determinations and considerations were made, the FCEA was law and the Secretary was bound to follow the law at the time he performed his duties. USDA argues, nonetheless, that it is excused from complying with the FCEA because prior to its enactment, the Secretary had already completed some parts of the hearing. Since the FCEA was unknown at the time the hearing commenced, the Department argues, it cannot be bound to adhere to it, even though the findings and determinations of the proceeding had not been made and the rulemaking had not been completed.

The FCEA requires the Secretary to make specific determinations and consider those results in adjusting make allowances. The Secretary makes determinations and findings, not during the evidentiary hearing, as USDA urges, but subsequent thereto when he issues a decision on the evidence. The USDA Rules of Practice for Formulation of rules provides:

> After due consideration of the record, the Secretary shall render a decision. Such decision shall become a part of the record and shall include: (a) A statement of his findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law or discretion presented on the record,* * *[32]

---

[31]Pub. L. No. 110-246 §1504(G), 122 Stat. 1651 (2008) (emphasis added).

[32]7 C.F.R. §900.13a.

Determinations of costs of feed and fuel incurred by producers and consideration of those when adjusting make allowances would have occurred when USDA issued a decision. In the instant case, that would be the June 20 Formula Decision.

As an example of how the Secretary makes such determinations and considerations, one need only look at the Secretary's Regulatory Flexibility Act analysis in the Formula Decision:

> In accordance with the Regulatory Flexibility Act (5 U.S.C. 601–612), the Agricultural Marketing Service **has considered** the economic impact of this action on small entities.[33]

Similarly, in accordance with the RFA, the Secretary "determines" what businesses that act encompasses when it says,

> For the purposes of **determining** which dairy farms are small businesses, the $750,000 per year criterion was used to establish a production guideline of 500,000 pounds per month.[34]

In short, the argument that a termination of the evidentiary proceeding forecloses the Secretary from complying with the FCEA is not only wrong as a matter of the Secretary's own procedures and processes, but creates an absurdity wherein the Secretary would be obligated to consider data and make determinations before he even has a record to consider. That is, to accept the USDA's position is to create a nonsensical statute.

The obligation to take action under the FCEA "as a part of any hearing" has to be read in the context of the process of rulemaking. In Subsection 1504(C), Congress provides "Hearing

---

[33]73 Fed. Reg. 35306 (June 20, 2008) (emphasis added).

[34]*Id.*

10

Guidelines" recognizing that the hearing includes more than just the evidentiary phase. Even the Secretary refers to the rulemaking proceedings in their totality, not just the evidentiary phase, as hearings. USDA/AMS/Dairy Programs website has information on "National Hearings" and Regional Hearings" wherein all of the aspects of the hearing process are included from the opening proposal through publication of the rule.[35]

The Secretary's obligation is thus prospective, not retroactive. Compliance with the law cannot be judged based on what the Secretary did before the FCEA, but what he does afterwards, and in this case, what he did in the Formula Decision. Even though parts of the hearing, including the evidentiary hearing, had occurred already the Secretary had yet to issue his findings and determinations. The additional requirements imposed by the FCEA could have and should have been met.

The enactment of the FCEA created several options for USDA. One option is to use evidence already present in the record to comply with the FCEA, if possible. USDA and Intervenors argue that the evidence was before the Secretary in the form of monthly reports of costs incurred in producing milk by state, not marketing area.[36] The Secretary could review that data and determine whether he might be able to derive the costs "within the marketing area" as required by the FCEA.

The problem, of course, is that data referred to by USDA and the Intervenors is state specific. But the federal marketing areas are not subject to state political lines. For example, the Pacific Northwest marketing area overlaps portions of three states, the Northeast area includes portions of

---

[35]<<http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELDEV3018680>>.

[36]USDA at 9, IDFA at 16-17.

eleven states,[37] the Southeast area includes nine states, the Central area includes seven states, and the Appalachian area includes portions of eight states.  Several states are split between marketing areas, including Kentucky, Tennessee, Wisconsin, Missouri, Pennsylvania and Florida.[38]  The argument that existing data could satisfy the FCEA fails to recognize that the law **requires** USDA to determine the specific costs for the marketing areas, not individual states.  There is nothing in the record demonstrating that such marketing area costs have been determined, as required by the FCEA.

