**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                              )
ARKANSAS DAIRY COOPERATIVE,    )
Inc., et al.,                  )
                              )
            Plaintiffs,        )
                              )        Civ. No. 08-1426(EGS)
       v.                      )
                              )
UNITED STATES DEPARTMENT OF    )
AGRICULTURE,                   )
                              )
            Defendant,         )
                              )
       And                     )
                              )
INTERNATIONAL DAIRY FOODS      )
ASSOCIATION, and AGRI-MARK,    )
Inc., et al.                   )
            Defendant-         )
            Intervenors        )
                              )
_____)


**MEMORANDUM OPINION**

     This case was filed by a group of dairy producers and

cooperatives seeking declaratory and injunctive relief from an

interim final order of the U.S. Department of Agriculture

("USDA") that reduces the minimum prices dairy farmers receive

under federal milk marketing orders ("FMMO").[1]  Plaintiffs

_____

[1] Plaintiffs include the Arkansas Dairy Cooperative Association,
Inc. of Damascus, AZ; Central Sands Dairy, LLC of Nekoosa, WI;
Columbia River Dairy, LLC of Boardman, OR; Continental Dairy
Products, Inc of Artesia, NM; Dairy Producers of New Mexico of

contend that they would be irreparably harmed by allegedly unlawful changes to the minimum price formulas used to determine prices paid to dairy farmers.  They maintain that the interim final rule that increases the "make allowance"[2] factors in the formulas that establish the federal minimum milk price are unlawful and must be set aside because the regulation failed to consider factors mandated by the Food, Conservation, and Energy Act of 2008 ("FCEA"), Pub L. 110-246, § 1504, 122 Stat. 1651, 1721 (2008), codified at 7 U.S.C. § 608c(17)(G) and the Agricultural Marketing Act of 1937, as amended 7 U.S.C. §§ 602, *et seq.* ("AMAA").  Plaintiffs originally argued that the order was unlawful because it was scheduled to take effect only twenty-two days after it was promulgated, whereas the statute requires at least thirty days notice.  After this lawsuit was filed, USDA postponed the effective date of the amendment; Plaintiffs and Defendants agree that the notice issue is now moot.

Plaintiffs further allege that USDA's decision was based on speculation, was arbitrary and capricious, and that the USDA

---

Roswell, NM; Lone Star Milk Producers, Inc. of Windthorst, TX; Maryland and Virginia Milk Producers Cooperative Association of Reston, VA; Select Milk Producers, Inc. of Artesia, NM; United Dairymen of Arizona of Tempe Arizona; and Zia Milk Producers, Inc. of Roswell, NM.

[2] A "make allowance" is a USDA-regulated and fixed margin between the wholesale price of commodity dairy products and the regulated milk price that product manufacturers may pay to producers.

denied them the right to participate in the hearing process when making its decision.

USDA argues that Plaintiffs are improperly attempting to set aside extensive and careful decision-making by USDA in the complex area of milk price regulation.  USDA contends that Plaintiffs' motion should be denied because they have failed to make any of the required showings for such relief.  USDA maintains that Plaintiffs have not accurately evaluated the harm to dairy manufacturers nationwide if their motion is granted and that the public interest strongly favors permitting the new regulations to go into effect.  Intervenor-Defendant International Dairy Foods Association ("IDFA") argues that this Motion should be denied for lack of standing.

Upon consideration of the motion, the responses and replies thereto, oral argument made at the hearing, and the applicable law, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction.

### I. BACKGROUND

The USDA administers and modifies FMMOs under the authority of the AMAA, which was first enacted by Congress in 1937.  *See* 7 U.S.C. § 608c(7).  USDA regulates milk prices in order to advance market stability, supply adequacy, milk cost equity between handlers, and milk price equity between producers.  *See* 64 Fed. Reg. 16,026, 16,109 (April 2, 1999).  USDA is concerned

with a "more efficient pricing structure that offers cost savings in the organization of the nation's milk supply and in the transportation of milk and dairy products." *Id.* at 16,113.

FMMOs "provide[] a uniform blend price for sellers of raw milk while imposing nonuniform obligations on the dealers purchasing that milk." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 189 n.1 (1994). "[S]ince Federal order prices are minimum prices, handlers may increase their pay prices in response to changing supply/demand conditions even when Federal order prices do not increase." 67 Fed. Reg. 67,905, 67,911 (Nov. 7, 2002). "The formulas are used to establish minimum prices for milk used in making particular dairy products, not for determining payments to dairy farmers." *Id.*

Since fluid milk commands a higher price than milk that is used in the manufacture of other dairy products, the price of milk is determined by the end use of it, even when the milk is of the same quality. *See Alto Dairy v. Veneman*, 336 F.3d 560, 562 (7th Cir. 2003). For the purposes of the FMMOs, however, USDA classifies milk according to its end use: Class I (for fluid milk products); Class II (for soft dairy products like yogurt and cottage cheese); Class III (for hard and spreadable cheeses); and Class IV (for butter, evaporated milk, and dried milk). *See* 7 C.F.R. § 1000.40.