The Secretary also has the option to accept additional testimony on the issue of feed and fuel costs and accept comments thereon.  The USDA did just this in a prior Make Allowance hearing during 2006.  It held an evidentiary hearing January 24-27, 2006.[39]  Comments and exceptions were filed by February 27, 2006.  But rather than issue a decision, USDA published a notice requesting additional evidence.  The hearing was continued on September 14–15, 2006 and additional evidence was taken.[40]  Likewise, in this hearing, USDA accepted as evidence a CDFA report issued after the evidentiary portion of the hearing closed and briefs were filed and the ALJ had certified the record.

Of course, based upon the change in the law, USDA could also have terminated the proceeding by finding it no longer effectuated the Act.

---

[37] 7 C.F.R. §1001.2.

[38] A map of the federal milk marketing orders is available online at<<http://www.ams.usda.gov/dairy>> and clicking the link at the bottom right of the page (accessed on September 2, 2008).  A copy is submitted as Appendix 2 to this Reply Brief.

[39] 71 Fed. Reg. 545 (January 5, 2006).

[40] 71 Fed. Reg. 52505 (September 6, 2006).

To be sure, the standards applicable to this still open rulemaking have been changed by statute. But none of the parties, proponents of rule changes, intervenors, or plaintiffs have any vested right to a particular result in the rulemaking proceeding. Compliance with the FCEA will not impose upon any party an obligation to reorder contracts or affairs completed in the past. Congress has imposed criteria and standards which the Secretary must meet. The parties rights, if any, in these proceedings are that the USDA complies with those rules and laws. Thus, application of the vesting of rights as argued by the government is not sustainable.[41]

USDA also incorrectly argues that Plaintiffs wish to apply the FCEA to all make allowance hearings, open or closed:

> In contrast, plaintiffs simplistic construction that §1504 applies to all hearings, regardless of their date of conclusion is without limiting principle. It would require the agency to reopen not just the present hearing, but also presumably all make allowance hearings extending back to the adoption of the product-pricing formulas, including the hearing that formed the basis for the make allowances presently in effect.[42]

This assertion wholly misstates Plaintiffs' claim. The only proceedings that the FCEA can apply to are those that have not yet resulted in a decision. The argument set forth by USDA is just another red herring offered to distract from the fact that USDA did not comply with the FCEA in this instance.

---

[41]USDA brief at 27.

[42]USDA brief at 26-27.

USDA further argues that, ". . . any ambiguity in the meaning of the term 'hearing' in § 1504(G) must be resolved by reference to the agency's reasonable construction of that term."[43] Such an argument fails in several ways— the USDA publishes a website wherein the term "hearing" covers the entire process, USDA has never given an explanation of how FCEA implicates make allowance hearing, and regardless, the scope of the term is not the critical issue. The point of the statute is that in "any hearing" commenced before September 2012, then FCEA is implicated. The evidentiary "hearing" is not the place where compliance could occur, but the event which compels agency action. The fact that the rulemaking hearing had and the Secretary had not yet made his determinations and conclusions at the time the FCEA was enacted mandates that the Secretary meet the requirements of the FCEA in his analysis.

USDA performed an econometric analysis which, it is argued, complies with the requirements of the FCEA. The FCEA specifically requires that USDA "consider the most recent monthly feed and fuel price data available."[44] But the economic analysis performed by USDA was run in March 2008, three months before USDA issued the Formula Rule. Further, the econometric model relied upon by USDA uses baseline feed and fuel price data updated in February 2007.[45] Since that baseline was published, not only has another baseline been issued, but unprecedented increased in both the price of milk and the cost of feeds and fuels have occurred. Quite simply, if the use of an econometric analysis would satisfy FCEA, which Dairy Producers contends is not the case, the use of this econometric analysis using a baseline nearly 18 months stale at the time of

---

[43]*Id*. at 26.

[44]FCEA, § 1504(G)(ii).

[45]*See* Economic Analysis p. 3. The econometric analysis was previously provided to the Court in the Plaintiffs' submission of exhibits to their opening brief.

publication is not "the most recent monthly feed and fuel price data available" as mandated by the FCEA.