The "make allowances" used in Class III and Class IV prices are uniform throughout the country because USDA determined that manufactured dairy products compete in a national market. *See* 59 Fed. Reg. 42,422 42,424 (Mar. 10, 1994). The make allowance rate remains constant even as product prices may increase or decrease substantially. Though Class I prices begin with the uniform Class III and IV calculations, Class I prices vary by milk marketing order because Class I prices are adjusted by location-specific "differentials" that account for local supply and demand. *See* 7 C.F.R. § 1000.52. The minimum price for milk components used to make Class II products is determined by adding seventy cents per hundredweight (100 pounds) to the Class IV price, *Id.* § 1000.50(e), and the minimum prices for milk components used to make Class I products is determined by adding a fixed "differential" (which varies by geographic location) to the higher of the Class III or IV price in a given month, *id.* §§ 1000.50(a), 1000.52.

After USDA sets make allowances, milk producers are then guaranteed to be paid a uniform minimum price for the milk they sell to handlers, regardless of the end use. This ensures that producers who sell milk to a fluid processor do not get a higher price than producers who sell to a cheese plant. See 7 U.S.C. § 608c(5)(B)(ii). Only two-thirds of milk production in the United States is subject to the orders; the other one-third is

subject to state orders, or no orders.  USDA issues regional milk orders that govern terms and conditions for the sale of dairy products in specific geographical regions.  *See* § 608c(11)(C).

Under the FMMOs, a dairy plant pays, and a dairy producer receives, minimum prices in the form of federally established "component prices" for butterfat, protein, solids not fat, and other solids, or skim-fat prices that are derived from those component prices.  *See* 7 C.F.R. § 1000.50.  There are three factors that are used in the pricing formulas:  (1) prices of certain dairy products surveyed by the National Agricultural Statistics Service ("NASS"); (2) a make allowance; and (3) a yield.  *See id.*  The levels of each of these factors affect the price that plants pay for raw milk and, ultimately, how much producers received for their milk.  Adjustments in any of these factors will impact pricing.

The make allowance and the yield are fixed by rule; the product prices are determined weekly by NASS.  *See id.*  Every Friday morning, NASS reports the prices of certain cheeses, butter, non-fat dry milk, and dry whey.  USDA then announces the advanced prices based on the weighted average of two weeks of NASS prices.  *Id.*  The make allowances represent the allowance for manufacturing raw milk into a finished product.  Changes to the make allowance have an inverse relationship to the resulting

changes in the minimum prices.  Producers benefit from lower make allowances, and manufacturers benefit from higher make allowances.  The yield factor represents the amount of a manufactured dairy product that can be produced per hundredweight (100 pounds) of milk.  USDA accounts for the portion of the price of milk that is attributable to the costs of the manufacturing process through the make allowance.  When the price of manufactured goods is raised, however, USDA recaptures the cost by reporting a higher price for the wholesale product prices to NASS.  As a result, any increase in the selling price of manufactured goods used to produce milk will increase the price manufacturers must pay producers for raw milk.  *Id.*

The pricing formulas are changed through formal rule-making hearings.  *See* 7 C.F.R. §§ 900.3–900.18.  After the close of the evidentiary portion of the hearing, exceptions and comments are filed by interested parties and an administrative law judge certifies the transcript to USDA.  *See id.* §§ 900.9–900.10. Dairy Programs, a division of USDA, then prepares and submits a recommendation to USDA.  The recommendation details the findings of fact, rationale, and the legal authority for its decision. *See id.* § 900.12.  After Dairy Programs has issued its recommendation, another round of comments follow, and a referendum on the order, as amended, is held.  Producers facing

a referendum must choose between voting out the entire marketing order or approving the amended order.  There is no vote on the amendment itself.  If the referendum passes, the order is adopted and becomes a final rule.  *See id.* §§ 900.300–311.

In the instant case, the USDA announced its original hearing to address only the proposed adjustments to the make allowances in the pricing formulas in January 2006.  An on-the-record hearing was held that month and post-hearing briefs were filed.  On September 6, 2006, however, USDA announced that it had insufficient evidence to issue a decision changing the make allowances.  Another hearing was reconvened for September 14, 2006.  USDA announced a tentative final decision on November 2, 2006 and required comments to be filed by January 22, 2007.  *See* 71 Fed. Reg. 67,467, 67,467 (Nov. 22, 2006).  On December 29, 2006, an interim order was issued.  A legal challenge was launched to halt the implementation of those make allowances, *see Bridgewater Dairy, LLC v. U.S. Dep't of Agric.*, 2007 WL 634059 (N.D. Ohio Feb. 22, 2007), and the hearing remains open, as USDA has not ruled on the comments or made a final decision.