## IV.    USDA also failed to comply with the broader requirements of §608c(18).

As explained in Dairy Producers' opening brief, USDA also failed to consider the mandatory factors set forth in Section 17 of the AMAA.[46]    The dual requirements of Section 17 are that minimum price formulas ""reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products"[47] and that such analysis be tailored to "the marketing area to which the contemplated marketing agreement, order, or amendment relates."[48]    As explained further below, the arguments of the Defendants on these two points miss the mark.    The econometric analysis relied upon to support the consideration of feed costs and economic conditions is, at best, an indirect consideration of such factors and rather than ensure that formulas "reflect" these economic factors is merely uses them to model an economic response to changes in the make allowances.    As for the requirement that a marketing area level analysis be performed, the argument from intervenor IDFA is not a defense of compliance, but rather a defense that such analysis is not required.

Intervenor Agri-Mark extensively describes USDA's base line model to attempt to explain how USDA complied with both the provisions of Subsection 18 and the new Subsection 17 in the AMAA.[49]    Though feed and fuel costs appear to be part of the model, its purpose as expressed by

---

[46]Plaintiffs' brief at 12-17.

[47]7 U.S.C. § 608c(18).

[48]*Id*.

[49]Agri-Mark at pp. 9.

Dr. McDowell is "Again, our model is projecting changes off the baseline, with respect to policy changes dealing with dairy."[50]  In short, the model expresses, in the case of the proposed make allowances, how much income producers will lose.  It is summarized in the March Economic Analysis and shows the loss of approximately $250 million in the first year as "respect to policy changes dealing with dairy."

Contrast the function of the econometric baseline with the mandate of the AMAA.  It requires that the Secretary:

> . . . shall fix such prices as he finds will reflect such factors [the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order], insure a sufficient quantity of pure and wholesome milk, and be in the public interest.[51]

The model is not designed to provide information as a proactive input into the fixing of prices so that USDA can make minimum prices reflective of certain factors, but, instead, is a review of the effect of the change in dairy policy after the changes have been decided.  That is, the model's result is driven not by changes in the costs of the production of milk, but in the change in the prices of the milk.  Congress, in Subsection 18, wanted USDA to set prices for the benefit of producers in response to their input costs.  But instead, USDA has simply measured how much damage producers suffer when make allowances are changed.

---

[50]McDowell Tr. at p 196 (Feb. 26, 2007).

[51]7 U.S.C. § 608c(18).

16

This type of consideration has been politely labeled "indirect" consideration of the feed and fuel factors. And this indirect consideration was deemed insufficient by the District Court of Vermont.[52] That court explained that, "[h]ad such indirect consideration been sufficient, Congress would not have gone to such lengths in drafting § 608c(18)'s explicit requirements that feed costs and other regional economic considerations be accounted for in the setting of milk prices."[53] In a challenge to USDA's last amendment to make allowances, the District Court for the Northern District of Ohio found that Congressional action following the decision in *St. Albans* indicated that indirect consideration was sufficient.[54]

Of course, neither *St. Albans* nor *Bridgewater Dairy* are binding precedent on this Court. But it is worth noting that just as Congress acted to force the Secretary to act following the *St. Albans* decision (which was interpreted by the *Bridgewater Dairy* court as Congressional dislike for the St. Albans holding) Congress amended the AMAA through Section 1504 of the FCEA to add additional more precise requirements in the case of make allowance amendments. If indirect consideration of the Section 18 economic factors was acceptable when *Bridgewater Dairy* was decided (which Dairy Producers maintain was unacceptable), passage of the FCEA exhibits Congressional intent to respond to that decision. In the wake of the FCEA, something more must be required. And USDA had failed to meet those requirements. But in any event, USDA has not met the second element of Subsection 18 consideration.

---

[52]*St. Albans Co-op. Creamery, Inc. v. Glickman*, 68 F. Supp. 2d 380, 391 (D. Vt. 1999).

[53]*Id.*

[54]*Bridgewater Dairy, LLC v. USDA*, 2007 WL 634059 at * 5 (N.D. Ohio, Feb 22, 2007).