While the hearing was pending, USDA published notice of the instant Formula Hearing on February 9, 2007.  That notice included a number of modifications to the component prices of the formulas but also included proposed adjustments to the make allowances, which was the subject of the hearing that was still

pending.  The Formula Hearing commenced on July 11, 2007, and
was held in three different cities over the course of twelve
days.  Thirty witnesses provided live testimony before an
administrative law judge, and seventy-eight exhibits were
entered into evidence.  USDA took judicial notice of numerous
documents, including government data on fuel and feed prices.
USDA also commenced an econometric analysis of the impact of the
price increase; the econometric model accounted for various
factors including feed costs incurred by producers.[3]   The
comments were filed, and an administrative law judge certified
the transcript on October 11, 2007.

On June 16, 2008, USDA issued a tentative partial final
decision, and published the decision in the Federal Register
four days later.  *See* 73 Fed. Reg. 35,306 (June 20, 2008).  USDA
concluded that "current make allowance levels are not reflective
of the costs manufacturers incur in processing raw milk into the
finished products of cheese, butter, [non-fat dry milk], and dry
whey" and that the make allowances required adjustment in order
to reflect the significant increase in these costs.  *Id.* at

---

[3] Econometric modeling -- a long-accepted aid to agency decision-
making in complex economic regulation, *see Sierra Club v.
Costle*, 657 F.2d 298, 332-38 (D.C. Cir. 1981) -- is a
significant part of USDA's decision-making process for
preliminary and final economic analyses of the supply, demand,
and price impact of proposed make allowance amendments on the
dairy sector, including producers, manufacturers, and consumers.

35,324 n.4.   Furthermore, USDA noted that while "the costs of producing milk are reflected in the supply and demand conditions for the dairy products," the increased costs incurred by manufacturing and processing that milk can only be recovered by regulatory modification of the make allowance.   *Id.*   The formula that USDA used here is the same formula that was used to calculate the make allowance adjustment in 2006.   The Secretary of the Department of Agriculture ("Secretary") specifically found that the minimum price for milk reflected the prices of feeds, available supplies of feeds, and other economic conditions which affect market supply and demand for milk.   *See* 73 Fed. Reg. 44,617, 44,618 (July 31, 2008).   Producers, by referendum, approved the proposal by a two-thirds vote to increase the make allowances.   *See id.; see also* 7 U.S.C. § 608c(9)(B)(i) (requiring approval of two-thirds of milk producers for milk marketing orders).   USDA made a determination that an urgent need existed to increase make allowances, and after a referendum vote, the proposed rule was adopted as an interim final rule on July 31, 2008.   *See* 73 Fed. Reg. at 44,618.   But for the instant lawsuit, the Formula Rule was to take effect on an emergency basis on September 1, 2008.   *See id*.

Plaintiffs sent Dairy Programs a letter on August 8, 2008, arguing that the Formula Rule did not comport with statutory requirements and warning that implementation of the rule on

August 22, 2008 would violate USDA's rules requiring at least thirty days notice before implementation.  Plaintiffs requested that USDA withdraw the Formula Rule, but the request was denied on August 14, 2008.  The interim final rule was to take effect September 1, 2008.  On August 15, 2008, Plaintiffs filed a motion in this court for a temporary restraining order.  In response, USDA postponed the effective date of the rule by one month to allow this Court to rule on Plaintiffs' request for a preliminary injunction.

On August 19, 2008, this Court granted International Dairy Foods Association's ("IDFA") Motion to Intervene as Defendant. On August 26, 2008, this Court granted a Motion to Intervene as Defendants for Agri-Mark, Inc., Associated Milk Producers, Inc., Foremost Farms USA Cooperative, Land O' Lakes, Inc., Michigan Milk Producers Association, and Northwest Dairy Association.

## II.  DISCUSSION

### 1. Standing

Intervenor IDFA argues that Plaintiffs lack standing in this Court because the AMAA is the kind of law that "preclude[s] judicial review" in either express or implied terms according to the Administrative Procedure Act ("APA").  5 U.S.C. § 701(a)(1). Arguing that their claims are akin to those made in *Stark v. Wickard*, 321 U.S. 288 (1944), where the Supreme Court found standing for producers, Plaintiffs contend that they have

standing to challenge a final rule that reduces payments into the producer settlement fund.[4]  Plaintiffs' complaint makes no reference to the producer settlement fund, and the Court finds their argument unpersuasive.  For the following reasons, this Court finds that the AMAA does not provide producers the right to bring a lawsuit which challenges the legality of one or more provisions of an FMMO.  Therefore, Plaintiffs lack standing and are precluded from challenging the final interim order at issue.