Subsection 18 requires the Secretary to measure these factors within the marketing areas. The econometric model covers the entire nation and includes areas where approximately one–third of the nation's milk, which is not part of any federal marketing area. Subsection 18 requires more–a consideration economic conditions of the marketing area to which the amendment relates.

Each marketing area is unique. As set forth infra, the relative percentage of manufacturing grade milk in each marketing area varies dramatically, as to other economic factors, including feed costs, transportation, and labor. The court need only look at the geographical alignment of the cooperative parties to this action to see that what works for the Northeast (Agri-Mark's region of influence) does not work for the Southwest, Arizona, and Southeast, where the Plaintiff cooperatives represent approximately 40% of milk production. The Secretary's failure to perform any meaningful analysis on a market-by-market basis violates the requirements of Subsection 18.

The arguments from IDFA that the Secretary has long utilized a national manufacturing price formula[55] does not relive the Secretary of his responsibility under the AMAA and miscategorizes the argument of Dairy Producers. IDFA argues that the Secretary may properly adopt a single national manufacturing price and cites a litany of prior rulemaking to illustrate that point. The language of the AMAA speaks for itself more than does the categorization of prior rulemakings cited by IDFA. But the argument of IDFA misses the point. The Secretary may, in fact, adopt a national manufacturing price, **after a consideration of the factors in Section 18**. Nothing in the AMAA prevents the Secretary from considering the economic conditions in the various marketing areas and then establishing a single manufacturing formula at a level appropriate given the regional economic considerations.

---

[55]IDFA brief at 27-32.

It may be that in this case, the Secretary retains a single manufacturing price after considering the economic conditions in each of the marketing areas. But that formula might be quite different  if the Secretary gives due consideration to economic considerations in the various marketing areas. Or, the Secretary might determine that multiple price formulas is appropriate. The important point is that on the record here, the Secretary failed to give any consideration to the economics of the individual marketing areas.

The failure of the Baseline Model to meet the Subsection 17 standards is even greater. Congress has directed the USDA to determine monthly, by marketing area, the costs of feed and energy incurred by producers. The model does not do that. There is no table or report by NASS or anyone else that tells this Court or anyone what the costs of those inputs are in any of the marketing areas. Nor does the model show how those input costs were considered when determining whether or not to adjust the make allowances.

Congress was dissatisfied with USDA's consideration of producers' costs under the existing Subsection 18. It mandated new criteria when it enacted the FCEA, specifically Section 1504(G). Compliance with Subsection 18, cannot, therefore, mean compliance with Section 1504.

The importance of the fuel change is not immaterial. As was identified by several witnesses at the hearing, increases in energy costs result in increases in the cost to produce milk through higher costs for planting and harvesting crops, for feeding cattle, for operating barns, for cooling milk, and for hauling milk to the market. The only place these costs can be recovered is in the sale of the milk. What USDA has done in the Formula Decision and in earlier adjustments to make allowances is to shift an additional energy burden onto producers by having them guarantee that any change in energy will be covered by producers, not by the sale of finished products. Because producers are

losing money, it is not just shifting of costs, but actual wealth of the farm to consumers. This contradicts the purpose of the AMAA, which is "wealth redistribution in favor of milk producers."[56]

The requirement that USDA determine and consider these primary costs of production forces USDA to recognize that it is asking producers, in some cases and in some market areas, to produce milk at less than cost and to consider that when setting make allowances. Merely burying the loss of farms and milk production in a model is not compliance with the Act.

## V.    The Balance of Harm weighs heavier on Plaintiffs than others.

In their opposition the Intervenors claim that every dollar the plaintiffs and dairy producers lose would also be lost by the intervenors if relief is granted. This is not true. The Intervenors represent manufacturers of Class and IV products. They manufacture the cheese, butter, and powder that was the target of the regulations. Ancillary to these manufacturers are those plants which manufacture Class I and II products (beverages, creams, and yogurt). They capture their "make allowance" in their added value plants. Because Class I and II are "advanced Class III and IV" prices, producers will receive lower minimum prices when the make allowances are increased for cheese and butter-powder operations. The loss of income to producers from Class I and II is not income to manufactures of cheese and powder.