Plaintiffs' complaint is the kind of complaint the D.C. Circuit deemed improper in *Benson v. Schofield,* 236 F.2d 719 (D.C. Cir. 1956).  In *Benson*, the D.C. Circuit held that producers do not have standing to challenge FMMOs.  The Court found that producers – who are unregulated by the AMAA -- are given no more rights than handlers -- who are regulated under the AMAA – to challenge FMMOs in court.  *Id.* at 722.

In *Block v. Commt'y Nutrition Inst*., 467 U.S. 340 (1984), the Supreme Court also held that the AMAA precludes judicial review of consumer challenges to an FMMO.  Citing 7 U.S.C. § 608c(15)(A), the Supreme Court noted that only processors have an express cause of action under the Act.  "Congress intended that judicial review of market orders issued under the Act ordinarily be confined to suits brought by handlers in

---

[4] In *Stark*, the Supreme Court held that producers had standing to challenge certain deductions the Secretary made from the producer settlement fund.  *Stark*, 321 U.S. at 302.

12

accordance with 7 U.S.C. § 608c(15)." *Id.* at 348.  The Court explained that the "regulation of agricultural products is a complex, technical undertaking" and that "Congress channeled disputes concerning marketing orders to the Secretary in the first instance because it believed that only [she or] he has the expertise necessary to illuminate and resolve questions about them." *Id.* at 347.  "[W]hen a statute provides a detailed mechanism for judicial consideration for particular issues at the behest of particular persons," judicial review by others is "impliedly precluded." *Id.* at 349.

The *Block* Court distinguished *Stark* based on the unique facts of that case.  *Stark* held that the AMAA did not impliedly preclude judicial review of "certain administrative actions even though the Act did not expressly provide them a right to judicial review." *Block*, 467 U.S. at 351.  *Stark*, however, involved a situation where "'handlers could not question the use of the [producer settlement] fund, because handlers had no financial interest in the fund or its use.'"[5]  *Id.* at 351-52 (quoting *Stark*, 321 U.S. at 308).

---

[5] Likewise, in *Benson*, the D.C. Circuit acknowledged the narrowness of the holding in *Stark* because the legal challenge was "not that the blended price [was] too low, but that the blended price has been reduced by a misapplication of money deducted from the producers' minimum price." *Benson*, 236 F.2d at 723.

In *Edaleen Dairy, LCC v. Johanns*, 467 F.3d 778 (D.C. Cir. 2006), the D.C. Circuit re-confirmed that *Stark* was a "limited holding that turned on the unique circumstances of that case." *Id.* at 782.  The D.C. Circuit found that the "two key factors" were that "the producers were not merely objecting to the regulation [but] were suing to protect their 'definite personal rights' in the settlement pool fund," for which there was "no access to an administrative remedy." *Id.* (quoting *Stark*, 321 U.S. at 308).  The reasoning in *Benson* guides this Court's analysis, and *Edaleen Dairy* provides direction for how the D.C. Circuit might decide this issue if it were squarely presented with it today.   *Edaleen Dairy* re-enforced the "narrow exception" the Supreme Court carved out in *Stark* for producers "who seek to challenge a milk marketing order".  *Id.* at 782. *Edaleen Dairy* also emphasized that its holding was consistent with *Alto Dairy*, where the Seventh Circuit found that a group of producers and producer-handlers were entitled to judicial review.  *See Edaleen Dairy*, 467 F.3d at 784 (citing *Alto Dairy*, 336 F.3d at 568-69).  The D.C. Circuit distinguished *Alto* as involving "plaintiffs [who] were seeking *access* to pooling funds."  *Id.*   Plaintiffs here make so such claim in their complaint.  The legal challenges before this Court are presented by a group of producers and cooperatives (some of which are

14

producer-handlers)[6] "objecting to a regulation" rather than a producer asserting a definite personal right in a settlement fund.

Producer standing has also been examined by this Court.   In *Northwest Ind. Dairy Producers Ass'n v. Veneman*, 312 F. Supp. 2d 23 (D.D.C. 2004), this Court, relying on *Block*, held that producers did not have standing to challenge the mechanism by which price values for various classes of milk were determined under the AMAA.   *Id.* at 26 ("[T]he inclusion of producers in the administrative process but their exclusion from the provisions enabling judicial review is the type of omissions that indicate a specific Congressional intent to omit.").   In *Goodie Brand Packing Corp. v. Lyng*, 1987 WL 14597 (D.D.C. 1987), this court held that "plaintiffs must be 'handlers' within the meaning of the AMAA in order to obtain judicial review of the present order" therefore "producers lack standing to challenge marketing order[s]."   *Id.* at *2.