This is illustrated in the Federal Milk Order Marketing and Utilization Summary for July 2008.[57] The following table uses the values from that USDA report and shows on an average, that producers will lose $1.92 for every dollar that manufacturer plants do not gain by lower milk costs.

---

[56]*Farmers Union*, 930 F.2d at 475

[57]Federal Milk Order Marketing and Utilization Summary, July 2008 <<http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5071809>> (accessed on August 31, 2008). A copy is submitted as Appendix 1 to this Reply Brief.

| Order | Class I and II | Class III and IV | Ratio Producer to Manufacturing Plant |
|---|---|---|---|
| Northeast | 61 | 39 | 2.56 |
| Appalachian | 88 | 11 | 9.09 |
| Southeast | 80 | 20 | 5.00 |
| Florida | 92 | 8 | 12.50 |
| Mideast | 56 | 44 | 2.27 |
| Upper Midwest | 20 | 80 | 1.25 |
| Central | 52 | 48 | 2.08 |
| Southwest | 42 | 58 | 1.72 |
| Arizona | 39 | 61 | 1.64 |
| Pacific Northwest | 34 | 66 | 1.52 |
| Average | 48 | 52 | 1.92 |

Further, unlike plants who can, and currently are, passing on the cost of milk to their customers, producers do not have the ability to pass on the reduced income of their only sale to any one except the profit and loss and from their to their equity. In short, it is a transfer of wealth from the producers to the processors.

The Intervenors claim that the loss of millions of dollars to producers, as calculated by the USDA econometric analysis is not a loss, because producers could contract for higher prices. But the exact purpose of minimum prices is to guarantee producers a certain minimum return. USDA's own econometric analysis confirms that producer losses are real, certain, and result from decreases to the minimum prices that are not offset by over-order premiums.

Alternatively, the Intervenors argue that USDA would not change its mind if it complied with the law, and that Dairy Producers' claims are therefore not viable. But this statement is wholly

21

conclusory.  Knowing that USDA did not consider all of the factors that Congress had ordered it to determine and consider, USDA might very well arrive at a different decision once it performs the required analyses of the FCEA and AMAA.

## VI.    Conclusion

The USDA not only can, but must, comply with the Food Conservation and Energy Act of 2008.  Holding a hearing on make allowances prior to 2008 triggered the compliance.  Further, it is clear that Plaintiffs will succeed on the claim the Secretary has failed to comply with subsection 18 because he has failed to analyze the Formula Rule on an order-by-order basis.  That there is no question that producers will be irreparably harmed, issuance of a preliminary injunction would be appropriate.

WHEREFORE, the Plaintiffs respectfully request that this Court grant Plaintiffs injunctive relief and order USDA, its agents and attorneys and those persons in active concert or participation with them who receive actual notice of this order be restrained, until further order of this Court, from implementing the adjusted make allowances in amendments to the regulations found at 7 C.F.R. Parts 1000 - 1131, Proposed Rule; Tentative Partial Final Decision, 73 Fed. Reg. 35306 (June 20, 2008) and Interim Order Amending the Orders, 73 Fed. Reg. 44617 (July 31, 2008).

Respectfully submitted,

YALE LAW OFFICE, LP

/s/ Benjamin F. Yale

BENJAMIN F. YALE, OHIO 0024730
D.C. District Court No. OH 00068
527 North Westminster Street
P.O. Box 100
Waynesfield, Ohio 45896
419-568-5751
Fax 419-568-6413
ben@yalelawoffice.com
Counsel for Cooperative Plaintiffs


THE MILTNER LAW FIRM, LLC

/s/ Ryan K. Miltner

RYAN K. MILTNER, OHIO 0075405

D.C. District Court No. OH 0006
527 North Westminster Street
P.O. Box 477
Waynesfield, Ohio 45896
419-568-2920
Fax 419-568-6413
ryan@miltnerlawfirm.com
Counsel for Dairy Producers of New Mexico