Plaintiffs' protestations to the contrary, *Blair v. Freeman*, 370 F.2d 229 (D.C. Cir. 1966), provides them with no support.   In *Blair*, the D.C. Circuit found that the producer's challenge was similar to the one in *Stark* because "[t]he appellants . . . have standing to invoke the protection of

---

[6] No plaintiff is asserting a right as a handler to judicial review in this matter.

equity to insure that their statutory right to minimum price protection is not being improperly diminished." *Id.* at 235 n.15 (citing *Stark*, 321 U.S. at 290).  Plaintiffs invoke no such statutory right in this case.

Other circuits have also held that outside of the narrow exception found in *Stark*, producers do not have standing in the type of challenge before this Court.  *See Pescosolido v. Block*, 765 F.2d 827, 832 (9th Cir. 1985) ("We agree with those circuits which narrowly construe the exception in *Stark* to avoid evasion of the statute's clear intent to preclude generally such [farmer] actions."); *Marchezak v. McKinley*, 607 F.2d 37, 41 (3d Cir. 1979). *Cf. Dairylea Cooperative, Inc. v. Butz*, 504 F.2d 80, 83 (2d Cir. 1974) (finding *Stark*'s narrow exception applicable and permitting producer's suit).  *But see Minn. Milk Producers Ass'n v. Madigan*, 956 F.2d 816 (8th Cir. 1992) (finding producer standing).

Having failed to make a claim that they are seeking to protect a definite personal right granted by statute as in *Stark*, Plaintiffs lack standing to challenge the FMMO.  Even if the Motion for Preliminary Injunction were properly before this Court, for the following reasons, this Court would deny it.

**2. Injunctive Relief**

**a. Standard of Review for Injunctive Relief**

When deciding a claim for injunctive relief, a court must weigh four factors: "(1) whether there is a substantial likelihood that plaintiffs will succeed on the merits of their claims, (2) whether plaintiffs will suffer irreparable injury absent an injunction, (3) whether an injunction would harm the defendants or other interested parties (the balance of harms), and (4) whether the public interest would be furthered by an injunction." *Monument Realty, LLC v. Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 74 (D.C.C. 2008) (citing *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998)). "The factors 'must be viewed as a continuum, with more of one factor compensating for less of another.'" *Id.* (quoting *Bradshaw v. Veneman*, 338 F. Supp. 2d 139, 141 (D.D.C. 2004)). Therefore, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). A preliminary injunction is "an extraordinary and drastic remedy," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), and courts should grant it only when the party seeking relief clearly carries its burden of persuasion, *Monument Realty*, 540 F. Supp. 2d at 74.

### i. Likelihood of Success on the Merits

Plaintiffs maintain that they can show a likely success on the merits because they argue that USDA has failed to follow

statutory mandates to determine and consider the monthly average costs of feed and fuel in the marketing areas and to consider those numbers in determining whether or not to adjust make allowances.  Plaintiffs contend that their argument that they will succeed on the merits is very simple:  They argue that the FCEA requires an analysis of fuel and feed costs in plain, unambiguous terms and that USDA implicitly and explicitly demonstrated that in its decision, it chose not to conduct that analysis and has therefore failed to comply with the FCEA. Plaintiffs' characterization of USDA's rulemaking process is at odds with the facts and Plaintiffs' own brief.  Plaintiffs' claims are based on an erroneous reading of 7 U.S.C. § 608c(18), which does not constrain USDA in the manner they suggest.

This Court's interpretation of the statutory language is that the second and third sentences of § 608c(18) only apply when the Secretary first fixes minimum prices using a new pricing methodology, and only to minimum prices as a whole, not to each input used to derive those prices.  It is clear that § 608c(18) can be satisfied by an *indirect* relationship between prices and economic conditions.  See Bridgewater Dairy, 2007 WL 634059 at *6-*7.  If there were any ambiguity in the statute, under *Chevron*, the agency's reasonable construction of the statute is controlling.  *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984).  "If a statute is ambiguous, and if

the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (citing *Chevron*, 467 U.S. at 843-44). *Chevron* deference is particularly appropriate in the context of the "labyrinth of the federal milk marketing regulation provisions." *Zuber v. Allen*, 396 U.S. 168, 172 (1969); *see also Blair*, 370 F.2d at 232 ("A court's deference to administrative expertise rises to zenith in connection with the intricate complex of regulation of milk marketing.").