## FEDERAL MILK ORDER MARKETING AND UTILIZATION SUMMARY, JULY

**HIGHLIGHTS.**  Handler reports of receipts and utilization under the Federal milk order system for July have been filed and tabulated.  Combined totals for the 10 consolidated orders are being released.  During July, about 10.0 billion pounds of milk were received from producers.  This volume of milk is 0.2 percent higher than the July 2007 volume.  In July 2007, there was a significant volume of milk not pooled due to intraorder disadvantageous price relationships.  About 3.5 billion pounds of producer milk were used in Class I products, 1.2 percent higher than the previous year.  Calendar composition likely had a positive impact on milk used in Class I in 2008 as compared to 2007.  The all-market average Class utilization percentages were: Class I = 35%, Class II = 13%, Class III = 39% and Class IV = 13%.  The weighted average statistical uniform price was $20.06 per cwt., $0.61 higher than last month and $2.29 lower than last year.

| PRICE AND POOL STATISTICS FOR FEDERAL MILK ORDER MARKETING AREAS FOR THE MONTH OF JULY 2008 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| FEDERAL MILK ORDER MARKETING AREA 1/ | ORDER NUMBER | RECEIPTS OF PRODUCER MILK | | UTILIZATION OF PRODUCER MILK IN CLASS I | | | UTILIZATION OF PRODUCER MILK IN OTHER CLASSES | | | UNIFORM PRICE 2/ |
| | | TOTAL | CHANGE FROM PREV. YEAR | TOTAL | CHANGE FROM PREV. YEAR | PERCENT | CLASS II | CLASS III | CLASS IV | |
| | | MIL. LBS. | PERCENT | MIL. LBS. | PERCENT | | | PERCENT | | $ PER CWT. |
| Northeast (Boston) | 001 | 2,050.5 | 5.6 | 831.1 | 1.9 | 40 | 21 | 24 | 15 | 20.61 |
| Appalachian (Charlotte) | 005 | 476.5 | -0.9 | 330.8 | 1.0 | 69 | 19 | 5 | 7 | 22.31 |
| Southeast (Atlanta) | 007 | 539.9 | -3.9 | 365.7 | -1.1 | 68 | 12 | 12 | 8 | 22.68 |
| Florida (Tampa) | 006 | 244.4 | -1.6 | 204.2 | 2.7 | 84 | 8 | 4 | 4 | 24.89 |
| Mideast (Cleveland) | 033 | 1,389.2 | -5.3 | 505.6 | 1.4 | 36 | 20 | 35 | 9 | 19.71 |
| Upper Midwest (Chicago) | 030 | 2,383.8 | -0.3 | 348.9 | 2.3 | 15 | 5 | 77 | 3 | 18.90 |
| Central (Kansas City) | 032 | 930.8 | -5.7 | 327.3 | -1.3 | 35 | 17 | 31 | 17 | 19.38 |
| Southwest (Dallas) | 126 | 1,034.3 | -1.4 | 324.2 | 3.4 | 31 | 11 | 38 | 20 | 20.09 |
| Arizona (Phoenix) | 131 | 328.3 | 5.7 | 105.2 | -1.5 | 32 | 7 | 32 | 29 | 19.31 |
| Pacific Northwest (Seattle) | 124 | 665.5 | 12.9 | 180.1 | 1.5 | 27 | 7 | 33 | 33 | 18.94 |
| **ALL MARKET AVERAGE OR TOTAL** | 3/ | 10,043.2 | 0.2 | 3,523.1 | 1.2 | 35 | 13 | 39 | 13 | 20.06 |

1/ Names in parentheses are the major city in the principal pricing point of the market.
2/ Statistical uniform price for component pricing orders (Class III price plus producer price differential).  For other orders, uniform skim milk price times 0.965 plus uniform butterfat price times 3.5.
3/ In July 2007, due to a disadvantageous relationship between intraorder class prices and the location adjusted statistical uniform (blend) price in Order Nos. 030, 032, and 124, handlers elected not to pool an estimated 300 million pounds of milk that normally would have been associated with these markets.  After adjusting for not-pooled milk, the year-to-year percent change is -2.9%.

Case 1:08-cv-01426-EGS    Document 17-3    Filed 09/03/2008    Page 1 of 1

# Federal Milk Marketing Order Areas