USDA argues that the statute is clear that after the Secretary initially fixes minimum milk prices for a marketing order at a price other than parity, the Secretary is not bound to revisit every enumerated economic factor each time he makes an adjustment to those prices to account for changed circumstances.  This is a reasonable interpretation of the statute, and an interpretation that gives effect to each sentence of the subsection.  The first sentence of § 608c(18) directs the Secretary to ascertain the parity price of milk as a guidepost for establishing minimum prices in any milk marketing order.

> The Secretary of Agriculture, prior to prescribing any
> term in any marketing agreement or order, or amendment
> thereto, relating to milk or its products, if such
> term is to fix minimum prices to be paid to producers
> or associations of producers, or prior to modifying
> the price fixed in any such term, shall ascertain the
> parity prices of such commodities.

7 U.S.C. § 608c(18).  The price parity is regularly calculated

by USDA.  The second sentence then directs the Secretary to

adjust that parity price as necessary based on consideration of

certain economic factors:

> [The parity price] shall, for the purposes of such
> agreement, order, or amendment, be adjusted to reflect
> the price of feeds, the available supplies of feeds,
> and other economic conditions which affect market
> supply and demand for milk or its products in the
> marketing area to which the contemplated marketing
> agreement, order, or amendment relates.

*Id.*  The third sentence then details the manner in which the

Secretary is to depart from the traditional reliance on parity

prices if he finds them unreasonable in light of economic

factors:

> Whenever the Secretary finds, upon the basis of the
> evidence adduced at the hearing required by section
> 608b of this title or this section, as the case may
> be, that the parity prices of such commodities are not
> reasonable in view of the price of feeds, the
> available supplies of feeds, and other economic
> conditions which affect market supply and demand for
> milk and its products in the marketing area to which
> the contemplated agreement, order, or amendment
> relates, he shall fix such prices as he finds will
> reflect such factors, insure a sufficient quantity of
> pure and wholesome milk, and be in the public
> interest.

*Id.*  The Secretary has not set price parity for many years, as the current price parity is much higher than necessary to ensure an adequate supply of milk.  What the Secretary has done is fix minimum prices, first through competitive pay price series, and then through the product-pricing formulas in use today.

It is the fourth sentence that sets forth the procedure for making further adjustments to minimum milk prices once the Secretary has already fixed minimum prices at a level other than parity using the procedures outlined in the first three sentences:

> Thereafter, as the Secretary finds necessary on account of changed circumstances, he shall, after due notice and opportunity for hearing, make adjustments in such prices.

*Id.*  Even though the fourth sentence still requires that the rule-making process include a hearing, it contains no language mandating *direct* consideration of each of the economic factors articulated in the second and third sentences.  Once the Secretary has fixed prices at a level other than parity, this final sentence then enables the Secretary to adjust minimum milk prices in response to "changed circumstances" without specifically requiring re-consideration of all other economic factors.

USDA argues that the term "changed circumstances" in the fourth sentence -- while the second and third sentences both

specifically mention a list of economic factors -- indicates
that the fourth sentence should be given a distinct meaning.  In
drafting the sentence in the way that it did, Congress clearly
demonstrated a willingness to re-articulate the mandatory
economic factors word-for-word in the second and third
sentences.  *See Nat'l Women, Infants, & Children's Grocers Ass'n
v. Food & Nutrition Serv.,* 416 F. Supp. 2d. 92, 100 (D.D.C.
2006)("'When Congress includes particular language in one
section of a statute but omits it in another section of the same
Act, it is generally presumed that Congress acts intentionally
and purposely in the disparate inclusion or exclusion.'"
(quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).
Congress did not articulate those same requirements in the
fourth sentence and chose to write the statute in that manner
for a reason.  This court is not persuaded to disturb the
Secretary's reasonable interpretation of the statute.

The fourth sentence provides the Secretary with greater
discretion to adjust prices to respond to changed circumstances,
once he has initially fixed prices at a level other than parity
in accordance with the third sentence.  Construing the statute
in any other way would make the words of the statute
meaningless.  *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 339
(1979) ("In construing a statute we are obliged to give effect,
if possible, to every word Congress used." (citing *United States*

*v. Menasche*, 348 U.S. 528, 538–39 (1955))); *see also Nat'l Ass'n of Broadcasters v. Librarian of Congress*, 146 F.3d 907, 926 (D.C. Cir. 1998) ("[W]e do not read [the] subsection . . . in a manner that renders superfluous the final sentence of that provision.").

On its face, the statute provides that the overall price should reflect the enumerated economic factors; it does not mandate that every variable or input used to calculate that price also reflect those economic factors. *See Minn. Milk*, 153 F.3d at 645 ("It is the total Class I price . . . and not just the differential, that must satisfy the statute."). The Eighth Circuit held that USDA satisfied the statute when it determined that the Class I pricing formula reflected the statutory factors in § 608c(18). *Id.* This court agrees. When the USDA first adopted the pricing system that is currently in place, the agency determined that the overall design of the formulas would automatically account for the economic factors set forth in the statute. *See* 64 Fed. Reg. at 16,095 ("The pricing system contained in this decision will . . . account[] for changes in feed costs and feed supplies indirectly. The product price formulas adopted in this rule should reflect accurately the market values of the products made from producer milk used in manufacturing."); *see also* 67 Fed. Reg. 67,915 at (noting that statutory requirements were "fulfilled by the Class III and

Class IV component price calculation"). This determination was made in 1999 when USDA initially fixed minimum price formulas; the agency is not required to revisit the market value of the products each time it adjusts the value assigned to some factor within those formulas. The underlying design of the formulas remains unchanged and accords with the statute. The challenged rule-making "[did] not modify the portion of the formulas which indirectly incorporates feed costs and supply;" therefore, no additional requirements are in imposed upon the agency at this time. *Bridgewater Dairy*, 2007 WL 634059 at *7.

Plaintiffs make much of the fact that USDA did not "directly" consider the price of feeds and fuel when it varied the price of milk. The text of the statute does not mandate such a requirement. That statute merely requires the Secretary to adjust prices "as he finds will reflect" the listed factors. 7 U.S.C. § 608c(18). The Secretary has found, and hearing testimony reflects, that the minimum prices automatically reflect the statutory factors. *See* 64 Fed. Reg. at 16,095. Plaintiffs do not dispute this finding and acknowledge that the Secretary did indirectly consider the price of feeds and fuel. *See* Pl. Br. at 12. This concession is fatal to their claim and reflects their inability to demonstrate a likelihood of success on the merits.

*Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339 (6th Cir. 1994) and *St. Albans Co-op Creamery, Inc. v. Glickman*, 68 F. Supp. 2d 380 (D. Vt. 1999), cited by Plaintiffs, undermines, rather than supports, their position.  In *Lansing Dairy*, the Sixth Circuit concluded that § 608c(18) "is not a model of clarity or succinctness."  39 F.3d at 1351.  In light of that ambiguity, per *Chevron*, the Sixth Circuit deferred to USDA's construction of the statute.  *Id.*  In *Bridgewater Dairy*, which was bound by *Lansing Dairy*, the court concluded that the case provided no support for Plaintiffs' position.  *Id.* at *14.  *St. Albans* is not helpful to Plaintiffs because Congress legislatively overruled it.  *See* Pub. L. No. 106-113, 113 Stat. 1501 (Nov. 29, 1999); *see also* 64 Fed. Reg. 70,867, 70,868 (Dec. 17, 1999).  As *Bridgewater Dairy* noted, such congressional action "severely undermine[s]" any persuasive value the case might have otherwise have had.  *Bridgewater Dairy*, 2007 WL 634059 at *5.

USDA defends its use of national economic trends as reasonable and within the statute.  Section 608c(18) requires consideration of "economic conditions which affect market supply and demand" in each marketing area, and USDA determined a number of years ago that the value of Class III and IV milk is driven by the national market for the dairy products for which the milk is used.  *See* 59 Fed. Reg. at 42,424; 73 Fed. Reg. at 35,325; 64 Fed. Reg. at 16,100; *see also Defiance Milk Products Co., A Div*

*of Diehl, Inc. v. Lyng*, 857 F.2d 1065, 1066 (6th Cir. 1988).
USDA submits that there is no evidence, as charged by
Plaintiffs, that its long-standing determination that it is
appropriate to look at the national market to assess the value
of Class III and IV milk is arbitrary and capricious.  This
Court agrees.

USDA argues that Plaintiffs are no more likely to succeed
under § 1504 of the FCEA which directs the Secretary to "[a]s
part of any hearing to adjust make allowances [to] determine the
average monthly prices of feed and fuel incurred by dairy
producers in the relevant marketing area consider the most
recent monthly feed and fuel price data available; and consider
those prices in determining whether or not to adjust make
allowances."  7 U.S.C. § 608c(17)(G).  For the same reasons
previously stated, USDA complied with § 1504 of the FCEA.

USDA also contends that Plaintiffs' arguments under the
FCEA also fail because the provision Plaintiffs cite to did not
take effect until May 22, 2008.  *See* Pub. L. No. 110-246, § 4.
The hearing in question, however, closed on July 11, 2007.  The
effective date marks the date on which parties must begin to
conform their conduct to a statute's substantive mandates.  The
plain language of the statute only governs hearings conducted
after its effective date and because the hearing at issue was
completed nearly a year earlier, the court need look no further.

Even if there was any ambiguity, the term "hearing" must be resolved by reference to the agency's reasonable interpretation of that term. *See Chevron*, 467 U.S. at 843-44.  There is also a strong presumption against retroactivity. *See Gersman v. Group Health Ass'n*, 975 F.2d 886, 895 (D.C. Cir. 1992) ("legislation must be considered as addressed to the future, not to the past" (quoting *Greene v. United States,* 376 U.S. 149, 160 (1964))). The interpretation of § 1504 advanced by the Plaintiffs would be retroactive, and therefore presumptively erroneous.  Plaintiffs have not demonstrated a likelihood of success on the merits.

### ii. Irreparable Harm

"Irreparability of injury is a very high standard." *Am. Coastal Line Joint Venture, Inc., v. U.S. Lines, Inc*., 580 F. Supp. 932, 936 (D.D.C. 1983); *see also Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (irreparability of injury "must be both certain and great; it must be actual and not theoretical").

Plaintiffs' claims of economic harm fall short of the high bar set for irreparable harm.  Harm alleged from unspecified contractual arrangements and economic harm resulting from a reduction in the Class III and IV minimum prices are the same type of alleged harm *Benson* founding inadequate. *See Benson*, 236 F.2d at 722 ("Mere loss of income in consequence of the action of Government or economic disadvantage, by itself,

constitutes *damnum absque injuria*," and "there is no certainty of any such loss, [as the FMMO] prescribes merely minimum prices.").  There is nothing in the adjusted make allowances to prevent Plaintiffs from contracting to charge whatever price in excess of the minimum that the market will bear.  Plaintiffs have also failed to demonstrate that they will suffer concrete harm as a result of the *method* by which the Secretary adjusted the make allowance.  Plaintiffs' "loss" argument is belied by the extraordinarily high farm milk prices that have recently evolved in response to higher feed and fuel costs, and the remarkably high profits realized by many of the Plaintiffs.  *See* USDA, Econ. Research Serv., *available at* http://www.ers.usda.gov/Data/CostsAndReturns/testpick.htm. Plaintiffs have also failed to show that the Secretary's asserted failure to consider the factors they identify has resulted in the make allowances being at a higher level than they would otherwise have been.  *See Getty Images News Servs. v. Dep't of Def.*, 193 F. Supp. 2d 112, 123 (D.D.C. 2002) (relevant comparison for irreparable harm is between challenged system and one that comports with requirements asserted by plaintiffs). Plaintiffs are unable to make a convincing case for harm, much less irreparable harm.

    **iii. Balance of Harms**

USDA maintains that there is a very real harm to the dairy industry as a whole if a preliminary injunction is granted. Every dollar that would be secured by Plaintiffs as a result of a preliminary injunction will be lost to manufacturers, who will end up paying higher minimum prices than they will under the new rule.

Any harm, which Plaintiffs have been unable to show, is offset by the substantial harm that Defendant-Intervenors and other handlers would incur if an injunction is granted.  An injunction would cause Defendant-Intervenors and other handlers to lose revenue without recourse.  The potential harm to Defendant-Intervenors and other handlers is no less real than the alleged harm to Plaintiffs and other producers.  Indeed, the USDA recognized the harm that the status quo was causing handlers when it found that emergency conditions existed. *See* 71 Fed. Reg. at 67,477.

Dairy processors arguably stand to lose $14.5 million per month, or $173.7 million a year.  These damages represent real, unrecoverable losses, not merely a possible reduction in hoped-for future revenue.  The Secretary has determined that the status quo presents a serious threat to the industry as a whole. *See* 73 Fed. Reg. at 35,330.  Balancing the harms of interested parties, Plaintiffs have not made a convincing argument that

their alleged harm would be greater than the dairy industry as a whole.

### iv. Public Interest

The public interest is served by ensuring the health and viability of the dairy industry.  "[T]he purpose of the milk marketing scheme is to maximize the benefit to the largest number of producers, rather than to minimize a potential negative impact on a handful of producers."  *White Eagle Coop. Ass'n v. Johanns*, 396 F. Supp. 2d 954, 961 (N.D. Ind. 2005). USDA's economic analysis found that fluid milk prices, whether for school lunches or home cereal use, will be reduced unless the FMMO takes effect.  Plaintiffs, unlike handlers, are not constrained by regulation in their ability to charge more for milk to recover higher costs.  This Court agrees with USDA that there is "no significant public interests that weigh in favor of granting" extraordinary relief.  *Bridgewater Dairy*, 2007 WL 634059 at *8.

**III. CONCLUSION**

Accordingly, Plaintiffs' Motion for Preliminary Injunction is **DENIED.**  Any request to stay this order will be denied for all of the reasons stated in this memorandum.  An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **September 19, 2008**